# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

F I L E D

JUL 1 6 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| AMERICAN HARDWARE MANUFACTURERS ASSOCIATION, a Delaware not-for-profit corporation, ) ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Action No. 03 C 9421 |
| REED ELSEVIER, INC., a Massachusetts corporation, and ) ) ) | JURY DEMAND |
| REED EXHIBITIONS, a division of Reed Elsevier, Inc., and ) ) ) | Judge James B. Moran |
| ASSOCIATION EXPOSITIONS & SERVICES, a division of Reed Elsevier, Inc., and FREEMAN DECORATING CO. (a/k/a The Freeman Companies), an Iowa corporation, and FREEMAN DECORATING SERVICES, INC. (a/k/a The Freeman Companies), a Texas corporation. ) ) ) ) ) ) ) ) ) | |
| Defendants. ) ) | |

DOCKETED

JUL 1 9 2004

## FIRST AMENDED COMPLAINT

Plaintiff, American Hardware Manufacturers Association, a Delaware not-for-profit corporation ("AHMA"), by and through its attorneys, Gardner Carton & Douglas LLP, brings this civil action to obtain damages, an accounting and other relief against Defendants, Reed Elsevier, Inc., Reed Exhibitions, and Association Expositions & Services (collectively "Reed") and Freeman Decorating Co. and Freeman Decorating Services, Inc. (collectively "Freeman" and, together with Reed, the "Defendants"), and complains and alleges as follows:

21

## INTRODUCTION

1.     AHMA brings this suit seeking redress for the substantial monetary and other injuries suffered as a result of the unlawful conduct and kickback scheme of the Defendants in connection with Reed's role as manager and Freeman's role as general contractor of the National Hardware Show (the "Show").  For years, Reed, in concert with Freeman, defrauded AHMA and its members out of millions of dollars through a covert scheme in breach of statutory law, fiduciary obligations and common law, as well as the terms of long-standing agreements between AHMA and Reed.  In particular, in conjunction with Freeman, Reed:

- received undisclosed kickbacks for its own benefit from Freeman and other vendors that provided goods and services to the Show and/or Show exhibitors;

- engaged in a pattern and practice of diverting and misallocating revenue of the Show for its own financial gain and that of Freeman and other vendors;

- engaged in numerous self-dealing transactions;

- failed to obtain authorization for decisions affecting the success of the Show;

- breached fiduciary obligations to AHMA;

- violated and infringed the intellectually property rights of AHMA; and

- misstated accounting and financial information.

2.     In February 2003, Reed fraudulently induced AHMA to enter into the so-called Separation Agreement (as defined below) in an attempt to obtain a release from its liability stemming from its unlawful acts.   Then, Reed materially breached the provisions of the Separation Agreement.  At the time AHMA and Reed negotiated and executed the Separation Agreement, Reed had no intention of complying with its terms or otherwise living up to its obligations – despite its representations and inducements otherwise, and Reed did *not* comply with its terms or otherwise live up to its obligations.  Because of Reed's unlawful and fraudulent

conduct, the Separation Agreement is voidable, and Reed and Freeman are jointly and severally liable to AHMA for the significant damages (and other relief sought in this amended complaint) suffered as a result of their conduct.

3.      Alternatively, in the event the Separation Agreement is not deemed voidable, Freeman will remain fully liable as a co-conspirator for damages suffered by AHMA spanning years, and Reed will be liable for its conduct subsequent to the execution of the Separation Agreement.  AHMA seeks more than $100 million in damages from the Defendants.

## THE PARTIES

### The Plaintiff

4.      AHMA is a Delaware not-for-profit corporation, which maintains its principal place of business at 801 North Plaza Drive, Schaumburg, Illinois.  AHMA was formed in 1901. AHMA is a trade association consisting of approximately 869 members, including 702 U.S. manufacturing companies, 162 U.S. manufacturing representatives, and 5 trade publications.

### The Defendants

5.      Reed Elsevier, Inc. is wholly owned and controlled by the British and Dutch conglomerate Reed Elsevier Group PLC.  Reed Elsevier Group PLC operates in four-core segments:   (a) science and medical; (b) legal; (c) education; and (d) business.   The business segment of Reed Elsevier Group PLC consists of four closely integrated divisions including: (a) Reed Business Information (formerly Cahners); (b) Reed Business Information; (c) Reed Business Information (formerly Elsevier); and (d) Reed Exhibitions (a part of which is Association Expositions & Services).   Reed Elsevier, Inc. operates through these business divisions in the United States.

6.     Reed Exhibitions is a division of Reed Elsevier Group PLC and/or Reed Elsevier, Inc.  Reed Exhibitions is an organizer of trade and consumer exhibitions, with a portfolio of over 450 events in more than 35 countries; approximately 38 of those events are held in the United States.

7.     Association Expositions & Services is a division of Reed Exhibitions and/or Reed Elsevier, Inc.

8.     Freeman Decorating Co. is an Iowa corporation with its principal place of business located at 1421 West Mockingbird Lane, Dallas, Texas.

9.     Freeman Decorating Services, Inc. is a Texas corporation, with its principal place of business located at 1421 West Mockingbird Lane, Dallas, Texas.  Freeman Decorating Co. and Freeman Decorating Services, Inc. use trade style names of The Freeman Companies, Freeman Decorating, Freeman Exhibit, and Freeman Transportation.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a) and 1338(b).  This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.  AHMA is a Delaware not-for-profit corporation and has its principal place of business in Schaumburg, Illinois.  Reed is a Massachusetts corporation and has its primary place of business in either New York, New York or Newton, Massachusetts.  Freeman consists of a Texas and an Iowa corporation and have their primary place of business in Dallas, Texas.

11.     This Court may exercise personal jurisdiction over the parties to this action.  Each of the Defendants regularly transacts business, through its own activities or the activities of

4

agents and/or entities or individuals under its control and domination, in the State of Illinois.  In addition, the Defendants' contacts with the State of Illinois arise, with at least a fair measure of permanence and continuity, out of, or relate to, the events giving rise to this action, including, but not limited to, the Show.

12.     The amount in controversy exceeds seventy-five thousand dollars ($75,000.00) exclusive of interest and costs.

13.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391(a).

## FACTS COMMON TO ALL COUNTS

### The National Hardware Show

15.     In the 1960's, AHMA first considered sponsoring and conducting a trade show for the hardware/home improvement industry.  By 1973, AHMA had adopted plans to sponsor and conduct "Hardware Industry Week," a compilation of industry conferences, meetings, educational seminars, social events and a trade show.  The AHMA board of directors interviewed numerous trade show management firms to operate its hardware trade show.

16.     AHMA intended to conduct Hardware Industry Week, including its trade show, in Chicago.

17.     In 1975, AHMA sponsored and conducted the National Hardware Show (the "Show") held in conjunction with AHMA's first Hardware Industry Week.  AHMA was vested

with control and oversight of the Show and was entitled to a portion of all revenue derived from the Show.  AHMA organized a committee as the decision-making body for the Show.

18.   In 1977, a written agreement was signed by AHMA and Reed Publishing Corporation (a predecessor of Reed) relating to the Show.  The Show was sponsored and conducted by AHMA and the Show was managed by Reed and its predecessors pursuant to the written agreement, as amended, dated July 1, 1977 (the "Show Agreement").  A copy of the Show Agreement is attached as Exhibit A.  AHMA's control and oversight of all decisions necessary for the success of the Show, its ability to select the location of the Show, and its right to share significantly in all revenue derived from the Show remained in tact under the Show Agreement.

19.   The Show was one of the largest trade shows in the United States as recently as 2001.

20.   AHMA sponsored and conducted International Hardware Week (f/k/a Hardware Industry Week) annually, including the Show, since 1975.  Reed and its predecessors managed the Show for AHMA from 1977 through 2003.

21.   AHMA chose to keep the Show in Chicago annually since 1975 despite frequent requests by Reed to move the Show to Las Vegas.  The Show has been credited with pumping $39 million annually into the City of Chicago's economy during a typical three-day show.

### The Relationship Between AHMA and Reed

22.   The relationship between AHMA and Reed is governed by the Show Agreement and other agreements made by the parties from time to time from 1977 through 2003.  AHMA

has performed all of its required contractual obligations under the terms of the Show Agreement and all obligations required by the other agreements it has made with Reed.

23.    Paragraph 1 of the Show Agreement states:

> [AHMA] shall **conduct and sponsor** the Show and Hardware Industry Week [n/k/a International Hardware Week] annually for the purpose of permitting manufacturers of hardware, equipment and supplies to exhibit their wares and to establish seminars for the interchange of information.  [Reed] shall **manage** the Show in accordance with the terms and conditions herein set forth. (Emphasis added).

24.    Consistent with AHMA's control and oversight of the Show, Paragraph 3 of the Show Agreement provides that AHMA shall create a committee (the "Show Committee") for that purpose.

25.    Paragraph 4 of the Show Agreement provides that the Show Committee shall have the right to determine the location and dates of each Show during the period of the Show Agreement and any extension thereof after consultation with Reed.  Paragraph 4 of the Show Agreement also provides that the Show Committee shall determine all conditions that may be deemed necessary for the success of the Show.

26.    Paragraph 5 of the Show Agreement provides that Reed shall be responsible to the Show Committee for organization and operation of each Show and for the general conditions prevailing at the Show.

27.    Paragraph 7 of the Show Agreement provides that Reed shall execute exhibitor contracts pertaining to the Show as an agent for itself and AHMA.

28.    Paragraph 8 of the Show Agreement provides that AHMA shall incorporate the Show within the schedule of International Hardware Week (f/k/a Hardware Industry Week).

29.    Paragraph 10 of the Show Agreement provides that Reed shall be responsible for collecting all revenue derived from conducting the Show and for paying all expenses incurred in conducting the Show.

30.    Paragraph 10 of the Show Agreement also provides that Reed has a financial responsibility that applies to the conduct and operation of the Show.

31.    Paragraph 10(d) of the Show Agreement provides that Reed shall deliver to AHMA a certificate from an independent certified accountant that attests to the fact that the payments made by Reed to AHMA in respect of the Show are accurate.

32.    Paragraph 11(a) of the Show Agreement provides that neither Reed nor any controlled corporation of Reed shall conduct, sponsor or manage a trade exposition, other than the Show, in the United States that primarily relates to hardware, lawn, garden, and/or home improvement products.

### Revenue-Sharing Agreements Between AHMA and Reed

33.    AHMA and Reed have made numerous, binding agreements, in addition to the Show Agreement, relating to revenue sources and revenue sharing.  AHMA has performed all of its required contractual obligations under the terms of each of these agreements.

34.    The existence of these agreements was recognized in the Second Amendment to the Show Agreement in 1989.  In paragraph 4 of the Second Amendment, AHMA and Reed

acknowledged that they have entered into binding agreements relating to the allocation of revenues and expenses.

35.     These agreements have also been addressed in numerous annual financial reports provided to AHMA by Reed and in the minutes of meetings between AHMA and Reed. These agreements, like the Show Agreement, required that all lawful revenue derived from the Show and collected by Reed would be shared with AHMA.

36.     In 1977, the only source of revenue from the Show was the sale or rental of exhibit space.   As additional sources of revenue became available and were considered, including advertising, media, registration and sponsorship opportunities, AHMA, in its sole discretion, determined whether such opportunities would be pursued.  In most instances, it was Reed that presented new revenue opportunities to AHMA for consideration.  In many such instances, AHMA rejected Reed's proposals.  Many times the reason for rejecting a proposed revenue source was in an effort to maintain the integrity, professionalism and perception of the Show or to avoid increasing the costs to exhibitors.  In *every* instance where AHMA agreed with Reed to pursue a new source of revenue, the parties agreed on a method to allocate the revenue derived from such revenue source between AHMA and Reed.  The vast majority of the revenue allocations were 50/50.  In addition, AHMA made it clear to Reed that its approval of each additional source of revenue would be reviewed by the Show Committee annually and was subject to cancellation.  Reed agreed and purported to comply with this requirement.

37.     For example, concourse banner advertising was approved by AHMA as a revenue source in or about 1997 but was disapproved thereafter.  As additional examples, AHMA and Reed agreed to split kiosk advertising, show directory sales, magazine bin, and website sales

revenues 50/50 between AHMA and Reed.  AHMA was to receive 40% of registration revenue

from the Show.  Directory and sponsorship revenue was agreed to be split on an escalating basis

(from 20% to 40% to AHMA) based on the amount of revenue earned.

38.     Reed never presented a revenue source to AHMA for consideration that involved

payments from Freeman.  Reed did present a revenue source proposal involving the receipt of

commissions from a vendor of hotel and housing services to exhibitors and attendees of the

Show.  AHMA rejected that proposal.

### Expense-Sharing Agreements Between AHMA and Reed

39.     In addition to revenue-sharing agreements made between AHMA and Reed,

AHMA and Reed made numerous, binding agreements, in addition to the Show Agreement,

relating to expenses and expense sharing.  AHMA has performed all of its required contractual

obligations under the terms of each of these agreements.

40.     Examples of goods and services that AHMA paid a portion of expenses for at

certain points during its relationship with Reed included shuttle bus services, product locator

services and equipment, and certain registration services and equipment.  These agreements have

been addressed in numerous annual financial reports provided to AHMA by Reed.

### Reed's Fiduciary Duty

41.     Paragraph 7 of the Show Agreement provides that Reed shall act as an agent for

AHMA.  Reed's role as AHMA's agent gave rise to a fiduciary relationship as a matter of law,

which required Reed to treat AHMA with the utmost candor, care, loyalty, and good faith.  This

fiduciary relationship extended from July 1, 1977 to August 16, 2003.

42.     The conduct and course of dealings of AHMA and Reed, as well as the other agreements between AHMA and Reed relating to revenue and expense sharing, constitute such special circumstances so that Reed owed AHMA fiduciary obligations.

## Deterioration of the Relationship Between AHMA and Reed

43.     AHMA's relationship with Reed was plagued with problems throughout its more than 25-year history. In many years, this fact was attributed to the divergent goals and objectives of AHMA and Reed:  AHMA sought to provide value to its members and the hardware/home improvement industry, and Reed sought to return profits for its parent company and its shareholders.   However, without exception, from 1975 through 2000, the Show realized increased revenues every year for that 26-year period.  Due to the prosperity of the Show from 1975 through 2000, AHMA continued to honor the terms of the Show Agreement and maintain the Show as a part of International Hardware Week and maintain Reed as the manager of the Show.

44.     In 1999, the Show reached its high of 1.26 million square feet of exhibit space.  In 2000, exhibit space sales dropped slightly to 1.25 million square feet.  However, in 2000, the Show reached its highest level of revenue of more than $28.7 million, according to Reed, despite the modest drop in exhibit space.  This drop in exhibit space marked the first time the Show did not grow in size in the previous twenty-five years.  In 2001, exhibit space at the Show dropped dramatically to 963,104 square feet.  Exhibitors began to criticize the high costs of exhibiting.  In 2002, the Show suffered another precipitous drop to 578,803 square feet of exhibit space.  Departing exhibitors identified cost as the primary reason for the decline.  In 2003, the Show was reduced to approximately 460,000 square feet of exhibit space.

45.     During this decline in participation in the Show, AHMA and Reed jointly commissioned two independent research firms to conduct parallel studies to identify the causes for the drop in participation.  The studies returned similar results and each identified the cost of exhibiting as a primary reason for a decreasing number of exhibitors at the Show.

46.     AHMA sought to address these cost-concerns and to reduce prices being charged to exhibitors wherever possible.  Initially, AHMA considered reducing square footage rates.  However, Reed refused to lower square footage rates citing a provision of the Show Agreement which prohibited AHMA from lowering square footage rates without the consent of Reed.  AHMA also investigated other prices for goods and services that the research had indicated were troublesome to exhibitors.  Many of the costs identified in the reports related to drayage (the labor-intensive process of moving freight from the dock doors at a convention center to the booth locations within the exhibit halls), labor rates, and the prices of other goods and services provided by Freeman, the general contractor of the Show

## Reed and Freeman Shifted Costs to Exhibitors

47.     Shortly after the 2001 Show, AHMA contacted Freeman directly to inquire about the rates being charged to exhibitors and to seek a means of reducing those costs wherever possible.  Mr. Donald S. Freeman, Jr., Chairman and Chief Executive Officer of Freeman, responded to AHMA's inquiries with a letter to AHMA dated September 4, 2001, disclosing that the rates for exhibitor services had been inflated due to "cost-shifting."

