

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS **FILED**
EASTERN DIVISION

SEP 1 3 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

AMERICAN HARDWARE )
MANUFACTURERS ASSOCIATION, a )
Delaware not-for-profit corporation, )
)
)
Plaintiff, )
)
)
v. )
) No. 03 C 9421
)
REED ELSEVIER, INC., a Massachusetts )
Corporation, and REED EXHIBITIONS, a ) Judge James B. Moran **DOCKETED**
division of Reed Elsevier, Inc., and )
ASSOCIATION EXPOSITION & SERVICES, ) SEP 1 7 2004
a division of Reed Elsevier, Inc., and FREEMAN )
DECORATING CO. (a/k/a The Freeman )
Companies), an Iowa corporation, and FREEMAN )
DECORATING SERVICES, INC. (a/k/a The )
Freeman Companies), a Texas corporation, )
)
Defendants. )

## THE FREEMAN DEFENDANTS' MOTION TO DISMISS

Defendants, Freeman Decorating Company and Freeman Decorating Services, Inc. (together "Freeman"), move to dismiss the complaint of plaintiff, American Hardware Manufactures Association ("AHMA") pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6). In support of its Motion, Freeman concurrently has filed a brief in support and further states:

1.  On July 16, 2004, AHMA filed its First Amended Complaint ("Complaint"), which named Freeman as a defendant for the first time.

2.  Only three of the Complaint's thirteen Counts are directed against Freeman. These are Count II (Illinois Consumer Fraud Act), Count III (Civil Conspiracy), and Count VI (Unjust Enrichment). The remaining Counts are directed only against the Reed Defendants (together "Reed").

3.     The claims against Freeman should be dismissed because they previously have been released.  On February 26, 2003, AHMA and Reed executed a Separation Agreement that provided a full and complete release to Reed of any and all claims that it had with respect to this matter up to the date of the Separation Agreement.  As a joint-tortfeasor, Freeman also was released.

4.     In addition to this prior release, Count II (Illinois Consumer Fraud Act) should be dismissed because AHMA has not and cannot plead a violation of the Consumer Fraud Act. Additionally, the consumer fraud allegations fail to meet the standards of Rule 9(b).

5.     Count III (Civil Conspiracy), based on the consumer fraud claim, should be dismissed for similar reasons.

6.     Count VI (unjust enrichment) should be dismissed because AHMA has not alleged that Freeman received a benefit to which it is entitled.  Further, valid contracts entirely govern the relationships between the parties.

WHEREFORE, Defendants, Freeman Decorating Company and Freeman Decorating Services, Inc., respectfully request that the Court enter an order, pursuant to Rules 9(b) and 12(b)(6), that dismisses with prejudice Counts II, III and VI of American Hardware Manufacturers Association's first amended complaint with respect to Freeman.

Respectfully submitted,

FREEMAN DECORATING COMPANY
and FREEMAN DECORATING
SERVICES, INC.

By: _Anthony J. Carballo_
One of Their Attorneys

2

Anthony J. Carballo
Fred Foreman
Aren L. Fairchild
Garry L. Wills
Freeborn & Peters LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Tel.: 312/360-6000
Fax: 312/360-6596

Dated: September 13, 2004

#630821v2

## CERTIFICATE OF SERVICE

The undersigned certifies that he this day caused a copy of The Freeman Defendants'

Motion to Dismiss and Brief in Support of The Freeman Defendants' Motion to Dismiss to be

served upon the attorneys listed below by regular U.S. Mail, proper postage prepaid, prior to

5:00 p.m. on September 13, 2004.