48.     In the trade show industry, the term "cost-shifting" refers to the practice of a show manager (like Reed) receiving goods and services from a general contractor (like Freeman) and

12

then directing or permitting the general contractor to pass the costs for those goods and services to the exhibitors of the trade show by inflating the prices charged to them for goods and services.

49.     In fact, Mr. Freeman's letter to AHMA contained a March 5, 2001 article from *Trade Show Week* (a publication owned by Reed) that extensively quoted Mr. Barry Rappaport, Regional Vice President of Freeman, discussing cost-shifting and how the practice of cost-shifting increases costs to exhibitors.  Mr. Rappaport was quoted in the article as saying, "the costs of drayage may not be for material handling alone."  Mr. Rappaport was also quoted in the article as saying, "when we are approached about a show, we examine the overall revenue that we need to produce the show and make a reasonable profit.  Depending on the show's requirements, this may mean that exhibitors have to pay more for material handling."  This article published in a trade magazine owned by Reed went on to state that "show managers have come to expect free or significantly discounted registration counters, signage, aisle carpet, etc.  As with any other commodity, when the price is reduced in one area, it is raised in – or shifted to – another."[1]

50.     Shortly after receiving the letter from Freeman in September 2001, AHMA requested a meeting with representatives of Freeman.  Mr. Robert Lozier, Executive Vice President of Freeman, and Mr. David Dolan, National Sales Manager of Freeman, traveled to AHMA's offices in Schaumburg, Illinois and met with AHMA executives to discuss the issue of cost-shifting at the Show.  Mr. Ken McAvoy, Senior Vice President of Operations for Reed, and Mr. Dennis MacDonald, Senior Vice President for Reed, also attended the meeting.

---

[1] See Joan Mather, *Why Are Drayage Costs So High?*, Trade Show Week, March 5, 2001, at 6.

51.     At that meeting, Mr. Lozier stated that cost-shifting had occurred at the Show. Mr. Lozier also estimated that the prices of goods and services offered to the Show's exhibitors were increased by 20% as a result of the cost-shifting.

52.     AHMA instructed Reed to put the job of general contractor out for bid for the 2002 Show and to eliminate the practice of cost-shifting at the Show.  Reed refused and responded by stating that it had entered into a ten-year contract with Freeman relating to numerous trade shows, including the Show, and would not hire a different general contractor. Again in December 2002, AHMA directed Reed to prepare an RFP for the general contractor of the Show for 2003. Mr. MacDonald responded that when AHMA was willing to pay 50% of the costs of the general contractor or other vendors, then Reed would bid out those services. Reed's action, and inaction, in this regard violated the terms of the Show Agreement.

53.     AHMA severed all ties with Freeman relating to goods and services provided specifically to AHMA and engaged another firm to provide those services to AHMA for the 2002 and 2003 Shows.

## The Freeman Contract

54.     In 1998, Reed entered into a contract with Freeman whereby Reed agreed to engage Freeman to act as the general contractor for the Show every year through 2006. In 1999, Reed and Freeman extended the term of this relationship to 2009.

55.     On information and belief, in order to expand its business with Reed in 1998, Freeman agreed to pay Reed undisclosed kickbacks and provide undisclosed barter exchanges to secure the Freeman Contract. At that time, the Show was the largest trade show of the thirty-eight trade shows that are a part of the Freeman Contract.

14

56.     Both Reed and Freeman deliberately failed to disclose to AHMA the existence and amounts of the kickbacks paid in connection with the Show, in furtherance of a scheme to defraud AHMA and other associations involved in other trade shows that are part of the Freeman Contract.

57.     The Freeman Contract states that it differs dramatically from past contracts in that the "manner in which Freemen will be compensated has fundamentally changed.   Specifically, the Agreement now provides for a general décor package for each show which will be paid on a per square foot basis."  The Freeman Contract goes on to state, however, that "based on the value of business anticipated to be generated during the term of this Agreement, commencing November 1, 1998, each show, with the exception of the Auto Show and the JCK Shows, will be charged zero for the décor package."

58.     The décor package under the Freeman Contract includes the following goods and services that will be provided by Freeman to Reed:

- Masking Drape
- 8', 12', and 16' high draping
- Illuminated counters (standard inventory design)
- Carpet under registration counter
- Electrical power for counters where Freeman is prime contractor for electrical services
- Reed Exhibition logos on counter
- Standard fill-in counters
- Necessary furniture either standard rental or new generation
- Information counters
- International Business Center
- Registration counters (*i.e.*, exhibitor, tape sales, etc.)

- Program distribution
- Directional carpet
- Aisle carpet
- Management drayage
- Official offices and booths
- Marketing booth
- Entranceways
- Lounges
- Exhibitor's lounge
- Local transportation
- Aisle signs
- Carpet logos
- Signs
- MIS equipment

59.     After providing the above-referenced goods and services to Reed and receiving little or no remuneration in return, Freeman was permitted and/or directed to recoup the costs of those goods and services, plus profit, from the exhibitors.   Accordingly, under the Freeman Contract, Freeman was specifically entitled to provide the following services to exhibitors:

- Standard furnishings
- New generation furniture
- Floor coverings
- Drapery
- Standard rentals
- Signs

- Installation and dismantling labor
- Drayage
- Audio visual
- Custom rental units
- Cleaning
- Electric and plumbing

60.     The Freeman Contract provides, "For each [Reed] show, for which Freeman shall have provided services pursuant to this agreement, Freeman shall provide [Reed] with a report specifying, in reasonable detail, individual exhibitor, drayage billings and total exhibitor billing summary" (such total exhibitor billings for each show, "Total Exhibitor Billings").   These reports will be in a format standard to the Freeman Companies.   These reports will be sent to the [Reed] vice president of operations and vice president of finance at [Reed] in reasonable and timely fashion after each event."   On information and belief, these reports were used by Reed to ensure receipt of a certain percentage of those total exhibitor billings as a kickback; to, in effect, audit its kickbacks from Freeman.

61.     Mr. Lozier, the Executive Vice President of Freeman, signed the Freeman Contract on behalf of Freeman and is the same person that revealed the existence of cost-shifting at the Show in a meeting with AHMA and Reed.

### Termination of the Show Agreement Between AHMA and Reed

62.     In January 2002, AHMA concluded that AHMA and Reed were incompatible.

16

63.     On February 26, 2003, AHMA and Reed executed an agreement whereby the Show Agreement would be terminated effective August 16, 2003 (the "Separation Agreement"). A copy of the Separation Agreement is attached hereto as <u>Exhibit B</u>.  AHMA has performed its required contractual obligations under the terms of the Separation Agreement.

64.     Paragraph 1(a) of the Separation Agreement provides that "the Show Agreement shall remain in full force and effect from the date hereof until [August 16, 2003]."

65.     Paragraph 1(b)(i) of the Separation Agreement provides that "neither party, either directly or indirectly, prior to July 4, 2003, shall sell exhibit space, sponsorships, advertising or media opportunities to exhibitors, including, without limitation, disseminating exhibitor contracts, executing exhibitor contracts, accepting executed exhibitor contracts or collecting deposits for an exhibition scheduled to occur after [August 16, 2003]."

66.     Paragraph 1(b)(ii) of the Separation Agreement provides that "neither party shall assign exhibit space including, without limitation, conduct a 'space draw' with respect to an exhibition scheduled to occur after [August 16, 2003] until the day following [August 16, 2003]."

67.     Paragraph 7(b) of the Separation Agreement contains a release of certain liabilities but states that "nothing herein is intended to or shall be construed to effect or limit the liability or obligation of Reed and its affiliates and their respective officers, directors, employees, agents, predecessors, successors and assigns, if any, to AHMA pursuant to the terms of this [Separation] Agreement or under the Show Agreement, with respect to acts or omissions occurring after the date hereof."

68.    Paragraph 20(a) of the Separation Agreement prohibits Reed from engaging in, sponsoring, producing, conducting, or managing any trade show or exhibition relating primarily to the hardware/home improvement and/or lawn and garden industries or that is otherwise similar to the Show within a fifty (50) mile radius of Chicago, Illinois, or to provide any management, consulting, financial, administrative or other services to any person or entity engaged in such activities.   Reed also agreed to refrain from knowingly allowing any Reed trademarks to be used by any person or entity engaged in such activities.

### Reed's Fraudulent Inducement

69.    During the negotiations between AHMA and Reed in connection with the Separation Agreement, the necessity of Reed's strict adherence to the terms of the Show Agreement through August 16, 2003, was emphasized by AHMA.   This specifically included prohibiting Reed from competing with the Show by its involvement in any similar trade shows.

70.    As a critical component of the Separation Agreement and AHMA's willingness to execute the release, Reed, through its representative, Mr. MacDonald, represented that it would comply with the terms of the Show Agreement, including paragraph 11(a) which prohibited Reed from conducting, sponsoring or managing a trade show primarily related to hardware, lawn, garden and/or home improvement products during the term of the Show Agreement.

71.    Mr. MacDonald, on behalf of Reed, stated to AHMA that Reed had no intention of conducting a trade show that would compete with the Show or violate the terms of the Show Agreement, as incorporated into the Separation Agreement.   Mr. MacDonald made express assurances to AHMA that Reed would honor the terms of the Show Agreement, as incorporated into the Separation Agreement.

72.     Reed's representations and AHMA's reliance on those representations are reflected in the terms of the Separation Agreement.

73.     The statements made by Reed were knowingly false at the time they were made because, as AHMA has come to learn, Reed was simultaneously preparing to conduct competing trade shows.

74.     Reed subsequently presented, conducted, sponsored and/or managed three trade shows in violation of the Show  Agreement, as it is incorporated into the Separation Agreement - - all within thirty days following its execution:  (1) the Midwest Builders Show (March 18-21, 2003), (2) the International Security Conference and Exposition (March 26-28, 2003), and (3) the Home Automation Show (March 26-28, 2003).

75.     Also, during the negotiations between AHMA and Reed in connection with the Separation Agreement, Mr. MacDonald stated that Reed would not engage in cost-shifting at the 2003 Show and would pay the expenses incurred at the 2003 Show pursuant to the Show Agreement, as incorporated into the Separation Agreement.

76.     Reed's representations and AHMA's reliance on those representations are reflected in the terms of the Separation Agreement.

77.     These statements made by Reed were false at the time they were made because Reed simultaneously intended to continue the practice of cost-shifting and accepting goods and services from Freeman and other vendors without paying for those expenses.

78.     Reed engaged in cost-shifting at the 2003 Show and failed to pay for the expenses incurred in conducting the Show.

19

79.    Moreover, during the negotiations between AHMA and Reed in connection with the Separation Agreement, Mr. MacDonald, on behalf of Reed, stated that Reed would not use AHMA trade marks.

80.    Reed's representations and AHMA's reliance on those representations are reflected in the terms of the Separation Agreement.

81.    The statements made by Reed were false at the time they were made because, as AHMA has come to learn, Reed intended to use the AHMA trade marks in the promotion of its 2004 Las Vegas Event in violation of the Show Agreement and the Separation Agreement.  For example, although Reed modified its web sites to properly reflect the date and location for its 2004 Las Vegas it Event, it continued to identify its new show as being held in conjunction with International Hardware Week and identified its Las Vegas Event, in part, as the Building Products Exposition.  Similar trade mark violations occurred in Reed's *Trade Show Week* magazine's "2004 Data Book."  Reed's use of AHMA's trade mark in this regard constitutes trade mark infringement and a breach of the express terms of the Show Agreement and the Separation Agreement.

82.    The foregoing false statements and representations made by Mr. MacDonald were made to Mr. William P. Farrell and Mr. Timothy S. Farrell, in their capacities as employees and representatives of AHMA, in the Grand Hyatt Hotel in New York City on or about February 17, 2003.

83.    The false statements made by Reed were designed to and did induce AHMA to enter into the Separation Agreement.

20

84.     AHMA would not have entered into the Separation Agreement if it had known Reed did not intend to adhere to its terms and AHMA has been damaged by Reed's fraud.

85.     Reed concealed its true intentions from AHMA prior to the execution of the Separation Agreement and, rather, falsely assured AHMA that it would abide by its promises.

86.     Reed fraudulently induced AHMA to grant Reed the releases contained in the Separation Agreement.  Reed's conduct in this regard renders the Separation Agreement and the releases contained therein a nullity.

### Reed Received Undisclosed Kickbacks from Vendors

87.     On information and belief, Freeman and other vendors paid Reed a portion of the money they received from the Show's exhibitors in the form of commissions, rebates or kickbacks.  On information and belief, with respect to Freeman these kickbacks amounted to at least 15% of the total revenue Freeman received from exhibitors of the Show.  This practice was concealed from AHMA and the monies received by Reed in this manner were never disclosed to AHMA.

88.     Reed received monetary payments from vendors who provided goods or services at the 2003 Show and those payments were not disclosed to AHMA.

89.     Reed, acting in concert with Freeman and other vendors, retained the kickbacks received from vendors of the Show for its own account and to profit therefrom to the detriment of AHMA and in breach of Reed's contractual and fiduciary duties.  In furtherance of its scheme, on information and belief, Reed knowingly misled financial auditors and misrepresented and/or otherwise withheld information pertaining to the illegal kickbacks it received.  For example,

Reed was contractually obligated to submit a certificate from an independent certified public accountant attesting to the fact that the payments made by Reed to AHMA were accurate and in accordance with the provisions of the Show Agreement. Each year AHMA received an audit report from Reed's auditors – Deloitte & Touche. These audit reports omitted any mention of kickbacks, rebates, or commissions.

90.     Reed did not disclose payments it received from vendors relating to the 2003 Show on the accounting statements submitted to AHMA.

91.     Reed's inclusion of the Show into the Freeman Contract was essential for Reed to obtain the kickbacks and barter exchanges for other trade shows with which Reed was involved. However, their scheme was in direct contradiction to Reed's fiduciary duty and contractual obligations to AHMA and its members and it resulted in inflated prices charged to Show exhibitors by Freeman.

### COUNT I

### Fraud

### (Against Reed)

92.     AHMA incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 91 and 101 through 144 below of the amended complaint.

93.     Reed and Freeman engaged in a scheme of wrongful and deceitful conduct toward AHMA. Reed has concealed its practice of cost-shifting and Reed has made material misrepresentations to AHMA concerning its payment of expenses incurred relating to the Show.

94.     Reed concealed the existence and receipt of unauthorized payments from Freeman and other vendors and misrepresented the financial information from the Show to AHMA as part of an effort to siphon AHMA's share of all lawful revenues derived from the Show.

95.     Reed has made false and misleading representations to AHMA regarding the revenue Reed received from the Show, including the 2003 Show.  Such misrepresentations occurred on numerous occasions including in information provided by Reed to AHMA in an annual Show audit report.  For example, Mr. Scott Connolly, an employee in Reed's finance department, sent Mr. William Farrell, in his capacity as an employee and representative of AHMA, a letter dated October 15, 2001, containing detailed financial information along with a Deloitte & Touche audit report for the 2001 Show.  The information provided by Reed omitted reference to the kickbacks received by Reed relating to the 2001 Show, thereby misstating the financial information contained therein.  Reed submitted this false information to AHMA with the intent that AHMA rely on the accounting and continue to conduct the Show without launching a financial investigation.  AHMA received similar false financial information from Reed on or about September 29, 2000, September 26, 2002, and September 17, 2003.

96.     Reed's misrepresentations and concealments involved facts that were material to the success of the Show and Reed had an affirmative duty by virtue of its relationship with AHMA to disclose these facts.  Reed's actions in this regard were designed to cause AHMA to refrain from conducting an investigation of the Show's financial records and continue conducting the Show.

97.     Freeman knowingly and willfully assisted Reed in perpetrating their scheme to defraud.  Freeman knew or had reason to know that its actions with respect to cost-shifting and

paying kickbacks, its efforts to conceal theses practices from AHMA and its members, and its material misstatements with respect to the inflated prices charged to exhibitors as a consequence of cost-shifting constitute fraud against AHMA and its members.

98.     AHMA and its members relied to their detriment on the misrepresentations of Reed and Freeman.

99.     As a result of the wrongful conduct committed by Reed, Reed has received and/or retained significant monetary and other benefits at the expense of AHMA and its members.