William P. Farrell, Jr., Esq.
Scott J. Fisher, Esq.
Gardner Carton & Douglas LLP
191 North Wacker Drive
Suite 3700
Chicago, Illinois 60606

Benjamin J. Randall, Esq.
Randall & Kenig LLP
455 North Cityfront Plaza
Suite 3160
Chicago, Illinois 60611

Michael I. Rothstein, Esq.
Mark R. Bagley, Esq.
Tabet DiVito & Rothstein LLC
180 North LaSalle Street
Suite 1510
Chicago, IL 60601

_Anthony J. Carballo_
Anthony J. Carballo

Dated: September 13, 2004

#624392

UNITED STATES DISTRICT COURT **F I L E D**
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION SEP 1 3 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

AMERICAN HARDWARE )
MANUFACTURERS ASSOCIATION, a )
Delaware not-for-profit corporation, )
)
Plaintiff, )
)
v. )
) No. 03 C 9421
REED ELSEVIER, INC., a Massachusetts )
Corporation, and REED EXHIBITIONS, a ) Judge James B. Moran **DOCKETED**
division of Reed Elsevier, Inc., and )
ASSOCIATION EXPOSITION & SERVICES, ) SEP 1 7 2004
a division of Reed Elsevier, Inc., and FREEMAN )
DECORATING CO. (a/k/a The Freeman )
Companies), an Iowa corporation, and FREEMAN )
DECORATING SERVICES, INC. (a/k/a The )
Freeman Companies), a Texas corporation, )
)
Defendants. )

**BRIEF IN SUPPORT OF**
**THE FREEMAN DEFENDANTS' MOTION TO DISMISS**

The claims against Freeman should be dismissed. First, all claims based on acts or

omissions up to February 26, 2003 were released when AHMA gave a full and unrestricted

release of those claims to Reed, a purported joint tortfeasor. That unrestricted release also

released Freeman.

Each count against Freeman also should be dismissed for failure to state a claim.

Although over two hundred paragraphs long, the Complaint mostly makes conclusory,

unsupported, pejorative attacks on the defendants. The consumer fraud claim alleges that

Freeman's conduct allowed Reed to breach the terms of the Show Agreement between Reed and

AHMA. However, the plain language of the Show Agreement contradicts AHMA's statements.

The conclusory allegations also fail to meet the pleading requirements of Rule 9(b). The civil

34

conspiracy claim, alleged in an unsupported "guilty by association" manner, is based on the same insufficient allegations and, therefore, fails for the same reasons. Finally, the unjust enrichment claim fails because it cannot identify any benefit that Freeman received to which AHMA is entitled, and because express written contracts govern the entirety of the relationship among AHMA, Reed and Freeman.

## ALLEGATIONS FROM THE COMPLAINT

The complaint focuses on the twenty-seven year relationship between AHMA and Reed, and ten of its thirteen counts solely are directed at Reed. The three joint claims against Freeman and Reed allege that Freeman assisted Reed in Reed's avoidance of its contractual obligations to AHMA (Compl., ¶112), and that Freeman offered Reed "commissions, rebates or kickbacks" in order to become or remain Reed's general contractor (*Id.*, ¶¶55, 87). Because of the derivative nature of these claims, AHMA communally pleads against "Reed and Freeman" as if they were a single entity. *See, e.g., Id.*, ¶¶56 ("Both Reed and Freeman . . ."); 93 ("Reed and Freeman engaged . . ."); 107 (". . . allow Reed and Freeman"); 109 ("The conduct of Reed and Freeman . . ."); 111 (". . . the concerted actions of Reed and Freeman").

In 1998, Freeman entered into a contract with Reed ("the Freeman Contract"), under which Freeman would be general contractor for thirty-eight different trade shows. *Id.*, ¶¶54-55. The National Hardware Show ("the Show"), which AHMA sponsored, was just one of these shows. *Id.*, ¶¶15, 55. The Freeman Contract set forth the services that Freeman would provide for all of the shows, and how costs would be handled. *Id.*, ¶¶57-60.

Allegedly, in 2001, AHMA "contacted Freeman directly to inquire about the [high] rates being charged to exhibitors [at the Show]." *Id.*, ¶47. Allegedly, Freeman then candidly responded that "cost-shifting" may have increased rates. *Id.* Freeman also provided a trade

2

journal article describing the well-known practice of cost-shifting and its effects. *Id.*, ¶¶47-49. At the only meeting between Freeman and AHMA alleged in the complaint, Freeman purportedly again candidly discussed cost-shifting and its effects.[1] *Id.*, ¶48.

Later, after disagreements arose between AHMA and Reed over the Show, they executed a Separation Agreement in which AHMA gave an unrestricted release to Reed for "any and all claims" associated with the Show up to the date of the Separation Agreement. *Id.*, Ex. D, ¶7(b).