100.     As a direct and proximate result of Reed's conduct, AHMA has suffered, and continues to suffer, damages, which will be established at trial by jury.

## COUNT II

### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act

### (Against Reed and Freeman)

101.     AHMA repeats and realleges paragraphs 1 through 100 above and paragraphs 110 through 144 below as though fully set forth herein.

102.     The Illinois Consumer Fraud and Deceptive Business Practices Act (hereinafter "Consumer Fraud Act") provides, in pertinent part, as follows:

> "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to, the use or employment of any deception, fraud, false pretense, false promise, misrepresentation... or the use or employment of any practice described in §2 of the 'Uniform Deceptive Practices Act'... in the conduct of any trade or commerce or hereby declared unlawful whether any person has in fact been mislead, deceived, or damaged thereby."

815 ILCS §505/2.

103.   Reed's deceptive course of conduct, which included (a) demanding and accepting undisclosed kickbacks – disguised as commissions or rebates – from Freeman in return for being hired as the general contractor for the Show, (b) passing the costs incurred from conducting the Show on to AHMA members and other exhibitors of the Show, (c) passing off the 2004 Reed Las Vegas Event as one involving AHMA by using the AHMA trademark and goodwill of AHMA, (d) accepting bribes from Freeman in exchange for the lucrative general contractor position for the Show, and (e) concealing, suppressing and omitting material facts from AHMA, with the intent that AHMA rely upon the concealment, suppression or omission of such material facts, constitutes deceptive and/or unfair practices under the Consumer Fraud Act.

104.   Freeman's deceptive course of conduct, which included (a) paying undisclosed kickbacks – disguised as commissions or rebates – to Reed in return for being hired as the general contractor for the Show, (b) passing the costs incurred from conducting the Show on to AHMA members and other exhibitors of the Show, (c) paying bribes to Reed in exchange for the lucrative general contractor position for the Show, and (d) the concealment, suppression and omission of material facts from AHMA, with the intent that AHMA rely upon the concealment, suppression or omission of such material facts, constitutes deceptive practices under the Consumer Fraud Act and is the type of conduct that the Act was created to remedy.

105.   The bribery and kickback scheme constitutes unfair trade and deceptive practices in violation of the Consumer Fraud Act.

106.   Reed's use of AHMA's International Hardware Week trademark constitutes a passing off by Reed of its 2004 Las Vegas Event as that of AHMA's. This use likely caused confusion and misunderstanding on the part of consumers as to the source, sponsorship and

affiliation of Reed's 2004 Las Vegas Event.   As a result, Reed engaged in deceptive trade practices within the meaning of the Consumer Fraud Act.

107.   Such deceptive conduct was intended to cause AHMA to continue to conduct the Show believing that Reed was abiding by its contractual and fiduciary obligations and allow Reed and Freeman to retain and obtain monetary and other benefits properly and lawfully the property of AHMA, its members, and Show exhibitors and occurred in the course of trade and commerce.  Reed and Freeman intended to AHMA to rely upon their deception.

108.   Due to Reed and Freeman's bad faith and deception, AHMA has been damaged.

109.   The conduct of Reed and Freeman as alleged herein was willful and malicious, and demonstrates a wanton disregard for the rights of AHMA, thereby entitling AHMA to punitive damages.

## COUNT III

### Civil Conspiracy

### (Against Reed and Freeman)

110.   AHMA incorporates by reference, as if fully set forth herein, the allegations in Paragraphs 1 through 109 above and paragraphs 120 through 144 below of the amended complaint.

111.   Through the concerted action of Reed and Freeman, and others, a scheme, in breach of contractual and state-law and federal-law obligations, was perpetrated to defraud AHMA and obtain monetary benefits.

112.    In furtherance of the conspiracy, and in an effort to obtain significant monetary and other benefits, Freeman, knowing Reed was acting in derogation of contractual and legal obligations, assisted Reed in avoiding expenses incurred by operating the Show and shifting those costs to AHMA members and other exhibitors at the Show. These costs were properly and lawfully attributable to Reed and/or Freeman. In addition, Reed demanded and accepted kickbacks from Freeman in return for being hired as the general contractor for the Show. The acts of Freeman and Reed constitute tortious and otherwise unlawful behavior.

113.    All lawful revenue received by Reed should have been (1) disclosed to AHMA, (2) approved by AHMA, and (3) shared with AHMA; none of which occurred.

114.    Reed did not disclose to AHMA payments it received from Freeman or other vendors or the practice of avoiding expenses of the Show through cost-shifting.

115.    To the extent these payments were revenue, Reed did not, despite its obligations otherwise, properly allocate any portion of these revenues to AHMA.

116.    AHMA did not know of or approve of Reed's or Freeman's activities in this regard.

117.    As co-conspirators in the scheme, Reed and Freeman are jointly and severally liable for any and all damages AHMA incurred as a result.

118.    As a direct and proximate result of Reed and Freeman's conduct and nonfeasance, AHMA suffered damages.

119.    As a direct and proximate result of Reed's conduct, AHMA has suffered injury for which compensation is sought in the form of monetary damages, in an amount that will be established at trial by jury.

## COUNT IV

### Breach of Fiduciary Duty

### (Against Reed)

120.    AHMA repeats and realleges paragraphs 1 through 119 above as though fully set forth herein.

121.    Pursuant to the terms of the Show Agreement, Reed agreed to act as AHMA's agent. Reed's role as AHMA's agent gave rise to a fiduciary relationship as a matter of law, which required Reed to treat AHMA with the utmost candor, care, loyalty, and good faith. This fiduciary relationship extended to August 16, 2003. In addition, as alleged herein, the conduct, course of dealings and other agreements between AHMA and Reed, imposed fiduciary obligations on Reed.

122.    Reed owed AHMA the highest fiduciary obligation and utmost duty of good faith, fair dealing and full disclosure by virtue of the agency relationship it had with AHMA. Reed was obligated as a fiduciary to refrain from engaging in self-dealing or otherwise promote its interests at the expense of and to the detriment of AHMA.

123.    Reed has breached its fiduciary duty to AHMA by failing to exercise reasonable care, skill and diligence in the execution of exhibitor contracts and in the management of the Show, including, by way of example, the acts and omissions described herein.

124.   Reed's breaches of its fiduciary duty as agent and fiduciary were committed knowingly, intentionally, recklessly and with a conscious disregard of the rights of AHMA.

125.   AHMA has sustained economic and other injuries as a result of Reed's breach of fiduciary duty for which AHMA seeks compensation in the form of monetary damages in an amount to be determined at trial by jury and restitution of all profits made by Reed through a breach of duty.   In addition, because these breaches were committed knowingly, intentionally, recklessly and with a conscious disregard for the rights of AHMA, AHMA seeks to recover punitive damages over and above the monetary damages sought herein in an amount to be determined at trial by jury.

## COUNT V

### Breach of Contract – Show and Related Agreements

### (Against Reed)

126.   AHMA repeats and realleges paragraphs 1 through 125 above as though fully set forth herein.

127.   AHMA and Reed entered into the Show Agreement on July 1, 1977.  AHMA and Reed entered into subsequent binding agreements relating to revenue and expense sharing between 1977 and 2003.

128.   Because the Separation Agreement, including the release contained therein, is voidable (and a nullity) as a result of fraudulent inducement by Reed and the material breaches of the Separation Agreement (as alleged in Count XIII, below) by Reed, Reed is liable for all its breaches of the Show Agreement and the related agreements made between AHMA and Reed.

129.    Reed violated the terms of the Show Agreement and related agreements, including the terms contained in paragraphs 10 and 11.

130.    AHMA has performed all of its required contractual obligations under the Show Agreement and the related agreements.

131.    Paragraph 10(a) of the Show Agreement provides in pertinent part that "Reed shall be responsible for ... *paying* all expenses ... incurred in conducting the Shows." (emphasis added).

132.    Reed has failed to meet its obligations under paragraph 10(a) of the Show Agreement.  Reed has knowingly and willfully not paid expenses incurred in conducting the Show.  Specifically, through its arrangement with Freeman, Reed shifted the expenses incurred in conducting the Show away from itself and to AHMA members and other exhibitors of the Show through the practice of cost-shifting.

133.    For example, expenses incurred from conducting the Show include goods and services provided by the general contractor, leasing or purchasing of floral arrangements and other plant displays, leasing of fork lifts, arranging for security and other equipment and services, transportation services, registration goods and services and several others.  Reed did not pay for many of the goods and services provided by Freeman, the Show's general contractor or other vendors of these goods and services.

134.    Under the terms of the 1998 Freeman Contract, but contrary to the Show Agreement, Reed is not required to pay certain expenses relating to the Show.

135.    Mr. Cappiello, a representative of Reed, has publicly described Reed's practice of not paying for expenses incurred relating to the Show and has been quoted by the Chicago Tribune as saying, "What [Reed] has done is to negotiate the best deals with vendors. Have we gotten some freebies? Of course. That is simply the leverage a large customer uses with its vendors."[2]   The practice of cost-shifting may benefit Reed and its shareholders, but it is flatly contrary to Reed's obligations to AHMA under their agreements.

136.    Reed's scheme to divert the expenses incurred in conducting the Show to AHMA members and other Show exhibitors is diametrically inconsistent with Reed's contractual obligation to *pay* those expenses.

137.    Reed's breach in this regard was the direct and proximate cause of a loss of Show exhibitors and a reduction of revenue received by AHMA from the Show.  AHMA's injury has been exacerbated by the fact that the expenses that Reed failed to pay were assessed on AHMA's members and other Show exhibitors.  Further, Reed's violation of paragraph 10(a) of the Show Agreement denied AHMA the benefit of its bargain with respect to the revenue-sharing component of the Show Agreement which was determined with the responsibility of Reed to *pay* expenses in mind.

138.    Pursuant to the terms of the Show Agreement and other agreements (the existence and nature of which is acknowledged, inter alia, in the Second Amendment of the Show Agreement) between AHMA and Reed relating to the sharing of revenues derived from conducting the Show, Reed was obligated to share all lawful revenue derived from conducting the Show with AHMA in accordance with agreed-upon terms.  In addition, Reed was obligated

---

[2] See Ameet Sachdev, *Trade Show Feud in Court, Firm Says Reed Exhibitions Inflated Exhibitor Costs*, Chicago Tribune, January 3, 2004, Business Section at 1.

to submit new sources of revenue to AHMA for review and approval. *Every* potential source of revenue disclosed to AHMA by Reed that was approved by AHMA was the subject of a revenue-sharing agreement between AHMA and Reed.

139.   Reed has violated the terms of the Show Agreement and other agreements relating to sources of revenue derived from conducting the Show by failing to inform AHMA of certain sources of revenue and failing to share such revenue pursuant to agreed-upon terms.

140.   By way of example, on information and belief, Reed received payments from Freeman relating to the Show that have been intentionally concealed from AHMA. By way of further example, Reed failed to pay AHMA the proper amount of revenue based upon exhibit space sales and other sources of revenue.

141.   Reed received payments (revenue) derived from the Show as recently as 2003 from three vendors and that payments from two of these vendors were not disclosed to AHMA. These payments were not reflected in the accounting statements or financial information provided by Reed's auditors in its September 17, 2003 report. Further, AHMA received no portion of these payments.

142.   Paragraph 11(a) of the Show Agreement provides that Reed shall not conduct, sponsor, or manage a trade exposition, other than the Show, in the United States which primarily relates to hardware, lawn, garden and/or home improvement products.

143.   Reed has failed to meet its obligations under paragraph 11(a) of the Show Agreement.   Reed has knowingly and willfully conducted, sponsored, and/or managed trade expositions primarily relating to hardware, lawn, garden and/or home improvement products in

the United States during the term of the Show Agreement.  Specifically, Reed has conducted and managed the Home Automation Show and the International Security Conference and Exposition during the term of the Show Agreement.  Both of these trade expositions are related primarily to home improvement products.  These trade shows were managed by Reed in March and October, 2003 and previously.  In addition, Reed sponsored and presented the Midwest Builders Show during the term of the Show Agreement in March, 2003 and previously.  In addition, the Midwest Builders Show was conducted in Rosemont, Illinois, a municipality within a fifty (50) mile radius of Chicago, Illinois.

144.    As a direct and proximate result of Reed's willful conduct, AHMA has suffered injury for which compensation is sought in the form of monetary damages, in an amount that will be established at trial by jury.

## COUNT VI

### Unjust Enrichment

### (Against Reed and Freeman)

145.    AHMA incorporates by reference, as if fully set forth herein, the allegations in Paragraphs 1 through 144 of the amended complaint.

146.    As alleged in detail in this amended complaint, Reed and Freeman have engaged in a scheme of wrongful, tortious conduct toward AHMA.

147.    As a result of the wrongful conduct and tortious acts committed by Reed and Freeman, Reed has received and/or retained significant monetary and other benefits, including valuable services and materials from Freeman, at the expense of AHMA and its members.

148.    Likewise, Freeman has received and/or retained significant monetary and other benefits, including the lucrative general contractor position for the Show from Reed, through its wrongful conduct, at the expense of AHMA and its members.

149.    Reed and Freeman's receipt and retention of these benefits was unlawful and wrongful.

150.    As a result of the foregoing, Reed and Freeman have been unjustly enriched at the expense of AHMA, and AHMA has been damaged as a result of Reed and Freeman's unjust enrichment.

151.    As a direct and proximate result of Reed and Freeman's conduct, AHMA has suffered injury for which compensation is sought in the form of monetary damages, in an amount that will be established at trial by jury.

## COUNT VII

### Violation of Section 43(a)(1)(B) of the Lanham Act – False Advertising

### (Against Reed)

152.    AHMA incorporates by reference, as if fully set forth herein, the allegations in Paragraphs 1 through 151 of the amended complaint.

153.    Reed made false statements of fact on its website and in commercial promotions. Reed falsely advertised on its website that certain exhibitors and attendees were affiliated with and signed-up to exhibit or attend the 2004 Reed Las Vegas Event.

154.    The false advertising included false claims that PRO Group, Distribution America, General Tools and Great American Marketing, among others, were affiliated with and

signed-up to exhibit at or attend the 2004 Reed Las Vegas Event. Each of those entities has publicly denied the misrepresentations of Reed.

155.   The false statements by Reed actually deceived, and/or had the tendency to deceive, a substantial segment of the potential exhibitors, attendees and its audience.

156.   The false statements by Reed were not merely incidental; rather, they were material and likely to influence the decisions of potential exhibitors, attendees and other members of the industry.

157.   The false statements, which appeared on the Reed website or in quotes of Reed representatives in trade publications, were caused by Reed to enter interstate commerce.

158.   As a direct and proximate result of Reed's conduct, AHMA has suffered injury for which compensation is sought in the form of monetary damages, in an amount that will be established at trial by jury.

## COUNT VIII

### Unfair Competition Under the Lanham Act

### (Against Reed)

159.   AHMA incorporates by reference, as if fully set forth herein, the allegations in Paragraphs 1 through 158 of the amended complaint.

160.   AHMA is a leading association in the hardware/home improvement industry. Its trade show, international pavilions, educational conferences and other products and services are highly regarded by its members and throughout the industry.

161.    To help identify its position in the marketplace, AHMA has developed and uses distinctive designations to differentiate its trade show.  For example, AHMA is the owner of United States Trademark No. 2,380,411 for the mark International Hardware Week validly issued and registered on the Principal Register on August 29, 2000.  (A copy of the United States of America Certificate of Registration, Principal Register is attached to this amended complaint as Exhibit D).

162.    AHMA enjoys a valuable reputation among its constituents and in the hardware/home improvement industry as the sponsor and conductor of the premier trade show in the industry.  The trademark International Hardware Week has come to be recognized and associated exclusively with the high-quality trade show sponsored and conducted by AHMA.

163.    The International Hardware Week mark is a valuable business and marketing asset to AHMA, and indicates to consumers and the industry the high-quality product originating from only AHMA.  AHMA has expended substantial time, effort, and money in promoting and marketing this asset throughout the United States and the world for at least the past 5 years, and, as a result, the mark has become famous.

164.    Long after AHMA developed and registered its rights in its designation, Reed began to promote and offer to sell a competitive trade show bearing AHMA's distinctive designation.  (Copies of examples of Reed's improper conduct are attached to this amended complaint as Exhibit C).

165.    Reed has misappropriated AHMA's distinctive designation and mark without AHMA's consent or authorization, and did so with the intent to capitalize on the goodwill associated with the designation.