## ARGUMENT

### I.     Standard of Review.

The standards for a motion to dismiss under Rule 12(b)(6) are well known. However, although reasonable inferences may be made in a plaintiff's favor, the Court must ignore conclusory and unsupported allegations. *Palda v. General Dynamics Corp.*, 47 F.3d 872 (7th Cir. 1995) ("A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)"). Also, this Court need not stretch allegations beyond their sensible and reasonable implications. *Miller v. Showcase Homes, Inc.*, 1999 WL199605 at *2 (N.D. Ill. 1999). Further, for claims based on written documents, the terms of the documents control over a plaintiff's allegations. *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co. of Chicago*, 927 F.2d 988, 991 (7th Cir. 1991) (affirming dismissal where the terms of an attached agreement contradicted allegations in the complaint).

### II.     All Claims Based on Conduct Up to February 26, 2003, Have Been Released.

Under well settled Illinois law, the unrestricted release of a joint tortfeasor releases all other joint tortfeasors for the same injury. *E.g., Porter v. Ford Motor Co.*, 449 N.E.2d 827, 830 (Ill. 1983) ("A full or unqualified release as to one indivisible injury given to any of those concurring in its cause releases both joint and independent concurrent tortfeasors").

---

[1] Freeman will consider the plaintiff's allegations regarding "cost-shifting" as true for purposes of this motion only.

3

Here, AHMA alleges that Freeman is a joint tortfeasor with Reed. *See, e.g.,* Compl., ¶2 ("Reed and Freeman are jointly and severally liable"). In their Separation Agreement, however, AHMA provided a full and complete release to Reed of any and all claims up to the date of the Separation Agreement.[2] The Separation Agreement provides:

> AHMA on behalf of itself and its [related parties] hereby releases, covenants not to sue and <u>forever discharges</u> Reed and its [related parties] <u>from any and all claims</u>, demands, damages, losses, obligations, liabilities, costs, expenses (including, without limitation, attorneys' fees), causes of action, debts, contracts torts, covenants, fiduciary duties, responsibilities, suits and judgments, at law or in equity <u>of every nature and kind</u> that [AHMA and its related parties] may have had, or may have in the future against [Reed and its related parties] <u>whether known or unknown, for any and all matters, including without limitation, all matters relating to, arising out of or in conjunction with the operation, management or conduct of the Show, the Show Agreement or otherwise related to the Show Agreement</u> [from the beginning of time to the date of the Separation Agreement, but not for claims arising after the date of the Separation Agreement].

*Id.,* Ex. B, ¶7(b) (emphasis added). This plainly provides a broad, unrestricted, and complete release of any claims for injury associated with the Show or its related agreements. Without an express reservation of rights to retain claims against other joint tortfeasors, such as Freeman, AHMA's release of Reed also released Freeman.[3] *Porter,* 449 N.E.2d at 830.

## III. AHMA Has Not Sufficiently Plead A Violation of the Illinois Consumer Fraud Act.

Stripped of its rhetorical flourishes, derogatory attacks, and unsupported conclusions, AHMA's consumer fraud claim against Freeman boils down to allegations that, under the Freeman Contract, Freeman would serve as general contractor for the Show, and, unsurprisingly, Freeman then performed as required. This does not state a consumer fraud claim, where a plaintiff must allege that (1) the defendant committed a deceptive act or practice; (2) the

---

[2] As part of its first amended complaint, AHMA alleges the Separation Agreement should be set aside. Reed has addressed the enforceability of the Separation Agreement as part of its Motion to Dismiss the first amended complaint, which Freeman joins in and adopts by reference here.

[3] Given the rambling nature of the complaint, which is not limited to conduct only after the Separation Agreement, if any claims remain against Freeman after enforcement of the release, then those claims should be repled.

defendant intended that plaintiff rely on the deceptive act or practice; and (3) the deception occurred in the course of conduct involving trade or commerce. *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 593 (Ill. App. 1996). Moreover, the plaintiff must supply proof of proximate causation. *Id., see also Shannon v. Boise Cascade Corp.*, 805 N.E.2d 213, 217 (Ill. 2004) ("proof of actual deception of the plaintiff is required"); *Geschke v. Air Force Ass'n*, 2004 WL1615078 at *2 (N.D. Ill. July 16, 2004) (same). Consumer fraud allegations also are held to the same heightened pleading requirements as common law fraud claims. *See, e.g., Connick*, 675 N.E.2d at 593; *Appraisers Coalition v. Appraisal Inst.*, 845 F.Supp. 592, 608-09 (N.D. Ill. 1994).