166.   Reed's use of AHMA's distinctive trademark designation as alleged in the Complaint constitutes unfair competition, false representation, and false designation of origin upon and in connection with AHMA's trade shows, and thus violates 15 U.S.C. § 1125(a).

167.   The foregoing acts have been and continue to be deliberate, willful, and wanton, making this an exceptional case within the meaning of 15 U.S.C. § 1117.

168.   As a result of the acts by Reed, AHMA has been injured in its business and property.

169.   The injury to AHMA is, and continues to be, immediate and irreparable.   An award of monetary damages alone cannot fully compensate AHMA for its injuries, and AHMA lacks an adequate remedy at law.

## COUNT IX

## Common Law Unfair Competition

## (Against Reed)

170.   AHMA incorporates by reference, as if fully set forth herein, the allegations in Paragraphs 1 through 169 of the amended complaint.

171.   Reed's use of AHMA's trademark and distinctive designation as alleged in the Complaint has caused, and will continue to cause, confusion, mistake, and deception.

172.   Reed's use of the distinctive International Hardware Week designation suggests association, affiliation, or sponsorship with or approval by AHMA, so as to cause, or be likely to cause, confusion or mistake, or to deceive consumers as to the origin of Reed's goods.   Such use

constitutes an effort to pass off the 2004 Reed Las Vegas Event as originating from or approved by AHMA, all to the gain of Reed and to the loss of, and damage to, AHMA.

173.   As a result of the acts by Reed, AHMA has been injured in its business and property. The injury to AHMA is, and continues to be, immediate and irreparable.  An award of monetary damages alone cannot fully compensate AHMA for its injuries, and AHMA lacks an adequate remedy at law.

## COUNT X

## Common Law Trademark Infringement

## (Against Reed)

174.   AHMA incorporates by reference, as if fully set forth herein, the allegations in Paragraphs 1 through 173 of the amended complaint.

175.   Reed's use of AHMA's mark and distinctive designation as alleged in the Complaint constitutes intentional and willful infringement of AHMA's common law rights in and to the designation.

176.   As a result of the acts by Reed, AHMA has been injured in its business and property. The injury to AHMA is, and continues to be, immediate and irreparable.  An award of monetary damages alone cannot fully compensate AHMA for its injuries, and AHMA lacks an adequate remedy at law.

## COUNT XI

### Tortious Interference with Prospective Economic
### Advantage and Contractual Relationships

### (Against Reed)

177.   AHMA incorporates by reference, as if fully set forth herein, the allegations in Paragraphs 1 through 176 of the amended complaint.

178.   Based on its long-standing relationships and commitments from prior exhibitors, among other things, AHMA had a reasonable expectancy of entering into a valid business relationship with many exhibitors.

179.   Based on Reed's involvement in prior shows, discussions between Reed and AHMA, and the Show Agreement, among other things, Reed knew of AHMA's expectancy of entering into those relationships.

180.   Reed intentionally interfered with those relationships in an effort to prevent them from ripening into valid business relationships.  Reed's intentional interference is reflected by, among other things: (a) its scheme with Freeman that inflated exhibitor prices at the Show that directly resulted in dissatisfaction (and consequential loss) of exhibitors, (b) making and publishing false and disparaging statements about AHMA and the abilities of AHMA to organize and conduct the AHMA Hardware Show; (c) making and publishing false and disparaging statements about the AHMA Hardware Show and calling into question the viability of the AHMA Hardware Show; and (d) falsely advertising on the Reed website that certain exhibitors and attendees of the AHMA Hardware Show were affiliated with, and signed-up to exhibit at, the 2004 Reed Las Vegas Event.

181.   Reed's false and disparaging statements were made by, among others, Mr. Cappiello and Mr. David Tobin, and were made to, among others, Mr. Jeff Morey.   Those statements included such disparaging and false assertions that:  it was Reed, not AHMA, that sought to lower exhibitor costs prior to the 2003 Show and that the 2004 AHMA Hardware Show would be cancelled.

182.   The false advertising on the Reed website included false claims that General Tools and Great American Marketing, among others, were affiliated with, and signed-up to exhibit at, the 2004 Reed Las Vegas Event.   Both of those entities have publicly denied the misrepresentations of Reed.   Further, Reed representatives have falsely stated that Pro Group and Distribution America, two prominent buying groups in the hardware/home improvement industry, were registered to attend their 2004 Reed Las Vegas Event.   Both of those entities have publicly denied the misrepresentations of Reed.

183.   As a result of the conduct of Reed, potential business relationships and expectancies of AHMA were prevented from ripening and/or terminated, and AHMA suffered, and continues to suffer, damages.

<u>**COUNT XII**</u>

<u>**Full Accounting with Respect to the National Hardware Show**</u>

<u>**(Against Reed)**</u>

184.   AHMA repeats and realleges paragraphs 1 through 91 above as though fully set forth herein.

40

185.   AHMA has the right to formal accounting as to all revenues and expenses received or incurred relating to the National Hardware Show pursuant to the Lanham Act, Illinois common law, equitable doctrines and Illinois statutory law.

186.   Paragraph 10(d) of Show Agreement obligated Reed to provide AHMA with financial information concerning the revenues of the Show.  As herein alleged, Reed submitted fraudulent financial reports to AHMA.

187.   Moreover, by reason of the wrongful conduct of Reed with respect to the accounting and maintenance of business records relating to the Show discussed hereinabove, AHMA is entitled to a full accounting of all moneys, assets, accounts and other matters up to and including the time of the final order of this case.

188.   AHMA has made several demands for an accounting as to the foregoing matters, but Reed has refused to render such an accounting.

189.   Further, the total amount of moneys and other sums and assets due AHMA is not known to AHMA because the books and other documentation are in the possession of Reed and Reed has refused to allow AHMA to review these books and records.

190.   Accordingly, AHMA is entitled to a full and complete accounting and to other relief.

**Plead in the Alternative**

**COUNT XIII**

**Breach of Contract – Separation Agreement**

**(Against Reed)**

191.    AHMA repeats and realleges paragraphs 1 through 91 and paragraphs 126 through 144 above as though fully set forth herein.

192.    AHMA and Reed entered into the Separation Agreement as of February 26, 2003.

193.    Reed violated the material terms of the Separation Agreement, including the terms contained in paragraphs 1(a); 1(b)(i); 1(b)(ii); 3(b); 3(c); and 20(a).

194.    AHMA has performed each of its required contractual obligations under the Separation Agreement.

195.    Paragraph 1(a) of the Separation Agreement provides that the "Show Agreement shall remain in full force and effect from the date hereof until the Effective Date." The Effective Date under the terms of the Separation Agreement was August 16, 2003.

196.    Pursuant to the Separation Agreement, and in consideration for the benefits conferred in the Separation Agreement, Reed agreed to conform its conduct to, and abide by, the terms of the Show Agreement.

197.    Reed has failed to meet its obligations under the Separation Agreement by failing to comply with the terms of the Show Agreement as more specifically set forth in Count V, above.

42

198.   Paragraph 1(b)(i) of the Separation Agreement provides that "neither party, either directly or indirectly, prior to July 4, 2003, shall sell exhibit space, sponsorships, advertising or media opportunities to exhibitors, including, without limitation, disseminating exhibitor contracts, executing exhibitor contracts or collecting deposits for an exhibition scheduled to occur after [August 16, 2003]."

199.   Paragraph 1(b)(ii) of the Separation Agreement provides that "neither party shall assign exhibit space including, without limitation, conduct a space draw with respect to an exhibition scheduled to occur after [August 16, 2003] until the day following [August 16, 2003]."

200.   Reed has breached its obligations under Paragraph 1(b)(i) and Paragraph 1(b)(ii) of the Separation Agreement; to wit, Reed knowingly and willfully sold and assigned exhibit space for the 2004 Reed Las Vegas Event, prior to July 4, 2003.

201.   In Paragraph 3(b) of the Separation Agreement, Reed acknowledged AHMA's sole ownership, right, title and interest in certain service marks, trade marks and trade names. "International Hardware Week" was one such service mark, trade mark and/or trade name acknowledged by Reed as being solely owned by AHMA.

202.   Reed agreed to discontinue all use of AHMA's service marks, trade marks and trade names, including "International Hardware Week."

203.   In Paragraph 3(c) of the Separation Agreement, Reed agreed to refrain from using the trademark "National Building Products Exposition and Conference" and several derivations thereof as of August 16, 2003.

204.   Reed has failed to meet its obligations pursuant to Paragraph 3(b) and 3(c) of the Separation Agreement by using the trade marks "International Hardware Week" and "National Building Products Exposition and Conference," or a derivation thereof, to promote the 2004 Reed Las Vegas Event.  (Copies of examples of Reed's improper conduct are attached to this amended complaint as Exhibit C).

205.   In Paragraph 20(a) of the Separation Agreement, Reed agreed that it would refrain from engaging in, sponsoring, producing, conducting, or managing any trade show or exhibition relating primarily to the hardware/home improvement and/or lawn and garden industries or that is otherwise similar to the Show within a fifty (50) mile radius of Chicago, Illinois, or to provide any management, consulting, financial, administrative or other services to any person or entity engaged in such activities.  Reed also agreed to refrain from knowingly allowing any Reed trademarks to be used by any person or entity engaged in such activities.

206.   Reed has failed to meet its obligations pursuant to Paragraph 20(a) of the Separation Agreement by engaging in the prohibited conduct relating to the Midwest Builders Show which was held in Rosemont, Illinois in March, 2003 and/or allowing its trademark to be used by an entity engaged in such activities.  By way of example, the 2003 Midwest Builders Show was marketed as being "presented by" Reed Business Information and a Reed trademark appeared on the Midwest Builders Show website home page.  Reed Business Information is a division of Reed.  In addition, the 2000 annual report of Reed Elsevier contains a quote from the business division's CEO, Gerard van de Aast, stating "The businesses have been brought together in one cohesive global division… ."

207.   As a direct and proximate result of Reed's conduct, AHMA has suffered injury for which compensation is sought in the form of monetary damages, in an amount that will be established at trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, AHMA prays for judgment in its favor and against Reed and Freeman as follows:

A.   That AHMA be awarded actual damages in an amount in excess of $100 million exclusive of interest and costs, to be proven at trial by jury, including, but not limited to, damages due to the injury to AHMA's business reputation and the loss of its goodwill by reason of Reed's attempt to pass-off and market shows not emanating from AHMA but identified with AHMA's distinctive International Hardware Week designation.

B.   That AHMA be awarded punitive damages in connection with the fiduciary breaches, tortious acts and violations of the Consumer Fraud Act alleged herein.

C.   That Reed and its officers, directors, agents, representatives, attorneys and all persons acting or claiming to act on its behalf or under its direction or authority, and all persons acting in concert or in participation with Reed, be permanently enjoined from:

(i)   representing in any manner or by any method whatsoever that goods not sponsored, approved, or authorized by or originating from AHMA but provided by Reed are sponsored, approved, or authorized by or originate with AHMA, or from otherwise taking any action likely to cause confusion, mistake, or deception on the public as to the origin, approval, sponsorship, or certification of such goods; and

(ii)   using AHMA's distinctive International Hardware Week designation, or any other designation which is a colorable imitation of or is confusingly similar in any manner to those product designations, on or in connection with the sale, offering for sale, advertisement, or promotion of any goods not originating with AHMA, unless authorized by AHMA in writing.

**D.**     That, pursuant to 15 U.S.C. §1118, Reed be required to deliver up and/or destroy any and all catalogs, labels, advertisements, promotional items and the like in its possession or control which might, if sold or used in conjunction with the sale, distribution, or promotion of any products, violate and injunction granted herein.

**E.**     That AHMA have an accounting for damages and for all the profits of Reed together with those profits lost by AHMA due to the actions of Reed complained of in this amended complaint, pursuant to 15 U.S.C. § 1117.

**F.**     That the damages assessed against Reed be trebled pursuant to 15 U.S.C. § 1117.

**G.**     That Reed and Freeman pay AHMA's costs and disbursements in this action, including reasonable attorneys' fees, pursuant to 15 U.S.C. § 1117, the Consumer Fraud Act, and the agreement of the parties.

**H.**     That AHMA and independent auditors hired by AHMA have a full accounting with respect to the expenses and revenues of the National Hardware Show from 1977 through 2003.

**I.**     That AHMA have such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues triable by jury.

Dated:  July 16, 2004

Respectfully submitted,

AMERICAN HARDWARE
MANUFACTURERS ASSOCIATION,
a Delaware not-for-profit corporation

By: _____
       One of its attorneys

Gordon B. Nash, Jr.
William P. Farrell, Jr.
Scott J. Fisher
GARDNER CARTON & DOUGLAS LLP
191 North Wacker Drive, Suite 3700
Chicago, Illinois 60606-1698
Tel:    (312) 569-1000
Fax:    (312) 569-3000

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he or she caused a true and correct copy of the foregoing First Amended Complaint to be sent by messenger delivery and United States mail, first class, postage prepaid, this 16th day of July, 2004, to the following:

Michael I. Rothstein
Tabet DiVito & Rothstein LLC
180 North LaSalle Street, Suite 1510
Chicago, Illinois 60601

CH02/ 22324749.6

# EXHIBIT

# A

## AGREEMENT

AGREEMENT dated as of July 1, 1977, between American Hardware Manufacturers Association, a Delaware not-for-profit corporation ("Association"), whose purpose is to promote the common business interests of the hardware industry and the American hardware manufacturer, and National Hardware Show, a division of Reed Publishing Corporation ("Corporation"):

Corporation has expertise in managing trade expositions and has annually been producing and managing a trade exposition called the NATIONAL HARDWARE SHOW (the "Show")

In order to promote the general interests of the hardware industry and the interchange of information, the Association desires to conduct and sponsor the Show and associated activities connected with Hardware Industry Week with the Show to be managed by the Corporation.

NOW, THEREFORE, the parties hereto agree as follows:

1.   Association shall conduct and sponsor the Show and Hardware Industry Week annually for the purpose of permitting manufacturers of hardware, equipment and supplies to exhibit their wares and to establish seminars for the interchange of information.   The Corporation shall manage the Show in accordance with the terms and conditions hereinafter set forth.

2.   This Agreement shall commence with preparation for the Show held in 1977 and continue through the Show held in 1989.   Either party shall have the option to continue the Agreement through the Show held in 1994 by giving written notice to such effect to the other at any time between January 1, 1989, and March 31, 1989, inclusive.   In the event that in any year or years while this Agreement is in effect it shall be impossible or inadvisable by reason of force majeure, government regulations, war, strikes or other circumstances beyond the control of the parties to hold a Show, that Show will be postponed and the foregoing dates shall be moved back one year for each such postponement.

3.   Association shall create a committee of not

- 2 -

*PROP SEVEN*

(more than ~~six~~ ("Show Committee"), whose members shall be selected from officers and directors of Association and employees of members of Association, to work with and consult with Corporation in planning, organizing and operating each Show.

4.   The Show Committee shall have the right to determine the location and dates of each Show during the period of this Agreement and any extension thereof after consultation with the Corporation.   It is understood, that the Corporation has already leased McCormick Place for the years 1977, 1978 and 1979 with additional options through 1984 and such arrangements are hereby confirmed.   In the event there shall be a change in location, the new location chosen shall have facilities to house the National Hardware Show which will be equal to or larger than the facilities available for the Show held the preceding year.   Rental rates for space, attendance policies and general conditions prevailing at the Shows such as lighting, noise, booth design restrictions and such other conditions as may be deemed necessary for the success of the Show shall be deter-

- 3 -

mined by the Show Committee.  If Corporation objects to any such conditions and if the parties are unable to agree thereon, then the issue shall be submitted to a panel of three persons.  One to be selected by the Association, one to be selected by the Corporation, the third to be the President of the convention bureau in the city where the show is to be held; and their determination thereon shall be final and binding on Association and Corporation.  The rental rates to be fixed however, shall be no lower than the rates fixed for the preceding show, unless other rental rates are mutually agreed to.

5.  Corporation shall be responsible to the Show Committee for the organization and operation of each Show and for the general conditions, such as lighting, noise and booth design restrictions, prevailing at the Shows.

6.  Association shall promote each Show among its members and others in the hardware trade.  Corporation shall also use its best efforts to promote each Show.  The preparation and use of advertising, publicity and other literature for each Show-shall be approved jointly by Show Committee and Corporation.