Here, AHMA alleges Freeman's "deceptive course of conduct" was (1) paying "undisclosed kickbacks – disguised as commissions or rebates" to Reed in order to become its general contractor, (2) engaging in cost-shifting which resulted in Show expenses being passed on "to AHMA members and other exhibitors of the Show"; (3) paying "bribes" to Reed in order to become its general contractor; and (4) "the concealment, suppression and omission of material facts from AHMA." Compl., ¶104. As shown below, the terms of the agreement they purportedly violate, and other facts AHMA alleges, flatly contradict this. The allegations also fail to meet the heightened pleading requirements for fraud.

## A.    "Cost-Shifting" Does Not Violate the Consumer Fraud Act.

### 1.    "Cost-Shifting" Is Not A *Per Se* Consumer Fraud Act Violation.

At no point does AHMA allege that cost-shifting generally is *per se* a violation of the Consumer Fraud Act, or that any cost-shifting terms of the Freeman Contract are a *per se* violation. In fact, AHMA alleges only that the "bribery and kickback scheme" is an unfair or deceptive practice. *Id.*, ¶105. While AHMA apparently is upset about cost-shifting, that is not enough to become a violation or support a claim.

5

## 2. "Cost-Shifting" Did Not Violate the Show Agreement.

Instead of pointing to some *per se* illegal or improper act, AHMA attempts to allege that Freeman's cost-shifting became deceptive because it allowed Reed to violate its responsibility to pay expenses under the Show Agreement. *See Id*, ¶¶131 (under Paragraph 10(a), Reed was to pay "all expense" related to the Show); 132 (Reed did not pay expenses because, through its arrangement with Freeman, it shifted costs to AHMA members), 134 (the terms of the Freeman Contract contradict Reed's responsibilities to pay expenses related to the Show). However, the plain language of the Show Agreement contradicts this.

To create an illusion of deceptive conduct, AHMA alleges Reed <u>alone</u> was responsible for the payment of <u>all</u> expenses related to the Show. AHMA alleges:

> Paragraph 10(a) of the Show Agreement provides in pertinent part that "Reed shall be responsible for . . . **paying** all expenses . . . incurred in conducting the Shows." (emphasis added)

*Id.*, ¶131. AHMA plainly wants to create the impression that AHMA members should not be responsible for any expenses related to the show, such as Freeman's expenses as the general contractor. *See Id.*, ¶¶132 (Reed shifted expenses to AHMA members), 133 (general contractor expenses were the responsibility of Reed), 134 (the cost-shifting in the Freeman Contract contradicted Reed's requirement to pay for expenses); 136 (diverting expenses to AHMA members is "diametrically inconsistent with Reed's contractual obligation to **pay** those expenses") (emphasis in original). In fact, the Show Agreement provides that AHMA members would be charged for expenses.

First, in a pregnant omission, AHMA's elliptical citation to Paragraph 10(a) avoids critical contradictory language. That paragraph provides in its entirety:

> [Reed] shall be responsible for collecting all revenue derived from conducting the Shows and for paying all expenses, except those incurred directly

6

by [AHMA] without the consent of [Reed], incurred in conducting the Shows. For its services hereunder, [Reed] shall be entitled to retain all amounts remaining after payment of such expenses and all sums due to [AHMA] hereunder. The financial responsibility of [Reed] as herein provided shall apply only to the conduct and operation of the Show and not to other activities of [AHMA] in connection with Hardware Industry Week such as seminars, meetings, convention activities, luncheons, dinners, etc., which shall be the responsibility of [AHMA].