- 4 -

7.   Exhibitor contracts pertaining to Shows
shall be executed by Corporation as agent for itself and
Association.   Prior to each Show a policy or policies of
insurance, naming Association and Corporation as co-in-
sureds, shall be obtained in order to provide liability,
property damage and personal injury coverage in such amounts
as the Show Committee shall, after consultation with the
Corporation, from time to time deem to be adequate.

8.   Each year Association shall plan and conduct
an industry service program to be known as HARDWARE INDUSTRY
WEEK, which will incorporate within its schedule the Show.
Corporation shall not be responsible for any activities
relating to any HARDWARE INDUSTRY WEEK program other than
activities relating to the Show in accordance with the pro-
visions of this Agreement.

9.   (a)   Association hereby grants to Corporation
the right and license to use, during the term of this Agree-
ment, or any extension thereof, Association's trade and/or
service marks AHMA and Design and HARDWARE INDUSTRY WEEK
and Design in connection with its performance hereunder;

- 5 -

provided, however, that Corporation shall obtain the approval of Association with respect to all uses and displays of said marks prior to publication thereof.  Corporation agrees that nothing herein shall give it any right, title, or interest in the said marks, other than the right and license herein granted; that said marks are the sole property of Association; and that any and all uses of the said marks by Corporation shall be solely in connection with the Show and its promotion and shall inure to the benefit of Association.

(b)  Corporation hereby grants to Association the right and license to use, during the term of this Agreement, or any extension thereof, Corporation's trade and/or service mark NATIONAL HARDWARE SHOW in connection with the conduct by Association and the Corporation of Shows hereunder; provided, however, that Association shall obtain the approval of Corporation with respect to all uses and displays of said mark prior to publication thereof.  Association agrees that nothing herein shall give it any right, title or interest in said mark, other than the right and

license herein granted; that said mark is the sole property
of Corporation; and that any and all uses of said mark by
Association shall be solely in connection with the Show and
its promotion and shall inure to the benefit of Corporation.

10.   (a)   Corporation shall be responsible for
collecting all revenue derived from conducting the Shows and
for paying all expenses, except those incurred directly by
Association without the consent of Corporation, incurred in
conducting the Shows.  For its services hereunder, Corpora-
tion shall be entitled to retain all amounts remaining after
payment of such expenses and all sums due to Association
hereunder.  The financial responsibility of the Corporation
as herein provided shall apply only to the conduct and
operation of the Show and not to the other activities of the
Association in connection with Hardware Industry Week such
as seminars, meetings, convention activities, luncheons,
dinners, etc., which shall be the responsibility of the
Association.

(b)   For the Shows held in 1977, 1978 and 1979,
Association shall be entitled to receive an amount equal to
15% of the first $1,000,000, and 30% of the balance, of the

- 7 -

gross revenue (less any applicable gross receipts taxes and/or sales taxes) received from the sale or rental of space at each Show.   Corporation shall pay the amounts due Association as follows:

      (i)  Four months prior to the date of the Show, Corporation shall pay to Association 7-1/2% of all sums theretofor received from the sale or rental of space.

      (ii)  The balance due to Association shall be paid by Corporation within 60 days after the conclusion of the Show.   .

      (c)  Commencing with the Show held in 1980, Association shall be entitled to receive an amount equal to 15% of the first $1,000,000, 30% of the next $500,000, 35% of the next $500,000, and 40% of the balance, of the gross revenue (less any applicable gross receipts taxes and/or sales taxes) received from the sale or rental of space at each Show.   Corporation shall pay the amounts due Association as follows:

      (i)  Four months prior to the date of a Show, Corporation shall pay to Association 7-1/2% of all sums theretofore received from the sale or rental of space.

      (ii)  Two months prior to the date of a Show, Corporation shall pay to Association the excess of 15% of all sums theretofore

- 8 -

received from the sale or rental of space
over the amount previously paid by the
Corporation pursuant to clause (i), above.

(iii)   The balance due to Association shall
be paid by Corporation within 60 days after
the conclusion of the Show.

(d)   Within 60 days after the conclusion of each
Show, Corporation shall deliver to Association a certificate
from an independent certified public accountant that attests
to the fact that the payments made by Corporation to Associ-
ation in respect of the Show covered by the certificate were
correctly computed in accordance with the provisions of this
Agreement.

(e)   In the event any Show is cancelled as a re-
sult of one or more of the circumstances set forth in para-
graph 2 hereof and Corporation refunds to exhibitors all
sums paid to it for space rental, Association shall promptly
repay to Corporation all sums paid to it by Corporation for
such Show pursuant to this Agreement.   In the event that,
for any Show, after payment has been made to Association of
all sums due to it hereunder, the remaining revenue is not
sufficient to pay all of the expenses for such Show, the
deficit shall be assumed by the Corporation.

- 9 -

11.   (a)  Prior to the termination of this Agree-
ment, neither Corporation nor any Controlled Corporation,
as below defined, shall conduct, sponsor or manage a trade
exposition, other than the Show, in the United States which
primarily relates to hardware, lawn, garden and/or home
improvement products.  Association hereby acknowledges that
Corporation has produced, and may continue to produce in
the future, a Building and Construction Exposition and
Conference, approval for which is hereby granted by Associa-
tion.

(b)  Prior to the termination of this Agreement,
Association will not conduct, sponsor or manage a trade
exposition, other than the Show, in the United States which
primarily relates to hardware, lawn, garden and/or home
improvement products.  Corporation hereby acknowledges
that Association has produced or co-produced, and may
continue to produce or co-produce in the future, national
and/or regional conventions and/or conferences serving
the hardware trade, approval for which is hereby granted
by Corporation.  At such conventions or conferences there

shall not be trade exhibits other than convention or conference booths.

(c)   Upon termination of this Agreement, Corporation will immediately cease all uses of the marks of Association licensed to it under paragraph 9(a) and Association will immediately cease all uses of the mark of Corporation licensed to it under paragraph 9(b). Each party acknowledges that a breach of its agreements in this paragraph will result in irreparable and continuing damage to the other for which there will be no adequate remedy at law and agrees that, in such event, the other shall be entitled to injunctive relief and to such other and further relief as may be proper.

(d)   Upon the termination of this Agreement, Corporation shall have the right to conduct the Show with no liability whatsoever to Association and Association shall have the right to conduct its own show with no liability whatsoever to Corporation, but the name "National Hardware Show" shall continue to be owned by Corporation, and Association agrees that in the event it decides to

- 11 -

conduct its own show it will not use the name "National Hardware Show," and the name "Hardware Industry Week" shall continue to be owned by Association, and Corporation agrees that it will not use the name "Hardware Industry Week."

12.   If and whenever, during the term of this Agreement, the Corporation intends to select a new executive in charge of the Show, Corporation will consult with Association prior to selecting such a successor and will use its best efforts to make certain that such person possesses suitable qualifications to be the executive in charge of the Show.

13.   This Agreement supercedes the agreement dated October 9, 1973, between the parties which is hereby rescinded.  This Agreement constitutes the entire understanding between the parties and shall be binding upon each of them and their successors.  Neither party shall assign its rights hereunder without the prior written consent of the other. A merger or consolidation or other form of corporate reorganization shall be deemed to be an assignment for the purposes of this Agreement; except that the Corporation may

- 12 -

assign its rights and obligations hereunder, without Associa-
tion's consent, to any corporation controlling, controlled
by or under common control with, the Corporation.(a "Con-
trolled Corporation").

14.  It is understood that the National Hardware
Show is the business enterprise of the Corporation and if at
any time during the term of this Agreement or thereafter
during the period of one year following the expiration
hereof, the Corporation intends to sell the rights to the
Show to a third party (i.e., anyone other than a Controlled
Corporation), it shall notify Association in writing of such
intention.  For a period of 30 days after the date of receipt
of such notification, Association shall have the exclusive
right and option to purchase the rights to the Show, subject
to the Corporation's obligations with respect thereto, for
cash equal to the bona fide price actually offered for such
rights in writing, and acceptable to Corporation.  In the
event that Association elects to exercise such option, it
shall do so by a written notice delivered to Corporation not
more than thirty (30) days following receipt of Corporation's

offer. Association shall purchase the rights to the Show,
subject to the Corporation's obligations with respect thereto,
for cash upon the same terms and conditions set forth in the
offer, with the closing of such purchase to take place
within 30 days following the date of Association's exercise
of its option. In the event that the offer made to Cor-
poration by such third party is not wholly for cash, the
value of such other property shall be the fair value thereof
as determined in good faith by the Board of Directors of
Corporation. If Association does not exercise its option,
Corporation may sell the rights to the Show within the next
90 days for the price at which same was offered to Associa-
tion. If Corporation does not sell such rights within said
90 day period, Corporation shall again become subject to all
of the restrictions on transfer herein contained.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above set forth.

AMERICAN HARDWARE MANUFACTURERS
ASSOCIATION

By: *R. Burrell Brown*

REED PUBLISHING CORPORATION by
its National Hardware Show
Division

By: *Charles Finton*

## AMENDMENT

First Amendment dated May 22, 1981, by and between American Hardware Manufacturers Association, a Delaware not-for-profit corporation (the "Association"), and National Hardware Show, which is a division of Cahners Exposition Group, which is a division of Reed Holdings Inc. (the "Corporation").

WHEREAS, the parties (including the predecessor corporation of the Corporation) have entered into an Agreement, dated July 1, 1977 (the "1977 Agreement"), providing for Association's conduct and sponsorship of the National Hardware Show ("Show") and associated activities connected with Hardware Industry Week and the Show to be managed by the Corporation; and

WHEREAS, the parties wish to provide for an additional option to extend the term of the 1977 Agreement from 1994 to 1999, upon the terms and conditions hereinafter set forth;

NOW, THEREFORE the parties agree as follows:

1. In the event that the conditions set forth in paragraph 2 below are met, either the Corporation or the Association shall have the option of continuing and extending the 1977 Agreement, on the same terms and conditions as set forth in the 1977 Agreement, through the conclusion of the Show to be held in 1999 by giving written notice to such effect to the other party at any time between January 1, 1994 and March 31, 1994 inclusive. In the event that either of the conditions set forth below

are not met, this Amendment shall be null and void and cancelled ab initio.

2.  The foregoing option shall be exercisable only if the following conditions are met:

    (a)  the option contained in the 1977 Agreement to extend the 1977 Agreement from 1989 to 1994 shall have been duly exercised by either party; and

    (b)  the parties, having entered into an Agreement of even date herewith for the conduct and sponsorship of the WINTER NATIONAL HARDWARE & HOME CENTER SHOW, shall have, pursuant to the terms of such Agreement, met all of the conditions set forth in such Agreement for holding the 1983 Winter Show thereunder and shall have held such 1983 Show.

3.  In all respects other than as specifically amended herein, the 1977 Agreement shall remain in full force and effect.

IN WITNESS WHEREOF the parties have caused this Amendment to be duly executed as of the date first above set forth.

AMERICAN HARDWARE MANUFACTURERS ASSOCIATION

By _____ President

REED HOLDINGS INC., by its National Hardware Show Division

By _____

-2-

## SECOND AMENDMENT

Second Amendment dated December 6, 1989, by and between American Hardware Manufacturers Association, a Delaware not-for-profit corporation (the "Association"), and Cahners Exposition Group, which is a division of Reed Publishing (USA) Inc., a Massachusetts corporation (the "Corporation").

WHEREAS, the parties (including the predecessor corporation of the Corporation) have entered into an Agreement, dated July 1, 1977 as amended by a First Amendment dated May 22, 1981 (the "First Amendment"), (as so amended, the "Agreement"), providing for Association's conduct and sponsorship of the National Hardware Show ("Show") and associated activities connected with Hardware Industry Week and the Show to be managed by the Corporation;

WHEREAS, the parties provided for an additional option to extend the term of the Agreement from 1994 to 1999 in the First Amendment; and

WHEREAS, the parties desire to exercise their options to extend the term of the Agreement through 1999 and to further provide options to extend the term of the Agreement for up to two additional five-year terms, from 2000 to 2004 and 2005 to 2009, respectively, upon the terms and conditions hereinafter set forth;

-2-

NOW, THEREFORE the parties agree as follows:

1.   The parties hereby agree, without further notice or
other action by the parties, that the term of the Agreement
is hereby extended to and through the Show to be held in
1999 on the same terms and conditions as set forth in the
Agreement.

2.   Either the Corporation or the Association shall have
the option of continuing and extending the Agreement, on the
same terms and conditions as set forth in the Agreement,
through the conclusion of the Show to be held in 2004 by giving
written notice to such effect to the other party at any time
between October 1, 1994 and January 31, 1995 inclusive.

3.   In the event that either the Corporation or the
Association exercises the option described in paragraph 2.
hereof and the Agreement is extended through 2004, then either
the Corporation or the Association shall have the option of
continuing and extending the Agreement, on the same terms and
conditions as set forth in the Agreement, through the conclusion
of the Show to be held in 2009 by giving written notice to such
effect to the other party at any time between October 1, 1999
through January 31, 2000 inclusive.

4.   The parties acknowledge that they have from time to
time agreed to allocate specific items of expense or revenue,
as applicable, in a manner different from that provided in the

-3-

Agreement; such specific agreements are memorialized in the minutes of the joint annual meetings of the Association's Show Committee and CEG.  The parties stipulate that such specific agreements, or additional agreements of similar nature which the parties may make from time to time in the future, shall not be affected by the execution of this Second Amendment.

5.  In all respects other than as specifically amended herein, the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF the parties have caused this Amendment to be duly executed as of the date first above set forth.

AMERICAN HARDWARE MANUFACTURERS
ASSOCIATION

BY *William Farrell*
William P. Farrell
President and Chief Executive Officer

CAHNERS EXPOSITION GROUP
A Division of Reed Publishing (USA) Inc.

By *Patricia A. Dolson*
Patricia A. Dolson
Vice President & General Manager

## FIRST ADDENDUM TO AGREEMENT

First Addendum ("Addendum") dated June 21, 1991, by and between AMERICAN HARDWARE MANUFACTURERS ASSOCIATION, a Delaware not-for-profit corporation ("Association") and CAHNERS EXPOSITION GROUP, a division of Reed Publishing (USA) Inc., a Massachusetts corporation ("Corporation").

WHEREAS, the parties (including the predecessor corporation of Corporation) have entered into an Agreement, dated July 1, 1977, as amended by an Amendment dated May 22, 1981, and a Second Amendment dated December 6, 1989 (as so amended, the "Agreement"), providing for Association's conduct and sponsorship of the NATIONAL HARDWARE SHOW ("Show") and associated activities connected with HARDWARE INDUSTRY WEEK and the Show to be managed by the Corporation;

WHEREAS, Association wishes to conduct and sponsor and Corporation wishes to produce and manage, in addition to and in conjunction with the Show, a new annual trade exhibition and related conference program dedicated to the building products market (the "Building Products Show") tentatively to be called "The National Building Products Exposition and Conference"; and

WHEREAS, it is the parties intention that at a future time when additional appropriate exhibition space at Chicago's McCormick Place Exhibition Facility becomes available or when appropriate exhibition space at an exposition facility where the Show is to be held located in the United States other than McCormick Place is or becomes available, the Building Products Show will be held at the same time and at the same location as the Show;

NOW, THEREFORE, the parties hereby agree as follows:

1.  Subject to the terms and conditions of this Addendum and the Agreement, Association shall conduct and sponsor and Corporation shall produce and manage, in addition to and in conjunction with the Show, the Building Products Show.

2.  Except as specifically provided otherwise in this Addendum, all terms and conditions of the Agreement as pertaining to the Show shall apply identically to the Building Products Show.

3.  In the period of time until Paragraph 6 of this Addendum becomes effective, the Show and the Building Products Show shall be treated as separate events under the financial provisions of the Agreement and revenue due to Association from each of the events shall be calculated separately, each in accordance with the formula contained in paragraph 10(c) of the Agreement; specifically, Association shall be entitled to receive an amount equal to 15% of the first $1,000,000, 30% of the next $500,000, 35% of the next $500,000 and 40% of the balance of the gross revenues (less any applicable gross receipts taxes and/or sales taxes) received from the sale or rental of space at each Building Products Show.

4.  All assets of, rights to and interest in the Building Products Show shall be owned jointly and equally by Association and Corporation.