*Id.*, Ex. A, ¶10(a). Thus, far from requiring Reed alone to pay expenses, Paragraph 10(a) only requires Reed to handle the money associated with the Show. Reed first would collect fees from AHMA members, then it would pay AHMA its share of those gross fees, and then Reed would pay expenses out of the remainder. Indeed, the same paragraph further provides that, "In the event that, for any Show, after payment has been made to [AHMA] of all sums due to it hereunder, the remaining revenue is not sufficient to pay all of the expenses for such Show, the deficit shall be assumed by [Reed]." *Id.*, Ex. A, ¶10(e). This plainly shows that "Reed's obligation" to pay expenses only arrives if the fees collected from AHMA members are insufficient to cover both the payment to AHMA as well as the expenses.

Similarly, no other provisions in the Show Agreement, or any other purported agreement,[4] prohibit the practice of cost-shifting or provide that AHMA members would not be charged for expenses. Accordingly, AHMA has not shown that cost-shifting of any sort, even if eventually proven to be true, violates the Show Agreement or, therefore, is a deceptive practice in violation of the Consumer Fraud Act.

**B.     AHMA's Pejorative Allegations Regarding "Kickbacks" and "Bribes" Also Do Not State A Violation of the Consumer Fraud Act.**

Although AHMA claims that payment of "kickbacks" and "bribes" were separate deceptive acts, in essence both allegations are that Freeman gave something of value to Reed to

---

[4] At several places AHMA alleges that other expense sharing agreements exist. *See* Compl., ¶¶39, 40. However, AHMA has not alleged that any of these agreements are even remotely associated with cost-shifting, or that they have been breached.

become or remain the general contractor for the Show. Thus, they can be dealt with together. Again, AHMA does not allege that this conduct was a *per se* violation of the Consumer Fraud Act. In fact, AHMA itself refers to these payments as non-fraudulent "commissions" or "rebates." *See Id.*, ¶35. Instead, AHMA attempts to allege that a "scheme" to use them became a violation (*see* Compl., ¶105), and, again, the gravamen of those allegations is that the practice allowed Reed to avoid its contractual obligations to AHMA. *See Id.*, ¶¶107 (the purported fraud was designed to have AHMA believe that Reed was in compliance with contractual obligations); 138 (receipt of commissions violated Reed's contractual obligation to "share all lawful revenue" associated with the Show with AHMA); 139-41 (Reed violated its obligations to share revenue when it received commissions). However, AHMA has failed to adequately plead how any such purported agreement was violated.

For example, the plain language of the Show Agreement does not require Reed to share "all lawful revenue" with AHMA. It only covers fees collected from the sale or rental of exhibit space. *See Id.*, Ex. A, ¶10(b). Again, AHMA's allegations do not have a foundation in the written contract that purportedly was violated. AHMA attempts to circumvent this problem through an allegation that other revenue sharing agreements exist that require the sharing of "all lawful revenue." *See Id.*, ¶35. However, no specific terms of these agreements are given. Rather, AHMA characterizes the terms to be the same as those of the Show Agreement. *Id.* As no terms are given, undoubtedly because they are not as broad as AHMA desires the Court to believe,[5] the Court can only reference the terms of the Show Agreement, which has no such

---

[5] The allegations with respect to these other contracts, which do not involve Freeman, should be rejected because they provide absolutely no indication of which contract, if any, required disclosure of Freeman's payments to Reed or the actual terms of the contract that were violated. *See, e.g., Hoopla Sports and Entertainment, Inc. v. Nike, Inc.,* 947 F.Supp. 347, 356 (N.D. Ill. 1996) (in action based on a contract, plaintiff must allege formation of a contract, terms of that contract, performance by plaintiff, breach by defendant, and damages).

8

requirement. Thus, AHMA's characterization of these other agreements similarly fails.

Further, at least with respect to the alleged "kickbacks," AHMA has failed to show how they would have increased AHMA's share. Under the Show Agreement, after AHMA's share of the gross revenue is delivered, Reed pays expenses, including general contractor fees. AHMA's allegation of "kickbacks" is that the general contractor, Freeman, then gave a rebate back to Reed. That rebate, however, would not increase the revenue to which AHMA was entitled.