5.  (a)  This Addendum shall commence with the start of preparations for the Building Products Show to be held at the Rosemont Exposition Center, Rosemont, Illinois, on mutually agreed upon dates in August, 1992, which overlap in part with the Show and



shall continue through the Building Products Show to be held in 1999. Either party shall have the option of extending this Addendum through the Building Products Show to be held in 2004 by giving written notice to such effect to the other party at any time between October 1, 1994, and January 31, 1995, inclusive. If extended to 2004, then either party shall have the additional option of extending this Addendum through the Building Products Show to be held in 2009 by giving written notice to such effect to the other party at any time between October 1, 1999, and January 31, 2000, inclusive.

(b)   The parties hereby agree that no later than February 28, 1992, they shall mutually review the advisability of holding the 1992 Building Products Show hereunder if, by January 31, 1992, Corporation shall not have received signed and delivered exhibitor contracts with accompanying applicable deposits for at least 40,000 square feet of exhibitor space for said 1992 Building Products Show. If this criteria is not met by January 31, 1992, either party will have the option of postponing to the following year the Building Products Show scheduled to be held in 1992. The exercise by either party of such option shall have no effect upon either the Agreement or the Show.

(c)   In the event that the 1992 Building Products Show is postponed pursuant to clause (b) above, the parties hereby agree that no later than February 28, 1993, they shall mutually review the advisability of holding the 1993 Building Products Show hereunder if, by January 31, 1993, Corporation shall not have received signed and delivered exhibitor contracts with accompanying

-3-

applicable deposits for at least 40,000 square feet of exhibitor space for said 1993 Building Products Show. If this criteria is not met by January 31, 1993, either party will have the option of cancelling this Addendum in total by written notice to such effect at any time between January 31, 1993, and March 15, 1993. Upon such cancellation, this Addendum shall be null and void and cancelled ab initio. The exercise by either party of this option shall have no affect upon either the Agreement or the Show.

6.   The parties agree that when and if additional appropriate exhibition space at Chicago's McCormick Place Exhibition Facility becomes available or when appropriate exhibition space at an exhibition facility where the Show is to be held located in the United States other than McCormick Place is or becomes available, as provided in Paragraph 7 below, the Building Products Show will be held at the same time and at the same location as the Show; however, the Building Products Show will retain a separate name and remain a separate entity. Upon the co-location of the Show and the Building Products Show, as provided above, revenue due Association from the Show and the Building Products Show will not be calculated separately, but thereafter will be calculated together as gross Show revenue in accordance with the formula contained in Paragraph 10(c) of the Agreement.

7.   The decision to relocate the Building Products Show to the same location as the Show shall be that of the Show Committee in consultation with Corporation pursuant to Paragraph 4 of the Agreement. This decision shall be subject to the criteria contained in Paragraph 6 hereof and for such purposes, the terms

-4-

"additional appropriate exhibition space" and "appropriate exhibition space" (1) shall not include exhibition space located in the currently existing McCormick Place facility, (2) shall refer to space that must be in an amount no less than the amount of exhibition space rented at the immediately preceding Building Products Show and (3) shall not include exhibition space (whether currently existing or newly constructed) that may reasonably be required to satisfy the demand for exhibition space at the Show as then constituted.

8. The Agreement is hereby affirmed and in all respects and shall remain in full force and effect.

IN WITNESS WHEREOF the parties have caused this Addendum to be duly executed as of the date first above set forth.

AMERICAN HARDWARE
MANUFACTURERS ASSOCIATION

By _William P. Farrell_
William P. Farrell
President and Chief
Executive Officer

CAHNERS EXPOSITION GROUP
A Division of Reed Publishing
(USA) Inc.

By _Patricia Osler_
Title: _VP/General Manager_

-5-

# EXHIBIT

# B

# AGREEMENT

THIS AGREEMENT ("Agreement") is made as of the 26th day of February, 2003, by and between Reed Elsevier Inc., a Massachusetts corporation ("Reed"), and American Hardware Manufacturers Association, a Delaware not-for-profit corporation ("AHMA").

## RECITALS:

WHEREAS, Reed, through its Reed Exhibitions and Association Expositions & Services divisions, possesses all right, title and interest of Reed Publishing Corporation, Reed Holdings Inc., Cahners Exposition Group and their respective successors, divisions and affiliates in and to the Agreement dated July 1, 1977 between AHMA and National Hardware Show, a division of Reed Publishing Corporation, as amended by the Amendment dated May 22, 1981, Second Amendment dated December 6, 1989, and First Addendum to Agreement dated June 21, 1991 (collectively, the "Show Agreement") concerning the NATIONAL HARDWARE SHOW® and the NATIONAL BUILDING PRODUCTS EXPOSITION AND CONFERENCE® (collectively, the "Show");

WHEREAS, since 1977, the Show has been held annually in conjunction with the activities of INTERNATIONAL HARDWARE WEEK® (formerly known as HARDWARE INDUSTRY WEEK®);

WHEREAS, since 1977, AHMA has sponsored and conducted the Show and Reed has managed the Show;

WHEREAS, the parties have determined that it is in their mutual best interests to terminate the Show Agreement as of 5:00 p.m. on August 16, 2003 (the "Effective Date") and resolve all differences between them concerning the Show and the Show Agreement, on the terms and subject to the conditions of this Agreement; and

WHEREAS, it is understood by the parties that each party shall have the right to sponsor, conduct, manage or otherwise participate in trade shows and exhibitions in cities throughout the United States as of the Effective Date, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals which are by this reference incorporated herein and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged by the parties hereto, the parties, intending to be legally bound, agree as follows:

1.    <u>Termination of Show Agreement.</u>

a.    <u>Termination.</u>  The Show Agreement shall remain in full force and effect from the date hereof until the Effective Date.  Effective as of the Effective Date, the Show Agreement

03/11/03   14:55   ☎847 805 1093          AHMA                                    ☑003

shall be terminated and be of no further force or effect except that Reed shall continue to be obligated to make payments to AHMA and account for such payments pursuant to the Show Agreement with respect to revenues collected from the Show held pursuant to the Show Agreement in 2003.

        b.    <u>Future Exhibitions</u>. It is acknowledged that after the Effective Date both parties may, subject to the terms and restrictions herein contained, sponsor, conduct, manage or otherwise participate in future exhibitions, conferences, forums, shows, conventions and conferences including, without limitation, those relating primarily to hardware, lawn, garden and/or home improvement products (collectively "Exhibition" or "Exhibitions"). Upon execution hereof, both parties may, notwithstanding the provisions of the Show Agreement, begin to promote future Exhibitions, provided however:

        (i) Neither party, either directly or indirectly, prior to July 4, 2003, shall sell exhibit space, sponsorships, advertising or media opportunities to exhibitors, including, without limitation, disseminating exhibitor contracts, executing exhibitor contracts, accepting executed exhibitor contracts or collecting deposits for an Exhibition scheduled to occur after the Effective Date;

        (ii) Neither party shall assign exhibit space including, without limitation, conduct a "space draw" with respect to an Exhibition scheduled to occur after the Effective Date until the day following the Effective Date; and

        (iii) At the Show held pursuant to the Show Agreement in 2003 each party may operate one booth of the same size and same approximate location as the other, with such size and location to be mutually agreed upon by the parties, within which it may promote future Exhibitions, distribute an unlimited number of materials and execute and accept exhibitor contracts. Also, at the Show held pursuant to the Show Agreement in 2003, Reed may promote future Exhibitions, distribute an unlimited number of materials and execute and accept exhibitor contracts in Room No. S101 in the McCormick Place Complex and AHMA may promote future Exhibitions, distribute an unlimited number of materials and execute and accept exhibitor contracts in Room No. N426 in the McCormick Place Complex. Except as provided in the immediately preceding sentence, neither party shall be allowed to maintain any static displays (stands, kiosks, etc.) conduct booth drops, or mass-distribute promotional material for any future Exhibition at the Show held pursuant to the Show Agreement in 2003.

        2.    <u>Payments</u>. As consideration for the agreements and promises contained in this Agreement including, without limitation, the restrictive covenants contained in Section 20 below, Reed agrees to pay AHMA the amount of Two Million Dollars and No Cents ($2,000,000.00). Such payment shall be made within five (5) days of the full execution and delivery hereof by corporate

check payable to AHMA or by wire transfer to Harris Bank – Chicago, 111 West Monroe Street, Chicago, Illinois 60690, ABA Routing No. 071000288, for the account of AHMA, Account No. 172-189-3. In the event of payment by wire transfer, Reed shall be responsible and pay any and all fees associated therewith. Such payment within such specific period of time is intended and shall be construed as a material provision of this Agreement.

**3.     Intellectual Property and Data Transition.**

        **a.     Reed Marks.** With respect to the trademarks, service marks and trade names so identified in Exhibit A attached hereto and by this reference incorporated herein, AHMA acknowledges and agrees that Reed is the sole owner of all right, title and interest in and to such marks (the "Reed Marks"). AHMA shall not claim any rights therein or register any copyrights, domain names, trademarks or other rights in or to the Reed Marks. AHMA hereby gives, transfers and assigns to Reed all right, title, interest and goodwill AHMA may have in the Reed Marks as of the Effective Date, including, without limitation, any registrations, pending applications and domain names with respect thereto. The foregoing transfer and assignment shall include, without limitation, all rights and interest in the domain names www.nationalhardwareshow.com, www.nationalhardwareshow.org, www.nationalhardwarefair.org, www.nationalhardwareshowandconference.org, www.nationalhardwarefair.com and www.nationalhardwareshowandconference.com. AHMA agrees to execute and deliver such additional documents and take such additional reasonable actions, at Reed's expense, as Reed deems necessary or convenient to perfect or evidence Reed's ownership of the Reed Marks and related registrations, pending applications and domain names. Upon execution of this Agreement, AHMA agrees, except in connection with the Show held pursuant to the Show Agreement in 2003 to promptly: (i) discontinue all use of the Reed Marks; and (ii) delete the same from its corporate or business name and any domain names. Upon the Effective Date, AHMA agrees to promptly: (i) discontinue all use of the Reed Marks; (ii) delete the same from its corporate or business name and any domain names; and (iii) destroy all printed materials and, destroy or modify all electronic materials, bearing the Reed Marks, provided that AHMA may maintain a reasonable number of archival copies of such materials.

        **b.     AHMA Marks.** With respect to the trademarks, service marks and trade names so identified in Exhibit B attached hereto and by this reference incorporated herein, Reed acknowledges and agrees that AHMA is the sole owner of all right, title and interest in and to such marks (the "AHMA Marks"). Reed shall not claim any rights therein or register any copyrights, domain names, trademarks or other rights in or to the AHMA Marks. Reed hereby gives, transfers and assigns to AHMA all right, title, interest and goodwill Reed may have in the AHMA Marks as of the Effective Date, including, without limitation, any registrations, pending applications and domain names with respect thereto. The foregoing transfer and assignment shall include, without limitation, all rights and interest in the domain names www.internationalhardwareweek.com and www.internationalhardwareweek.org. Reed agrees to execute and deliver such additional documents and take such additional reasonable actions, at AHMA's expense, as AHMA deems necessary or

convenient to perfect or evidence AHMA's ownership of the AHMA Marks and related registrations, pending applications and domain names. Upon execution of this Agreement, Reed agrees, except in connection with the Show held pursuant to the Show Agreement in 2003 to promptly: (i) discontinue all use of the AHMA Marks; and (ii) delete the same from its corporate or business name and any domain names. Upon the Effective Date, Reed agrees to promptly: (i) discontinue all use of the AHMA Marks; (ii) delete the same from its corporate or business name and any domain names; and (iii) destroy all printed materials, and destroy or modify all electronic materials, bearing the AHMA Marks, provided that Reed may maintain a reasonable number of archival copies of such materials.

     c.    <u>National Building Products Exposition and Conference®</u>.  Each party agrees that as of the Effective Date it shall make no further use of and shall not license, consent, permit or otherwise encourage any third party to use, the trademarks NATIONAL BUILDING PRODUCTS EXPOSITION AND CONFERENCE, NATIONAL BUILDING PRODUCTS EXPOSITION, BUILDING PRODUCTS EXPOSITION, BPE, NBPE, or NBPEC. Reed shall not renew any trademark registrations pertaining to the foregoing trademarks and shall allow any such registrations to lapse. Each party agrees that it shall not attempt to register, or re-register, any of the foregoing trademarks.

     d.    <u>Limitations</u>.  AHMA and Reed each represent that they have used and developed a protectable equity in the name "The Hardware Show" in connection with trade shows and related products and services for the hardware industry and AHMA and Reed disagree with the representation of the other regarding their development of an equity in "The Hardware Show". To address the differences of the parties Reed and AHMA agree that:

     (i)  Reed shall not use the name "The Hardware Show" as the official name for any Exhibition for a period commencing on execution hereof and ending twenty-four (24) months from the Effective Date.

     (ii)  AHMA shall not use the name "The Hardware Show" as the official name for any Exhibition for a period commencing on execution hereof and ending twenty-four (24) months from the Effective Date.

     (iii)  Reed shall not be precluded by the terms of this Agreement from verbally referring to any Exhibition as "The Hardware Show".

     (iv)  AHMA shall not be precluded by the terms of this Agreement from verbally referring to any Exhibition as "The Hardware Show".

     (v)  AHMA shall not use the design mark which is depicted in U.S. application Serial No. 76/457,187 for a period commencing on execution hereof and ending twenty-four (24) months from the Effective Date.

(vi) AHMA shall not use either the name "The Hardware Show" or the name "Hardware Show" without another word, logo or acronym (e.g., "AHMA") of similar or larger type size in any headline, leadline or banner in any written advertising or promotional material contained in any written media relating to future Exhibitions for a period commencing on execution hereof and ending twenty-four (24) months from the Effective Date. In the event either the name "The Hardware Show" or the name "Hardware Show" is used without another word, logo or acronym (e.g., "AHMA") by AHMA within the body of text in any written advertising or promotional material contained in any written media relating to future Exhibitions, it shall not be emphasized in any manner (e.g., bold, italics, underscoring) to distinguish it from the surrounding text for a period commencing on execution hereof and ending twenty-four (24) months from the Effective Date. Nothing in the preceding sentence is intended or shall be construed as a limitation on AHMA from emphasizing "AHMA Hardware Show" within the body of text.

(vii) Reed shall not object to AHMA's use or registration of the name "AHMA Hardware Show", which is the subject of U.S. application Serial No. 76/457,858.

(viii) Reed shall not object to AHMA's use of the name "AHMA Hardware Show" in the manner of a mark or logo so long as the letters "AHMA" are presented in similar or larger type size as the letters "Hardware Show". Nothing in this paragraph d. is intended or shall be construed as a limitation on the type of font or graphic style of the letters "AHMA" or the letters "Hardware Show".

(ix) Nothing in this paragraph d. shall be construed as an acknowledgement by AHMA or Reed of any rights of the other in the name "The Hardware Show".

e.    Show Materials.   During the term of the Show Agreement, the parties utilized and will utilize various promotional, marketing, photographic and other materials pertaining to the Show (the "Show Materials"). To the extent that a party owns any copyrights in, or licenses to, the Show Materials, such party hereby grants the other party a non-exclusive, perpetual, royalty-free license to modify, copy, make derivative works, distribute and otherwise use the Show Materials; provided, however, that such license shall not include the license to any of the licensing party's or any third party's trademarks, trade names, logos or other marks that may be contained in the Show Materials. Notwithstanding the foregoing, the parties acknowledge and agree that some or all of the Show Materials may contain materials that are owned by third parties and which neither party has the right to license the other to use. EACH PARTY EXPRESSLY DISCLAIMS ANY WARRANTY OF NON-INFRINGEMENT WITH RESPECT TO THE SHOW MATERIALS, and each party shall be solely responsible for any third party claims arising from its use of the Show Materials. This paragraph e. of this Section 3 shall not apply to materials pertaining to

INTERNATIONAL HARDWARE WEEK® or any component thereof other than the Show and AHMA shall retain the exclusive right and ownership of all materials pertaining to INTERNATIONAL HARDWARE WEEK®.