C.     AHMA's Allegations of Freeman's "Omissions" Are Speculative and Contradicted by Other Allegations.

To sustain its consumer fraud claim, AHMA alleges that Freeman was aware that Reed was violating or would violate Reed's contracts with AHMA and, therefore, also desired to participate in the scheme. This assertion is entirely unsupported. Out of thirteen counts and two hundred seven paragraphs, only two conclusory (and legally inadequate) paragraphs allege that Freeman had any awareness of Reed's contracts with AHMA or a violation of them:

> 97.     Freeman knowingly and willfully assisted Reed in perpetuating their scheme to defraud. Freeman knew or had reason to know that its actions with respect to cost-shifting and paying kickbacks, its efforts to conceal these practices from AHMA and its members, and its material misstatements with respect to inflated prices charges to exhibitors as a consequence of cost-shifting constitute fraud against AHMA and its members.

> \*          \*          \*          \*

> 112.     In furtherance of the conspiracy, and in an effort to obtain significant monetary and other benefits, Freeman, knowing Reed was acting in derogation of contractual and legal obligations, assisted Reed in avoiding expenses incurred by operating the Show and shifting those costs to AHMA members and other exhibitors at the Show.

There is no factual support for these allegations, such as *how* Freeman had reason to know of Reed's contractual obligations or that Reed would violate them. At most, AHMA has alleged that Freeman was negligent – that it "had reason to know" of Reed's contractual obligations. Even that allegation of negligence, however, is speculative. No reasonable inference that

9

Freeman "should have known" from circumstantial evidence is possible either. AHMA alleges that Freeman and Reed had a contractual relationship and that Freeman acted in accordance with that contractual relationship. Not even the Consumer Fraud Act is so broad as to permit this to be an inference of fraud between them. Further, the Freeman Contract contradicts any such assumption.[6]

Other allegations also contradict the purported scheme to defraud. For example, AHMA describes only two direct communications with Freeman. *Id.*, ¶¶47-51. In both instances, AHMA alleges that Freeman made no effort to omit or conceal anything about its purportedly fraudulent conduct. To the contrary, AHMA alleges that Freeman was entirely candid about its practices. First, when AHMA inquired about exhibitor rates, Freeman apparently wrote back that cost-shifting could cause rates to rise. *Id.*, ¶47. Then, at a follow-up meeting, AHMA alleges that Freeman openly discussed cost-shifting. *Id.*, ¶51. Freeman also allegedly was forthright with the trade show industry in general – Freeman was quoted in a trade show publication on the practice of cost-shifting and its effect on exhibitor costs. *Id.*, ¶49. From these allegations, if true, it is unreasonable to assume that Freeman would participate in a "scheme to defraud" AHMA and then openly discuss with AHMA and the world the "deceptive" practice through which that fraud is carried out. If anything, the only reasonable inference that can be made is that Freeman had no interest to, nor did it, defraud AHMA or anybody else.

**D.     The Heightened Pleading Requirements of Rule 9(b) Are Not Met.**

To satisfy Rule 9(b), AHMA must plead particular facts showing the "who, what, when, where and how" of the fraud. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). *See also Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992); *Olympic Chevrolet,*

---

[6] The Freeman Contract contains sensitive and confidential business information. Therefore, Freeman will file a copy of this contract with the Court under seal as soon as the protective order pending before the Court is entered.

*Inc. v. General Motors Corp.*, 959 F. Supp. 918, 920, n1 (N.D. Ill. 1997) ("Claims made pursuant to the Illinois Consumer Fraud Act . . . must state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated." (citation omitted)).

Here, there are no particular factual allegations on *who* committed the fraud. A viable fraud claim must "inform each defendant of the nature of his alleged participation in the fraud." *See Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 778 (7th Cir. 1994) (citing cases). A plaintiff is not permitted to simply lump defendants together. *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) (affirming dismissal of complaint that "lumps" all defendants together due to insufficient particularity). AHMA, however, simply repeats over and over again that Freeman and Reed acted together without particularizing either the action or which defendant actually committed it.