      **f.**    **Data.** Reed hereby represents and warrants that it has used reasonable efforts to collect and deliver to AHMA a copy of all databases and other records containing information relating to attendees, exhibitors, attendee pre-registrants, attendee and/or exhibitor prospects, exhibitor participation data, exhibitor seniority and priority data, press and media contacts and data collected from the web sites www.nationalhardwareshow.com and www.reedexpo.com/hardwareshow18 (collectively, the "Show Data"), collected and/or used between January 1, 1996 and the date hereof in a format which was mutually agreed to by the parties. Reed shall have a continuing obligation to deliver all additional Show Data with respect to the Show held pursuant to the Show Agreement in 2003 created or obtained between the date hereof and the Effective Date to AHMA on the first day of each month between the date hereof and the Effective Date in ACCESS electronic format. Each party shall have the right to copy, use and distribute the Show Data, for any purpose, in its sole discretion. Neither party shall have any right, title or interest in any derivative work, modification, collection or other use of the Show Data by the other party after the Effective Date. Effective as of the Effective Date, each party shall be liable for all claims of liabilities whether actual or contingent, matured or unmatured, liquidated or unliquidated, known or unknown arising out of or connected with such party's use of the Show Data.

      **g.**    **Web Site.** Reed shall retain ownership of the URL address www.nationalhardwareshow.com; provided, however, that for a period (hereinafter referred to as the "Web Period") commencing on the Effective Date and ending on the date which is One Hundred Thirty Five (135) days following the Effective Date, @YourNET Connection, Inc. ("Host") shall maintain such URL address to host a single web page that will contain links to each party's web site (hereinafter referred to as the "Link Page"). The form and content of the Link Page shall be substantially in the same form as the illustration attached hereto as Exhibit C, and by this reference incorporated herein and shall not be modified without each party's written approval. Reed and AHMA shall equally share and be responsible, and bear all related fees, costs and expenses of the Host, for hosting the Link Page during the Web Period. Reed and AHMA may each use the software comprising the web site www.nationalhardwareshow.com in creating new web sites; provided, however, that neither party shall use the other party's trademarks or logos or otherwise refer to the other party's trade shows on their respective web sites. EACH PARTY EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF NON INFRINGEMENT, WITH RESPECT TO THE WEB SITE SOFTWARE, and each party shall be solely responsible for any third party claims arising from its use of the web site software.

    **4.**    **Exhibitor Contracts and Agreements.** Reed hereby represents and warrants that it shall deliver to AHMA, within ten (10) days of the execution hereof, a copy of all contracts, agreements or arrangements (including all deposit or payment information for each), including without limitation, all copies of Application & License Agreement For Exhibition Participation

received by Reed (the "Exhibitor Contracts"), current as of the date of delivery, relating to exhibitors or other participants for the Show to be held pursuant to the Show Agreement in 2003. Reed shall have a continuing obligation from and after the date hereof to provide all additional Exhibitor Contracts relating to the Show to be held pursuant to the Show Agreement in 2003 to AHMA, promptly upon receipt by Reed, via facsimile in accordance with Section 11 below.

5.    **Assignment and Assumption Agreement.**

a.    **McCormick Place.** As of the date hereof, Reed hereby assigns to AHMA any and all of its right, title and interest, free and clear of all liens and other encumbrances, in and to that certain McCormick Place License Agreement identified as License No. 100003522, between Metropolitan Pier and Exposition Authority and Reed and AHMA, fully executed on or about February 25, 2003, relating to the right to use the McCormick Place Complex ("McCormick Place Agreement") subject to the terms and conditions of the McCormick Place Agreement and to the extent an assignment is permitted thereby. AHMA, in its sole discretion, shall have the option to re-negotiate, discharge, amend, exercise, supplement, or otherwise modify the rights and obligations under the McCormick Place Agreement from and after the date hereof. Reed hereby represents and warrants that as of the date hereof it has not amended, assigned, breached, defaulted, or repudiated the McCormick Place Agreement. Effective as of the date hereof, AHMA hereby assumes all obligations, liabilities and claims of liabilities whether actual or contingent, matured or unmatured, liquidated or unliquidated, or known or unknown under the McCormick Place Agreement. Effective as of the date hereof, AHMA will indemnify, save and hold Reed harmless from and against any and all costs and expenses losses, liabilities, obligations, damages and lawsuits or other proceedings arising expressly out of the McCormick Place Agreement.

b.    **Hotel Money.** Pursuant to that certain letter from James R. Reilly of the Chicago Convention and Tourism Bureau to William P. Farrell of AHMA dated April 23, 2001 (the "CCTB Letter"), AHMA has received sums totaling Seven Hundred Eleven Thousand One Hundred Fourteen Dollars and Fifty Eight Cents ($711,114.58). AHMA shall not be obligated to pay any of such sum to Reed or account for its use and Reed hereby waives any and all rights in or to such a payment. Effective as of the Effective Date, AHMA hereby assumes all obligations, liabilities and claims of liabilities whether actual or contingent, matured or unmatured, liquidated or unliquidated, or known or unknown arising under or related to the CCTB Letter and all funds received thereunder.

6.    **Show Liabilities.**

a.    **AHMA Liabilities.** Except as expressly set forth in Section 5 above, AHMA will not assume, or otherwise be responsible for any liabilities or obligations of Reed relating to the Show or the Show Agreement, or any liabilities or obligations of Reed, whether actual or contingent, matured or unmatured, liquidated or unliquidated, or known or unknown, whether arising out of occurrences prior to, at or after the date of this Agreement ("Reed Show Liabilities"). Reed shall be

responsible for or otherwise discharge all Reed Show Liabilities (including, without limitation, any executory agreements entered into by Reed on behalf of itself or purportedly on behalf of AHMA).

**b.** **Reed Liabilities.** Reed will not assume, or otherwise be responsible for any liabilities or obligations of AHMA relating to the Show or the Show Agreement, or any other liabilities or obligations of AHMA, whether actual or contingent, matured or unmatured, liquidated or unliquidated, or known or unknown, whether arising out of occurrences prior to, at or after the date of this Agreement ("AHMA Show Liabilities"). AHMA shall be responsible for or otherwise discharge all AHMA Show Liabilities (including, without limitation, any executory agreements entered into by AHMA on behalf of itself or purportedly on behalf of Reed).

### 7. Mutual Release.

**a.** **Reed Release.** Reed on behalf of itself and its affiliates and their respective officers, directors, employees, agents, predecessors, successors and assigns, hereby releases, covenants not to sue and forever discharges AHMA and its affiliates and their respective officers, directors, employees, agents, predecessors, successors and assigns from any and all claims, demands, damages, losses, obligations, liabilities, costs, expenses (including, without limitation, attorneys' fees), causes of actions, debts, contracts, torts, covenants, fiduciary duties, responsibilities, suits and judgments, at law or in equity, of every nature and kind that Reed and its affiliates and their respective officers, directors, employees, agents, predecessors, successors and assigns have, may have had, or may have in the future against AHMA and its affiliates and their respective officers, directors, employees, agents, predecessors, successors and assigns whether known or unknown, for any and all matters, including, without limitation, all matters relating to, arising out of or in connection with the operation, management or conduct of the Show, the Show Agreement or otherwise related to the Show Agreement, for the period from the beginning of time through the date hereof; provided, however, except as set forth in paragraph c. of this Section 7, nothing herein is intended to or shall be construed to affect or limit the liability or obligation of AHMA and its affiliates and their respective officers, directors, employees, agents, predecessors, successors and assigns, if any, to Reed pursuant to the terms of this Agreement or under the Show Agreement, with respect to acts or omissions occurring after the date hereof.

**b.** **AHMA Release.** AHMA on behalf of itself and its affiliates and their respective officers, directors, employees, agents, predecessors, successors and assigns, hereby releases, covenants not to sue and forever discharges Reed and its affiliates and their respective officers, directors, employees, agents, predecessors, successors and assigns from any and all claims, demands, damages, losses, obligations, liabilities, costs, expenses (including, without limitation, attorneys' fees), causes of actions, debts, contracts, torts, covenants, fiduciary duties, responsibilities, suits and judgments, at law or in equity, of every nature and kind that AHMA and its affiliates and their respective officers, directors, employees, agents, predecessors, successors and assigns have, may have had, or may have in the future against Reed and its affiliates and their respective officers,

directors, employees, agents, predecessors, successors and assigns whether known or unknown, for any and all matters, including, without limitation, all matters relating to, arising out of or in connection with the operation, management or conduct of the Show, the Show Agreement or otherwise related to the Show Agreement, for the period from the beginning of time through the date hereof; provided, however, except as set forth in paragraph c. of this Section 7, nothing herein is intended to or shall be construed to affect or limit the liability or obligation of Reed and its affiliates and their respective officers, directors, employees, agents, predecessors, successors and assigns, if any, to AHMA pursuant to the terms of this Agreement or under the Show Agreement, with respect to acts or omissions occurring after the date hereof.

c.    Cooperation. Between the date hereof and the Effective Date the parties will work in good faith to avoid disputes under the Show Agreement and to work amicably on the Show to be held pursuant to the Show Agreement in 2003. In the event either party asserts any claim against the other arising under the Show Agreement the damaged party must pursue legal action related to such claim pursuant to Section 16 hereof on or before December 31, 2003. In the event no action has been filed within such period, all such claims, demands, damages, losses, obligations, liabilities, costs, expenses (including, without limitation, attorneys' fees), causes of actions, debts, contracts, torts, covenants, fiduciary duties, responsibilities, suits and judgments, at law or in equity, of every nature that either party may have against the other relating to the Show Agreement shall be deemed forever released and waived as if set forth in and covered by the release of each applicable party contained in paragraphs a. and b. of this Section 7. Notwithstanding the foregoing, in the event one party files a claim against the other within the proscribed period, the other party may file a counterclaim at any time. Nothing herein contained shall limit the liability of either party hereto for a breach of the terms or conditions of this Agreement.

8.    Authorization. Each of the parties hereby represents and warrants to the other party that this Agreement has been, and when executed and delivered, will be, duly authorized, executed and delivered by such party and constitute the legal, valid and binding obligations of such party enforceable in accordance with its terms. Reed hereby represents and warrants to AHMA that it possesses all right, title and interest of Reed Exhibitions, Association Expositions & Services, Reed Publishing Corporation, Reed Holdings Inc., Cahners Exposition Group and their respective successors, assigns and affiliates in, to and under the Show Agreement.

9.    Survival. All representations, warranties, covenants and agreements contained in this Agreement, and in any exhibit attached to this Agreement, shall survive and shall be deemed to have been relied upon and shall not be affected in any respect by the execution of this Agreement.

10.    Expenses. Except as expressly provided in this Agreement, each of the parties shall pay its own fees and expenses (including the fees of any attorneys, accountants, or others engaged by such party) in connection with the negotiation and consummation of this Agreement.

11. **Notices.** All notices or other communications required or permitted under this Agreement shall be given in writing and shall be deemed sufficient if delivered by hand (including by courier and reputable overnight mail), mailed by registered or certified mail, postage prepaid (return receipt requested), or sent by facsimile transmission, provided that confirmation of receipt of such transmission is received and a duplicate copy of such transmission is sent by one of the foregoing means as follows: if to Reed, Reed Exhibitions, 383 Main Avenue, Norwalk, CT 06851, Facsimile No.: (203) 840 9469, Attention: Dennis MacDonald, Senior Vice President, with simultaneous copies to Reed Elsevier Inc., 125 Park Avenue, 23rd Floor, New York, New York 10017, Facsimile No.: (212) 309 5487, Attention: Julie Goldweitz, Senior Vice President and General Counsel, Reed Exhibitions; and to Katz Randall Weinberg & Richmond, 333 West Wacker Drive, Suite 1800, Chicago, Illinois 60606, Facsimile No.: (312) 807 3903, Attention: Benjamin J. Randall; and if to AHMA, to American Hardware Manufacturers Association, 801 North Plaza Drive, Schaumburg, IL 60173-4977, Facsimile No.: (847) 605-1093, Attention: William P. Farrell, President and Chief Executive Officer, with a simultaneous copy to: Gardner Carton and Douglas LLC, 191 North Wacker Drive, Suite 3700, Chicago, IL, 60606, Facsimile No.: (312) 569-3364, Attention: William P. Farrell, Jr. Other address or facsimile numbers may be designated by notice. Notices shall be effective upon receipt or if delivery is refused, upon such refusal.

12. **Assignment.** This Agreement and all of the provisions shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns; provided, however, that neither this Agreement nor any of the rights, interests, or obligations hereunder may be assigned by any party without the prior written consent of the other party. Notwithstanding the foregoing, Reed may assign its rights and interests in and under this Agreement, in whole and in part, to another directly or indirectly majority-owned subsidiary of Reed or of Reed's ultimate parent corporation (an "Affiliate"), provided that such Affiliate succeeds to all or substantially all of Reed's assets and business, and further provided that such Affiliate expressly assumes in writing all of the obligations and liabilities of Reed under this Agreement; provided, however, that notice pursuant to Section 11 above of such assignment be given to AHMA within ten (10) days after such assignment.

13. **Entire Agreement.** This Agreement and the exhibits attached hereto embody the entire agreement and understanding of the parties with respect to the transactions contemplated hereby and supersede all prior or contemporaneous written or oral commitments, arrangements or understandings with respect thereto.

14. **Modifications, Amendments and Waivers.** Any term or provision of this Agreement may be modified, amended or supplemented, but only by a written instrument signed by both parties. No delay or failure by any party hereto in exercising any of its rights, remedies, powers or privileges under this Agreement at law or in equity and no custom, practice or course of dealing between or among any of such parties or any other person shall be deemed a waiver by such party of any such rights, remedies, powers or privileges, even if such delay or failure is continuous or repeated. No single or partial exercise of any right, remedy, power or privilege shall preclude any

BRANDALL/513417.16 February 26, 2003 (8:36AM)    10

other or further exercise thereof by any such party or the exercise of any other right, remedy, power or privilege by such party, including, without limitation, the right of such party subsequently to demand exact compliance with the terms of this Agreement.

15. **Counterparts; Facsimile.** This Agreement and the exhibits attached hereto may be signed in any number of counterparts, all of which when taken together shall be deemed to be one and the same instrument, and a facsimile of this Agreement and Exhibits attached hereto shall be effective as the original.

16. **Governing Law.** This Agreement shall be governed by the laws of the State of Illinois, irrespective of conflicts of law principles. Reed and AHMA hereby irrevocably submit to the exclusive jurisdiction of any state or federal court sitting in Chicago, Illinois in any action or proceeding arising out of or relating to this Agreement and hereby irrevocably agree that all claims in respect of such action or proceeding shall be heard and determined exclusively in a state or federal court sitting in Chicago, Illinois. Each party agrees not to raise and hereby waives any objection to such jurisdiction or to the laying or maintaining of the venue of any such proceeding in such county.

17. **Severability.** If any one or more of the provisions of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions of this Agreement shall not be affected thereby and this Agreement will be construed and enforced as if such invalid, illegal or unenforceable provision had not been included herein. To the fullest extent permitted by applicable law, each party waives any provision of law which renders any provision of this Agreement invalid, illegal or unenforceable in any respect.

18. **Third Parties.** Nothing in this Agreement shall be deemed to be for the benefit of, or enforceable by or on behalf of any third party.

19. **Non-Admission of Liability.** The contents of this Agreement shall not be construed or understood as an admission of liability by any person or entity.