Similarly, AHMA fails to establish *what* misrepresentations were made, *to whom* they were made, or *when* or *where* they were made. *See Graue Mill*, 927 F.2d at 992-93 (affirming dismissal where plaintiff did not allege "the *specific* content of any fraudulent statements or acts,...the time and place of the relevant misrepresentations or the individuals party to them") (emphasis in original). Here, only one paragraph claims that Freeman made "material misstatements with respect to the inflated prices charged to exhibitors." *Id.*, ¶23. AHMA provides no hint, however, as to the actual content of these alleged misrepresentations. In fact, all of the facts that AHMA does plead with particularity actually refute its claim of non-disclosure, such as the meeting where Freeman openly disclosed its supposedly conspiratorial behavior. *See Id.*, ¶¶47-51. AHMA also alleges in a general way that because Freeman and Reed entered into the Freeman Contract in 1998, the purported conspiracy "[o]n information and

belief" began in 1998. *Id.*, ¶55. The conspiracy then lasted "[f]or years" or "span[ed] years." *Id.*, ¶¶1, 3. Such allegations also fall short of the Rule 9(b) standard.

AHMA also alleges no facts to establish *how* any representation or omission by Freeman could have proximately caused any damage to AHMA. All of the damages that AHMA seeks flow from alleged violations of the Show Agreement (and purported later agreements) between Reed and AHMA. However, AHMA has not asserted how it could have acted differently because of any representations or omissions by Freeman. Accordingly, AHMA's claim should be dismissed because it fails to plead consumer fraud with the required specificity.

**IV. AHMA Has Not and Cannot Plead a Viable Claim for Civil Conspiracy.**

**A. No Independent Claim for Conspiracy Exists.**

Illinois does not recognize a separate cause of action for conspiracy, rather it relates to the underlying wrongful acts purportedly done in furtherance of the conspiracy. *See Caplan v. International Fidelity Ins. Co.*, 902 F. Supp. 170, 175 (N.D. Ill. 1995). Thus, a conspiracy claim brought over an underlying wrongful act of fraud must be dismissed if the fraud claim is dismissed. *Id.* (court dismissed conspiracy claim because it also had dismissed the underlying fraud and slander of title claims on which the conspiracy claim was based). Here, the conspiracy claim is predicated on the purported scheme to defraud through the use of cost-shifting and payment of "kickbacks." *See Id.*, ¶112. In other words, the same wrongful conduct that forms the basis of the consumer fraud claim. As that consumer fraud claim fails, the civil conspiracy claim also must be dismissed.

**B. The Civil Conspiracy Claim Fails to Meet A Heightened Pleading Standard.**

A bare allegation of a conspiracy is not sufficient to survive a motion to dismiss. *Ryan v. Mary Immaculate Queen Center*, 188 F.3d 857, 860 (7th Cir. 1999) (the "stringent requirement

of [Rule 9(b)] is appropriate where the gravamen of the plaintiff's conspiracy claim is based on fraud.")[7] *See also Tango Music, L.L.C. v. Deadquick Music, Inc.*, 2001 WL897606 at *6 (N.D. Ill. 2001); *Eisenhauer v. Stern*, 2000 WL136011 at *2 (N.D. Ill. 2000) (noting that "simply mouthing conclusory assertions of "conspiracy" in the context of an asserted fraud will not suffice"). To successfully allege a civil conspiracy claim, "a plaintiff must identify with particularity in its pleadings (1) the nature of the conspiracy and (2) each defendant's role in the conspiracy." *Herion v. Village of Bensenville*, 2000 WL1648937 at *7 (N.D. Ill. Nov. 1, 2000). Moreover, "a plaintiff must allege <u>particular facts establishing the existence of an agreement between the alleged conspirators to inflict the alleged harm</u>." *Id.* (emphasis added).

Here, AHMA's allegations are woefully short of this standard. It provides no details, other than its conclusory opinion that such a conspiracy existed, that would establish the existence of an agreement to defraud AHMA. To the contrary, it alleges numerous facts that undermine such a conclusion. It acknowledges that the relationship between Freeman and Reed was not based on a contract specific to AHMA's show. Rather, it related to numerous shows. *Id.*, ¶52. AHMA provides no particular facts of how an agreement designed to regulate the conduct of the parties for "numerous trade shows" also was designed specifically to inflict the alleged harms against AHMA. In a similar vein, it further alleges that the scheme to defraud was not just against AHMA, but also against other trade associations. *Id.*, ¶56. Again, however, it provides no details. AHMA also casually alleges that other, unnamed and unidentified individuals were part of this scheme. *Id.*, ¶111. These allegations fail to identify who these individuals are, what role they played in the conspiracy, or how they also were part of the agreement between Freeman and Reed. None of these conclusory allegations satisfy the necessary pleading elements for a civil conspiracy claim, and it should be dismissed.