20. **Restrictive Covenants.** As a material consideration for AHMA and Reed to enter into this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Reed and AHMA covenant and agree as follows:

    a. **Reed Restriction.** Except for the Show conducted pursuant to the Show Agreement in 2003, for a period commencing on execution hereof and ending twenty-four (24) months following the Effective Date (the "Restriction Period"), neither Reed nor any of its affiliates or any of their respective officers, directors, employees, agents or successors and assigns will at any time, in any capacity, directly or indirectly, do any of the following: (i) engage in, sponsor, produce, conduct, or manage any trade show or exhibition relating primarily to the hardware/home improvement and/or lawn and garden industries or that is otherwise similar to the Show within a fifty (50) mile radius of Chicago, Illinois (the "Chicago Area") or provide any management, consulting,

BRANDALL/513417.18 February 26, 2003 (8:36AM)

11

financial, administrative or other services to any person or entity engaged in such activities, including, without limitation, participating directly or indirectly as an officer, director, stockholder (excluding a stockholder holding less than 1% of a publicly held corporation), member, operator, sole proprietor, independent contractor, consultant, franchiser, franchisee, owner, employee, agent, representative or partner of, or having any direct or indirect financial interest (including, without limitation, the interest of a creditor) in any person or entity engaged in such activities within the Chicago Area, or (ii) knowingly allow the Reed Marks or any new Reed marks to be used by any person or entity engaged in such activities within the Chicago Area.

   b.   **AHMA Restriction.**  During the Restriction Period, neither AHMA nor any of its affiliates or any of their respective officers, directors, employees, agents or successors and assigns will at any time, in any capacity, directly or indirectly, do any of the following:  (i) engage in, sponsor, produce, conduct, or manage any trade show or exhibition relating primarily to the hardware/home improvement and/or lawn and garden industries or that is otherwise similar to the Show within a fifty (50) mile radius of Las Vegas, Nevada (the "Las Vegas Area") or provide any management, consulting, financial, administrative or other services to any person or entity engaged in such activities, including, without limitation, participating directly or indirectly as an officer, director, stockholder (excluding a stockholder holding less than 1% of a publicly held corporation), member, operator, sole proprietor, independent contractor, consultant, franchiser, franchisee, owner, employee, agent, representative or partner of, or having any direct or indirect financial interest (including, without limitation, the interest of a creditor) in any person or entity engaged in such activities within the Las Vegas Area, or (ii) knowingly allow the AHMA Marks or any new AHMA marks to be used by any person or entity engaged in such activities within the Las Vegas Area.

   c.   **Modification of Restriction.**  If a court of competent jurisdiction finds that one or more of the restrictions stated in this Section 20 are unreasonable, illegal, invalid or unenforceable in any respect under the circumstances then existing by reason of its duration, definition of geographic area or scope of activity, or any other reason, the parties agree that the court shall have the power to modify any such restrictions so that they are reasonable and enforceable.

   d.   **Remedy.**  Without limiting any of either party's rights under this Agreement, the parties hereto acknowledge that the parties, will be entitled to enforce their rights under this Section 20 specifically, to recover damages and costs (including reasonable attorneys' fees) caused by any breach of any provision of this Section 20 and to exercise all other rights existing in its favor. The parties acknowledge and agree that the breach of any term or provision of this Section 20 by the other party or any of its affiliates will materially and irreparably harm the other party, that money damages will accordingly not be an adequate remedy for any breach of the provisions of this Section 20 and that the damaged party, in its sole discretion and in addition to any other remedies it may have at law or in equity may apply to any court of law or equity of competent jurisdiction (without posting any bond or deposit) for specific performance and/or other injunctive relief in order to enforce or prevent any violations of the provisions of this Section 20.

21.    **Non-disparagement.** For a period commencing on the date hereof and ending twelve (12) months from the Effective Date, the parties agree that they will not, either directly or through an agent or representative, make any public statements, either oral or written, that are untrue or of a defamatory nature concerning the other party, including its officers, directors, administrators, employees and agents except as required by applicable law.

22.    **Interpretation.**

a.    **Interrelation.** This Agreement is in all respects intended by each party hereto to be deemed and construed to have been jointly prepared by the parties. The parties hereby expressly agree that any uncertainty or ambiguity existing herein shall not be interpreted against either of them as a result of the actual identity of the draftsman.

b.    **Gender.** Whenever the context so requires, references herein to the neuter gender shall include the masculine and/or feminine gender, and the singular number shall include the plural.

c.    **Further Assurances.** Each party agrees that it will, without further consideration, execute and deliver such other documents and take such other action, whether prior or subsequent to the termination contemplated hereby, as may be reasonably requested by the other party to consummate more effectively the purposes or subject matter of this Agreement.

d.    **Captions.** The article, paragraph and section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent and for any purpose, to limit or define the text of any portion hereof.

23.    **Costs of Enforcement.** If either party commences any legal proceedings against the other party (including a counterclaim) with respect to any of the terms and conditions of this Agreement, the non-prevailing party or parties will pay to the prevailing party or parties all reasonable expenses of those proceedings, including reasonable attorneys' fees.

24.    **Indemnification.**

a.    **AHMA Indemnification.** AHMA will indemnify, save and hold Reed harmless from and against any and all costs and expenses (including reasonable auditors' fees and attorneys' fees), losses, liabilities, obligations, damages and lawsuits or other proceedings arising out of or resulting from (i) any breach of any representation, warranty or covenant made by AHMA in this Agreement or any exhibit delivered pursuant to this Agreement; (ii) any liability expressly assumed by AHMA pursuant to this Agreement.

b.    **Reed Indemnification.** Reed will indemnify, save and hold AHMA harmless from and against any and all costs and expenses (including reasonable auditors' fees and

03/11/03   15:09   ☎847 605 1093   AHMA   ☒015

attorneys' fees), losses, liabilities, obligations, damages and lawsuits or other proceedings arising out of or resulting from (i) any breach of any representation, warranty or covenant made by Reed in this Agreement or any exhibit delivered pursuant to this Agreement; (ii) any liability expressly assumed by Reed pursuant to this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

AMERICAN HARDWARE MANUFACTURERS ASSOCIATION

REED ELSEVIER INC.

By: _William P. Farrell_                    By: _Dennis MacDonald_
William P. Farrell                               Dennis MacDonald
Authorized Agent                                 Authorized Agent



PAGE 15/33 * RCVD AT 3/11/2003 2:57:31 PM [Central Standard Time] * SVR:CHRFAX/020 * DNIS:3384 * CSID:847 605 1093 * DURATION (mm-ss):12-34

<u>Exhibit A</u>

<u>Intellectual Property Rights</u>

"Reed Marks"

National Hardware Show;

NHS;

The World's Fair of the Hardlines Industry;

The World's Fair of the Home Improvement Industry;

and

All logos and designs associated with the foregoing

BRANDALL/313417.16  February 26, 2003 (8:26AM)          15

**Exhibit B**

**Intellectual Property Rights**

**"AHMA Marks"**

American Hardware Manufacturers Association;

AHMA;

AHMA Hardware Show;

AHMA ONLINE;

Hardlines Technology Forum;

HTF;

Hardware Industry Week;

International Hardware Week;

IHW;

The Main Event;

Show Eagle;

Eagle Newsletter;

Key Club;

and

All logos and designs associated with any of the foregoing

**Exhibit C**

**Link Page**

Click on one of the icons below:

[Reed Show name and logo here]                    [AHMA logo here]
                                                   [AHMA name here]
                                                   [AHMA Show name here]

CH01/12274773.7

BRANDALL/513417.16 February 26, 2003 (8:36AM)                    17

# EXHIBIT

# C



| Partnerships | Press | Tips | Why Exhibitions |
|---|---|---|---|

| Home | Contact | Exhibition Search | About Us | Markets |
|---|---|---|---|---|

**Reed**

# Exhibition Search

## Results

Your search returned 37 matches.  Click on the logos to go directly to the Exhibitions' website. Click on More Informat further details on the selected Exhibition.

[ Previous 10 <] [ > Next 10 ] [ New Search]

---

**Name:** Infosecurity Europe
**City:** London
**Country :** UNITED KINGDOM
**Date :** 27 April 2004 - 29 April 2004

---

**Name:** National Hardware Show and Building Products Exposition (Held In Conjunction With International Hardware Week)
**City:** Las Vegas
**Country :** UNITED STATES OF AMERICA
**Date :** 10 May 2004 - 12 May 2004

---

**Name:** Industrial Pollutec
**City:** Bangkok
**Country :** THAILAND
**Date :** 01 June 2004 - 01 June 2004

---

**Name:** MEDPI HARDWARE: European Market for the Distribution of Interactive products
**City:** Monte Carlo
**Country :** MONACO
**Date :** 08 June 2004 - 11 June 2004

---

**Name:** Factory Equipment 2003
**City:** Bangkok
**Country :** THAILAND
**Date :** 24 June 2004 - 27 June 2004

---

**Name:** EDUCATION ICT : Thailand's First International IT Trade Exhibition and Conference for Education Industry
**City:** Bangkok
**Country :** THAILAND
**Date :** 01 July 2004 - 01 July 2004

---

**Name:** ESEC: Embedded Systems Expo & Conference in Tokyo
**City:** Tokyo
**Country :** JAPAN
**Date :** 07 July 2004 - 09 July 2004

---

**Name:** APPLE EXPO
**City:** Paris
**Country :** FRANCE
**Date :** 31 August 2004 - 05 September 2004

---

**Name:** Minnesota Plant Engineering & Facilities Management Show & Conference
**City:** Minneapolis, MN
**Country :** UNITED STATES OF AMERICA
**Date :** 01 September 2004 - 01 September 2004

---

**Name:** MACEF AUTUMN: International Exhibition of Tableware, Household and Gift Items, Silverware, Goldsmith's Items and Watches
**City:** Milan

Case 1:03-cv-09421   Document 21   Filed 07/16/04   Page 101 of 107



**Country : ITALY**
**Date : 03 September 2004 - 06 September 2004**

[ Previous 10 <] [ > Next 10 ] [ New Search]

Reed Exhibitions, Oriel House, 26 The Quadrant, Richmond, Surrey, TW9 1DL,United Kingdom. Tel: +44 (0) 20 8910 :
Copyright © 2003, Reed Exhibitions.

Reed Exhibitions Privacy Pledge - A Division Of Reed Business

Advertisement



## • Hardware

**LAST SHOW STATISTICS:**
Dates & Location:
2003—Apr. 25-26, Midwest Airlines
    Center, Milwaukee, WI

Net Square Footage: 22,200

Number of Exhibiting Companies: 84

Number of Professional Attendees: 2,700

## JLC LIVE Residential Construction Show - Portland Trade

**SHOW FACTS:**
Dates & Location:
2004—Dec., Site to be announced

**General Service Contractor:**
Freeman Decorating Company
7000 Placid St., Ste. 101
Las Vegas, NV 89119
Contact: Rhonda Kerr
Phone: (702) 263-4138
Email: kerr@totalshow.com

**Promotional Opportunities Offered by Show Management:** Show Directory; Conference Program; Web Site; Sponsorship of Social Events; Sponsorships. Contact show management for advertising rates.

**SHOW HISTORY:**
Frequency: Annual.
First Year of Show: 2001

## JLC LIVE Residential Construction Show - Providence Trade

**SHOW FACTS:**
Dates & Location:
2004—Mar. 26-27, Rhode Island Convention
    Center, Providence, RI

**Est. Net Sq. Footage:**
2004—40,000

**Est. Number of Exhibiting Companies:**
2004—160

**Est. Number of Professional Attendees:**
2004—5,500

**Est. Number of Hotel Room Nights:**
2004—1,000

**Est. Peak Room Night Requirements:**
2004—450

**General Service Contractor:**
Freeman Decorating Company
7000 Placid St., Ste. 101
Las Vegas, NV 89119
Contact: Rhonda Kerr
Phone: (702) 263-4138
Email: kerr@totalshow.com

**Pre-registration Fee:** $15

**At-Show Registration Fee:** $25

**Promotional Opportunities Offered by Show Management:** Show Directory; Conference Program; Web Site; Sponsorship of Social Events; Sponsorships. Contact show management for advertising rates.

**SHOW HISTORY:**
Frequency: Annual.
First Year of Show: 1995
Show Held in Same City Every Year: Yes

**LAST SHOW STATISTICS:**
Dates & Location:
2003—Apr. 4-5, Rhode Island Convention
    Center, Providence, RI

Net Square Footage: 38,800

Number of Exhibiting Companies: 134

Number of Professional Attendees: 5,200

## NATIONAL HARDWARE SHOW® & Building Products Exposition (held in conjuction with INTERNATIONAL HARDWARE WEEK®) Trade



**SHOW MANAGEMENT:**
Reed Exhibitions
383 Main Ave.
Norwalk, CT 06851
Mgmt. Co. Phone: (203) 840-4800;
(888) 344-8704; Fax: (203) 840-4804
Web Site: www.nationalhardwareshow.com
Manager: Dennis MacDonald, Sr. VP
    Phone: (203) 840-5469
    Email: dmacdonald@reedexpo.com
Exhibit Sales Contact: David Tobin, Dir. of Sls.
    Phone: (203) 840-5919
    Fax: (203) 840-9919
    Email: dtobin@reedexpo.com

**SHOW SPONSOR:**
American Hardware Manufacturers' Association
801 N. Plaza Dr.
Schaumburg, IL 60173-4977
Contact: William P. Farrell, President & CEO
Phone: (847) 605-1025; Fax: (847) 605-1093

**SHOW DESCRIPTION:**
This show, held in conjunction with International Hardware Week, provides an annual marketplace for hardware products, hand and power tools, electrical and plumbing supplies, building materials, paint, sundries, housewares, safety equipment, security systems, automotive parts and accessories, information technology, outdoor power equipment, outdoor-living products, lawn and garden equipment, grills and outdoor furniture.

**SHOW FACTS:**
Dates & Location:
2004—May 10-12, Sands Expo & Convention
    Center/Venetian Resort Hotel
    Casino, Las Vegas, NV

**General Service Contractor:**
Freeman Decorating Company
5040 W. Roosevelt Rd.
Chicago, IL 60644-1474
Phone: (773) 379-5040; Fax: (773) 379-5042

**Pre-registration Fee:** Free

**At-Show Registration Fee:** $100

**Profile of Exhibitors:** Manufacturers producing a full line of hardware products, plus hand and power tools, electrical and plumbing materials, housewares, building materials, paint and sundries, lawn and garden products, outdoor-living, power equipment information technology, home-improvement supplies and automotive aftermarket products.

**Profile of Attendees:** Home improvement wholesalers, retailers, home centers, specialty distributors, mass merchandisers, lawn and garden retailers, pro dealers and exporters. Attendees come from every U.S. state and 90 foreign countries.

**Promotional Opportunities Offered by Show Management:** Show Directory; Web Site; Sponsorships. Contact show management for advertising rates.

**Department of Commerce Certification:**
This show will be promoted overseas by the U.S. Department of Commerce under the Foreign Buyer Program.

**SHOW HISTORY:**
Frequency: Annual.
First Year of Show: 1946
Show Held in Same City Every Year: Yes

exhibitgroup giltspur    800.424.6224    www.e-g.com    exhibits • events • environments

# EXHIBIT

# D



## CERTIFICATE OF REGISTRATION
## PRINCIPAL REGISTER

*The Mark shown in this certificate has been registered in the United States Patent and Trademark Office to the named registrant.*

*The records of the United States Patent and Trademark Office show that an application for registration of the Mark shown in this Certificate was filed in the Office; that the application was examined and determined to be in compliance with the requirements of the law and with the regulations prescribed by the Commissioner of Patents and Trademarks; and that the Applicant is entitled to registration of the Mark under the Trademark Act of 1946, as Amended.*

*A copy of the Mark and pertinent data from the application are part of this certificate.*

*This registration shall remain in force for TEN (10) years, unless terminated earlier as provided by law, and subject to compliance with the provisions of Section 8 of the Trademark Act of 1946, as Amended.*



*Commissioner of Patents and Trademarks*

Int. Cls.: 35 and 41

Prior U.S. Cls.: 100, 101, 102 and 107

**United States Patent and Trademark Office**

Reg. No. 2,380,411

Registered Aug. 29, 2000

## SERVICE MARK
### PRINCIPAL REGISTER

## INTERNATIONAL HARDWARE WEEK

AMERICAN HARDWARE MANUFACTURERS ASSO-
CIATION (DELAWARE CORPORATION)
801 NORTH PLAZA DRIVE
SCHAUMBURG, IL 601734977

FOR: PLANNING, SPONSORING AND CON-
DUCTING MEETINGS AND EXPOSITIONS FOR
HARDWARE MANUFACTURERS AND TRADE CUS-
TOMERS AROUND THE WORKED, IN CLASS 35
(U.S. CLS. 100, 101 AND 102).

FIRST USE 3–0–1997; IN COMMERCE 3–0–1997.
FOR: CONDUCTING SEMINARS ON TOPICS OF
INTEREST TO HARDWARE MANUFACTURERS

AND THEIR CUSTOMERS, IN CLASS 41 (U.S. CLS.
100, 101 AND 107).

FIRST USE 3–0–1997; IN COMMERCE 3–0–1997.
OWNER OF U.S. REG. NOS. 1,425,079 AND
1,432,192.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT
TO USE "HARDWARE", APART FROM THE MARK
AS SHOWN.

SEC. 2(F).

SER. NO. 75–524,426, FILED 7–23–1998.

KATHLEEN M. VANSTON, EXAMINING ATTORNEY