---

[7] In fact, a bare allegation of conspiracy does not even meet the more liberal Rule 8 standards. *Id.*

13

## V.   AHMA Cannot State a Claim For Unjust Enrichment.

AHMA's claim for unjust enrichment fails because AHMA does not and cannot allege that Freeman received any benefit that rightfully belongs to AHMA.   AHMA alleges that "Freeman has received and/or retained significant monetary and other benefits, including the lucrative general contractor position for the Show from Reed, through its wrongful conduct, at the expense of AHMA and its members." *Id.*, ¶148.   AHMA therefore seeks to recover a benefit that AHMA did not directly confer on Freeman.   In situations where a third-party, not the plaintiff, conferred the benefit on the defendant, the plaintiff must show that "(1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead, (2) the defendant procured the benefit from the third party through some type of wrongful conduct, or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant." *HPI Health Care v. Mt. Vernon Hosp.*, 131 Ill.2d 145, 161-62, 545 N.E.2d 672, 679 (1989) (citations omitted).   However, in all of these situations, the plaintiff must show that the benefit rightfully belonged to the plaintiff. *Id.* Here, AHMA cannot do so.

AHMA's allegation about Freeman becoming the general contractor can be dismissed easily because AHMA clearly could not and should not have received that benefit.   As for cost-shifting, Freeman's expenses purportedly were paid from fees collected from AHMA members that AHMA alleges Reed should have paid.   There is no allegation, however, how this benefit should have been paid to AHMA instead.

In a different fashion, AHMA's allegations with respect to "kickbacks," or any other payments made to Reed to secure its position as general contractor, also fail because Freeman did not *retain the benefit*.   Rather, it *paid these benefits* to Reed.   Thus, Freeman did not retain any benefit to which AHMA would be entitled.

14

AHMA's claim for unjust enrichment fails for the additional reason that express written contracts govern the entirety of the relationship among AHMA, Reed and Freeman. The theory of unjust enrichment is based upon a contract implied in law. *LaThrop v. Bell Federal Savins & Loan Assoc.*, 68 Ill. 2d 375, 370 N.E.2d 188, 195 (1977); *Sobel v. Franks*, 261 Ill. App. 3d 670, 682-83, 633 N.E.2d 820, 828 (1st Dist. 1994). The courts will not imply a contract where an express contract exists on the same subject matter. *University of Illinois v. Continental Cas. Co.*, 234 Ill. App. 3d 340, 353, 599 N.E.2d 1338, 1347 (4th Dist. 1992); *see also F.H. Prince & Co. v. Towers Financial Corp.*, 275 Ill. App. 3d 792, 804, 656 N.E.2d 142, 151 (1st Dist. 1995) ("[W]here there is a specific contract which governs the relationship of the parties, the doctrine [of unjust enrichment] has no application."). Therefore, there can be no claim of unjust enrichment when there is a contract governing the relationship of the parties. *LaThrop*, 370 N.E.2d at 195. Here, AHMA admits in its pleading that there are contracts governing the entirety of the relationships between AHMA, Reed and Freeman. In fact, AHMA specifically incorporates its breach of contract claim as part of its unjust enrichment count. *See Id.*, ¶145. Accordingly, AHMA's unjust enrichment claim against Freeman should also be dismissed.

## CONCLUSION

For all of these reasons, this Court should grant Freeman's Motion to Dismiss.

15

Respectfully submitted,

FREEMAN DECORATING COMPANY
and FREEMAN DECORATING
SERVICES, INC.

By: _Anthony J. Carballo_
One of Their Attorneys

Anthony J. Carballo
Fred Foreman
Aren L. Fairchild
Garry L. Wills
Freeborn & Peters LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Tel.: 312/360-6000
Fax: 312/360-6596

Dated: September 13, 2004

#628220v6

16