

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN HARDWARE MANUFACTURERS ASSOCIATION, a Delaware not-for-profit corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. 03 C 9421 |
| REED ELSEVIER, INC., a Massachusetts corporation, et al., | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff American Hardware Manufacturers Association (AMHA) brought this action against defendants Reed Elsevier and two of its divisions, Reed Exhibitions and Association Expositions & Services (collectively "Reed"), and Freeman Decorating Co. and Freeman Decorating Services, Inc., (collectively "Freeman"), alleging thirteen counts, including fraud, conspiracy, breach of contract and violation of the Lanham Act. Reed and Freeman filed motions to dismiss, which the court granted in part and denied in part. *See* American Hardware Manufacturers Association v. Reed Elsevier, Inc., 2004 WL 3363844, 2004 U.S. Dist. LEXIS 28007 (N.D. Ill. 2004) (AHMA).[1] Reed has now moved for summary judgment on Counts IX and X of its counterclaim and its second affirmative defense. Freeman joins Reed's motion for summary judgment, and seeks to dismiss the civil conspiracy claim. For the

---

[1] In this ruling the court denied the motion to dismiss Count I (fraud); dismissed in part Count II (Illinois Consumer Fraud and Deceptive Business Practices Act) against Reed, and in whole against Freeman; denied the motions to dismiss Count III (conspiracy); dismissed in part Count IV (breach of fiduciary duty); dismissed in part Count V (breach of contract); denied Reed's motion to dismiss Count VI (unjust enrichment), but granted Freeman's motion to dismiss that count; dismissed in part Count XI (tortious interference with prospective economic advantage and contractual relationships); and denied the motion to dismiss Count XII (accounting).

following reasons the motion for summary judgment is denied.

## BACKGROUND

The factual background is taken from the parties' statements of fact submitted pursuant to Local Rule 56. AHMA is a non-profit trade association serving the hardware and home improvement industry, and it consists of manufacturer members, manufacturing representatives and trade publications. Reed owns and operates trade shows around the world. In 1977, AHMA and Reed entered into an agreement ("show agreement") concerning the operation of the National Hardware Show, a major convention and trade show. Pursuant to the show agreement, the Hardware Show was sponsored and conducted by AHMA and managed by Reed. Paragraph 11(a) of the agreement provided that Reed would not conduct, sponsor or manage any trade show primarily related to hardware, lawn, garden or home improvement products, anywhere in the United States.[2]

Through the years, the Hardware Show enjoyed general success as attendance levels grew and revenues increased, until around 2001, when rented exhibit space began to decline. AHMA believed that the negative trend was caused by excessive fees charged to exhibitors by Freeman, the show's general contractor. Freeman allegedly increased fees to exhibitors in order to compensate for free services that it provided to Reed. AHMA asked Reed to discontinue its cost-shifting practice and accept bids from contractors other than Freeman, but

---

[2] Paragraph 11(a) states:
Prior to the termination of this Agreement, neither [Reed] nor any Controlled Corporation, as below defined, shall conduct, sponsor or manage a trade exposition, other than the [Hardware Show], in the United States which primarily relates to hardware, lawn, garden and/or home improvement products. [AHMA] hereby acknowledges that [Reed] has produced, and may continue to produce in the future, a Building and Construction Exposition and Conference, approval for which is hereby granted by [AHMA].
Def. ex. E at 10.

Reed refused.[3] Due to parties' fundamental disagreements regarding the show's operation, they decided to end their quarter-century business relationship.

On February 17-18, 2003, Reed and AHMA met and discussed the termination of their relationship, and on February 26, 2003, they executed an agreement known as the separation agreement. The separation agreement terminated the 1977 show agreement effective August 16, 2003. Since that date was after the 2003 Hardware Show, the terms of the show agreement remained in full force through the 2003 Hardware Show. The separation agreement also contained a release provision, under which AHMA discharged Reed from liability for actions taken before but not after February 26, 2003.[4] The release is central to the parties' dispute because AHMA claims that, prior to February 26, 2003, Reed violated the terms of the show agreement. For Reed to face liability for those alleged violations, AHMA must defeat the

---

[3]The court previously noted that at the heart of AHMA's complaint are "allegations that Reed made secret arrangements with Freeman, resulting in plaintiff receiving less revenue than it was due, exhibitors paying higher prices for their exhibiting costs, and attendance at the hardware show declining sharply." AHMA, 2004 WL 3353844, *3.

[4]The release provision sets forth:
AHMA on behalf of itself and its affiliates and their respective officers, directors, employees, agents, predecessors, successors and assigns, hereby releases, covenants not to sue and forever discharges Reed and its affiliates and their respective officers, directors, employees, agents, predecessors, successors and assigns from any and all claims, demands, damages, losses, obligations, liabilities, costs, expenses (including, without limitation, attorney's fees), causes of actions, debts, contracts, torts, covenants, fiduciary duties, responsibilities, suits and judgments, at law or in equity, of every nature and kind that AHMA and its affiliates and their respective officers, directors, employees, agents, predecessors, successors and assigns have, may have had, or may have in the future against Reed and its affiliates and their respective officers, directors, employees, agents, predecessors, successors, and assigns whether known or unknown, for any and all matters, including, without limitation, all matters relating to, arising out of or in connection with the operation, management or conduct of the Show, the Show Agreement or otherwise related to the Show Agreement, for the period from the beginning of time through the date hereof; provided however, except as set forth in paragraph c. of this Section 7, nothing herein is intended to or shall be construed to affect or limit the liability or obligation of Reed and its affiliates and respective officers, directors, employees, agents, predecessors, successors and assigns, if any, to AHMA pursuant to the terms of this Agreement or under the Show Agreement, with respect to acts or omissions occurring after the date hereof.
Def. ex. D at 8-9.

release provision. It attempts to do so by claiming that Reed fraudulently induced its acceptance of the terms in the separation agreement, including the release provision.

AHMA initially claimed that Reed induced its consent to the separation agreement by "misrepresent[ing] its intent (1) to conform with the show agreement's restriction on managing competing shows, (2) to refrain from using AHMA's trademark other than to promote the 2003 hardware show, and (3) to cease the practice of cost-shifting at the 2003 show." AHMA, 2004 WL 3363844, *5. The court held that AHMA failed to state a promissory fraud claim based on the latter two alleged misrepresentations, but that it did state a claim based on Reed's statements that it would not sponsor competing trade shows. *Id.* at *6. Reed's motion for summary judgment focuses on MacDonald's statements regarding the allegedly competing trade shows – the Midwest Builders Show (Builders Show), International Security Conference (Security Show) and Home Automation Show.

According to AHMA, prior to and during negotiations for the separation agreement, Dennis MacDonald, Senior Vice-President of Reed, assured William Farrell, President of AHMA, that Reed would comply with the show agreement and not conduct any trade show that competed with the Hardware Show. Farrell became concerned about Reed's relationship with the show on January 13, 2003, after he received an e-mail advertising the Builders Show. The e-mail stated that the show was "brought to you by" Reed Business Information, a division of Reed (plf. facts ¶¶ 7, 17). The website for the show listed Reed Business Information as a presenter (*id.* at ¶ 8; def. ex. 7). AHMA states that it began to investigate Reed's involvement in other shows that possibly competed with the Hardware Show after it received the January 13, 2003, e-mail. AHMA ultimately identified the Security Show and Home Automation Show as competing shows (plf. facts ¶¶ 34, 35). On January 27, 2003,

Farrell asked MacDonald "to provide any information relating to Reed's affiliation with the Builders Show so that we may determine whether Reed's involvement violates paragraph 11(a) of the Show Agreement" (def. ex. O). MacDonald then asked Tom Fagan, a Reed employee, to see whether the Builders Show competed with the Hardware Show (def. ex. A, ¶ 44), and Fagan concluded that it did not compete (id; def. ex. B, ¶ 10). On February 4, 2003, MacDonald informed Farrell that the Builders Show "does not fall within the description contained in paragraph 11(a) of our 1977 agreement. FYI . . . Reed Business Information is simply exchanging promotional support for this local event" (def. ex. P). This e-mail drew a prompt response from Farrell, who asked MacDonald to define "exchanging promotional support," and noted that Reed's role appeared "to be tantamount to sponsorship of the show," in violation of the show agreement (def. ex. Q). The record contains no indication that MacDonald responded to Farrell's request for clarification.

During the February 17 and 18 meeting, Farrell expressed his concerns about Reed's involvement in the Builders Show (id. at ¶ 24). AHMA states that Farrell and MacDonald discussed in detail Reed's involvement in the Security Show and Home Automation Show, and Reed denied that these shows violated the show agreement (plf. facts ¶¶ 36, 37; def. ex. A ¶ 10). At the meeting, AHMA emphasized the importance of Reed's compliance with the Show Agreement, particularly paragraph 11(a) (plf. facts ¶ 41). MacDonald asserted that Reed was in compliance with the show agreement because no show competed with the Hardware Show (def. ex. A ¶¶ 10, 13). The Builders Show took place on March 18-21, 2003, less than three weeks after the separation agreement was signed (plf. ex. 6-7), and the Security Show and Home Automation Show were held less than a week later, on March 25-28, 2003 (id. ex. 14).

Reed does not deny that it was involved in the shows. It argues that its role in those

shows did not violate the separation agreement because the shows did not compete with the Hardware Show, in violation of the show agreement. In support of that claim, Reed contends that AHMA knew of the Builders Show, Security Show and Home Automation Show prior to signing the separation agreement, and that it did not assert that they were competing events. According to Reed, MacDonald believed that the shows did not compete and that his statements concerning the nature of the shows were not knowingly false. Reed also argues that AHMA's reliance on MacDonald's statements was not reasonable because of its prior knowledge of the shows and the express integration clause in the separation agreement. Reed further contends that the integration clause renders irrelevant any pre-contractual statements not expressly memorialized in the contract. Freeman joins Reed's claim that the separation agreement is valid, and it also argues that it was released from liability when AHMA released Reed. AHMA counters, and argues that it has created a genuine issue of fact as to the validity of the separation agreement, and that even if the release was enforceable, it does not extend to Freeman.

## DISCUSSION

Summary judgment is proper when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). We do not make credibility determinations or weigh evidence when ruling on a summary judgment motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Indeed, it is error to make credibility determinations at the summary-judgment stage. Morfin v. City of E. Chicago, 349 F.3d 989, 999 (7th Cir. 2003). Our only task is to "decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). "[T]here is no issue

for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Anderson</u>, 477 U.S. at 249. Facts and inferences are construed in the light most favorable to plaintiffs, the nonmoving parties. <u>Darnell v. Thermafiber, Inc.</u>, 417 F.3d 657, 659 (7th Cir. 2005).

The issue is whether the separation agreement can be enforced. If it can, then the release and covenant not-to-sue provisions bar AHMA's action as it relates to Reed's conduct prior to February 26, 2003. AHMA could be liable for breaching the terms of the separation agreement, and the indemnification provision would also come into play.[5] But AHMA may proceed with its action if the separation agreement is invalid.

To prevail on its promissory fraud claim, AHMA must prove the following elements of common law fraud: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; (5) plaintiff's damages resulting from reliance on the statement." <u>Davis v. G.N. Mortg. Corp.</u>, 396 F.3d 869, 881-82 (7th Cir. 2005) (quoting <u>Capiccioni v. Brennan Naperville, Inc.</u>, 339 Ill. App. 3d 927, 791 N.E.2d 553, 558, 274 Ill. Dec. 461 (Ill. App. 2d Dist. 2003)); <u>Shanahan v. Schindler</u>, 63 Ill. App. 3d 82, 379 N.E.2d 1307, 1316, 20 Ill. Dec. 239 (Ill. App. 1st Dist. 1978). Whether these elements are present is an issue of fact. <i>See</i> <u>Washington Courte Condo. Association-Four v. Washington-Golf Corp.</u>, 267 Ill. App. 3d 790, 643 N.E.2d 199, 216, 205 Ill. Dec. 248 (Ill. App. 1st Dist. 1994). Promissory

---

[5] The Separation Agreement requires AHMA to:
indemnify, save and hold Reed harmless from and against any and all costs and expenses (including reasonable auditors' fees and attorneys' fees), losses, liabilities, obligations, damages and lawsuits or other proceedings arising out of or resulting from (i) any breach of any representation, warranty or covenant made by AHMA in this Agreement; (ii) any liability expressly assumed by AHMA pursuant to this Agreement.
Def. ex. D a 13.

fraud exists when a party communicates an intent to perform future conduct when he does not actually intend to carry out that promise. <u>Houben v. Telular Corp.</u>, 231 F.3d 1066, 1074 (7th Cir. 2000); <u>Bower v. Jones</u>, 978 F.2d 1004, 1011 (7th Cir. 1992) (quoting <u>Concord Indus., Inc. v. Harvel Indus. Corp.</u>, 122 Ill. App. 3d 845, 849-50, 78 Ill. Dec. 898, 462 N.E.2d 1252 (Ill. App. 1st Dist. 1984)) (promissory fraud occurs when "'a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where the other party relies on it to his detriment.'"). However, promissory fraud involves more than a broken promise. <u>McDonald v. McDonald</u>, 408 Ill. 388, 97 N.E.2d 336, 339 (Ill. 1951). A misrepresentation of intent to perform future conduct, even if made without a present intent to perform, is not actionable unless it is part of a pattern of fraudulent acts, known as a scheme to defraud. <u>Lillien v. Peak6 Invs., L.P.</u>, 417 F.3d 667, 671 (7th Cir. 2005); <u>Speakers of Sport, Inc. v. ProServ, Inc.</u>, 178 F.3d 862, 866 (7th Cir. 1999); <u>Weeks v. Samsung Heavy Indus. Co.</u>, 126 F.3d 926, 942 (7th Cir. 1997); <u>Desnick v. American Broad. Cos.</u>, 44 F.3d 1345, 1354 (7th Cir. 1995). A scheme to defraud may exist when there is a string of broken promises, particularly egregious broken promises that occur in close proximity to the promises. <u>Bower</u>, 978 F.2d at 1012. Because promissory fraud "is easy to allege and difficult to prove or disprove," it is disfavored in Illinois and the burden on the plaintiff claiming promissory fraud is "deliberately high." *Id.*

The parties' arguments primarily turn on the first, second and fourth elements of fraud. The false statements involve MacDonald's assertions that Reed was not violating and did not intend to violate the show agreement.[6] The second element focuses on MacDonald's

---

[6]As noted above, AHMA initially based its fraud claim on three separate grounds, and only the allegations that Reed promised to comply with the show agreement survived the motion to dismiss. One of the two grounds that was dismissed was AHMA's claim that Reed promised to stop its practice of cost-

belief in the veracity of his statements, and necessarily blends with the first element. The fourth element relates to the reasonableness of AHMA's reliance on MacDonald's statements. Prior to discussing the content of MacDonald's pre-contractual statements, we must first discuss whether they may be considered.

We first note that there are no apparent admissibility issues concerning MacDonald's statements.[7] Reed argues that AHMA cannot rely on any pre-contractual statements that do not appear in the separation agreement because that agreement contains an integration clause, which provides:

> This Agreement and the exhibits attached hereto embody the entire agreement and understanding of the parties with respect to the transactions contemplated hereby and supersede all prior or contemporaneous written or oral commitments, arguments or understandings with respect thereto.

(def. Ex. D. ¶ 13). Reed principally relies on Barille v. Sears Roebuck & Co., 289 Ill. App. 3d 171, 682 N.E.2d 118, 224 Ill. Dec. 557 (Ill. App. 1st Dist. 1997), which, according to Reed, held that promises of future conduct omitted from an expressly integrated written contract cannot be reasonably relied on as a matter of law. AHMA ripostes that the integration clause does not preclude it from reasonably relying on MacDonald's statements, and cites Vigortone AG Products v. PM AG Products, 316 F.3d 641 (7th Cir. 2002). AHMA also claims that

---

shifting. We held that "too much time elapsed between promise and breach for the court to infer fraudulent intent" (AHMA, 2004 WL 3363844, *6). AHMA may not bolster its promissory fraud claim with reference to Reed's allegedly false promises not to cost-shift, because those alleged misrepresentations failed to state a promissory fraud claim. This is true regardless of whether the court struck AHMA's cost-shifting allegations. Since we have held that a promissory fraud claim based on allegations relating to cost-shifting failed to state a claim, AHMA cannot now re-raise that basis in its response to Reed's summary judgment motion.

[7]A party may not rely on inadmissible hearsay to resist summary judgment. Bombard v. Fort Wayne Newspapers, Inc., 92 F.2d 560, 562 (7th Cir. 1996). But statements by MacDonald are statements of a party opponent. They are therefore admissible under Fed. R. Ev. 801(d)(2)(D), and can be considered on summary judgment. See Davis, 396 F.3d at 874 n.3.

MacDonald's promises were not of future conduct, but instead of present fact.

In <u>Barille</u>, the plaintiff claimed that the defendant's misrepresentations induced her into signing an employment contract to serve as an insurance agent for the defendant. The defendant argued that the merger clause in the contract made it unreasonable for the plaintiff to rely on prior oral representations. <u>Barille</u>, 682 N.E.2d at 122. The court noted that "statements regarding future events are not a basis for fraud," unless "the misrepresentation is alleged to be the mechanism by which the party making that representation intended to defraud." *Id.* at 123. The court then relied on the doctrine of merger to bar the introduction of any statements not contained in the contract.[8] *Id.*

In <u>Vigortone</u>, the defendant made several oral assertions concerning the market risks of a business transaction with the plaintiff. <u>Vigortone</u>, 316 F.3d at 643. The defendant argued that the integration clause barred the plaintiff from relying on any pre-contractual oral assertions to establish fraud. The court disagreed with the plaintiff, noting that the "general rule is to the contrary" because unlike a breach of contract claim, a claim asserting fraud is not constrained by the parol evidence rule. *Id.* According to the court, an integration clause is relevant only in contract interpretation disputes, and serves no role when the claim is whether the contract was induced by fraud. *Id.* The court noted the absence of analysis in <u>Barille</u>, and cited an Illinois appellate decision contrary to its outcome. *Id.* (citing <u>Salkeld v. V.R. Business Brokers</u>, 192 Ill. App. 3d 663, 139 Ill. Dec. 595, 548 N.E.2d 1151, 1157-58 (Ill. App. 2d Dist.1989)). If parties seek to bar fraud claims, the court observed, the proper course is to insert no-reliance clauses in the contracts. We have already determined that the relevant

---

[8] The contract provided that "it is the complete and exclusive statement of the agreement between you and the Company, and that it supersedes all proposals, oral or written, and all other communication between you and the Company relating to the subject matter of this Agreement." <u>Barille</u>, 682 N.E.2d at 122.

clause here resembles an integration clause and not a non-reliance clause. <u>AHMA</u>, 2004 WL 3363844, *7-8.

Reed claims that <u>Salkeld</u> is distinguishable because it deals with false statements of then-existing facts. In <u>Salkeld</u>, the court rejected the defendant's claim that the plaintiff could not rely on pre-contractual statements because of the doctrine of merger. *Id.* at 1157. The defendant made representations about what type of assistance he would give plaintiff, that a product was selling well, and other representations about a product that the plaintiff eventually licensed from the defendant. The court concluded that the plaintiff reasonably relied on the defendant's untrue statements that, taken together, "painted a picture of a company which would 'be with plaintiff every step of the way.'" *Id.* at 1158. This observation deals with promises of future conduct, not merely present statements of fact.

According to Reed, the court should rely on <u>Barille</u> and not <u>Vigortone</u> because the former dealt with promissory fraud, but the latter dealt with misrepresentations of fact. However, both cases dealt with false statements made by defendants before the contracts were signed, and plaintiffs relied on those statements. Further, the defendants in each case claimed that the integration clauses in the contracts rendered the plaintiffs' reliance on the statements unreasonable. Moreover, the characterization of the statements at issue does not alter the nature of AHMA's fraud claim, a tort action that is not affected by the parol evidence rule or integration clauses. *See* <u>Vigortone</u>; <u>W.W. Vincent & Co. v. First Colony Life Ins., Co.</u>, 351 Ill. App. 3d 752, 814 N.E.2d 960, 968, 286 Ill. Dec. 734 (Ill. App. 1st Dist. 2004) ("The parol evidence rule, as a doctrine of contract law, has no application to cases sounding in tort."); <u>Astor Chauffeured Limousine v. Runnfeldt Inv.</u>, 910 F.2d 1540, 1546 (7th Cir. 1990) ("claims of fraud in the inducement are not blocked by the parol evidence rule"). The cases do not

draw the distinction that Reed attempts to delineate. False promises of future conduct that form a scheme are at the heart of promissory fraud claims. AHMA contends that Reed's fraudulent inducement renders the contract a nullity. To hold that an integration clause in a fraudulently induced contract precludes a fraud-based challenge to the contract is illogical and would also provide a blueprint for defrauding parties to shield their wrongdoing. *See* J.C. Whitney & Co. v. Renaissance Software Corp., 2000 U.S. Dist. LEXIS 6180, *32 (N.D. Ill. 2000).

Reed's reference to Rissman v. Rissman, 213 F.3d 381, 383 (7th Cir. 2000), is unavailing because that case turned on a non-reliance clause, not an integration clause. The difference between the two clauses is significant. A non-reliance clause precludes a party from claiming reliance on prior statements. Rissman does not stand for the broad proposition that parties may not base fraud claims on pre-contractual oral statements. Indeed, in a concurring opinion in Rissman, Judge Rovner anticipated the claim Reed now marshals, when she stated: "I write separately merely to avoid the inevitable quotes in future briefs characterizing our holding as an automatic rule precluding any damages for fraud based on prior oral statements when a non-reliance clause is included in a written agreement." (*Id.* at 389, Rovner, J, concurring.) Reed's reliance on Tirapelli v. Advanced Equities, Inc., 351 Ill. App. 3d 450, 813 N.E.2d 1138, 286 Ill. Dec. 445, 813 N.E.2d 1138 (Ill. App. 1st Dist. 2004), fails for the same reason. In Tirapelli, the court rejected the plaintiff's fraud claim in light of a non-reliance clause in the contract. *Id.* at 1143. The court distinguished Salkeld and Vigortone on the grounds that they involved contracts containing integration but not non-reliance clauses. *Id.* at 1145. The separation agreement contains an integration clause and clearly falls on the side of Salkeld and Vigortone, not Rissman and Tirapelli.

The reasoning in <u>Barille</u> has been rejected by state and federal courts, and we will not adopt its rationale to bind AHMA's tort action by the strictures of contract law. *See* <u>Tricontinental Indus. Ltd. V. Anixter</u>, 215 F. Supp. 2d 942, 950 (N.D. Ill. 2002) (holding that <u>Barille</u> did not apply when the plaintiff alleged fraud). Thus, we may consider MacDonald's statements and determine whether there are any material issues of fact relating to the reasonableness of AHMA's reliance on those statements.

## Reasonableness of AHMA's Reliance

Reed also challenges AHMA's reliance on MacDonald's statements, and claims that it was unreasonable for a number of reasons. To determine whether AHMA reasonably and justifiably relied on MacDonald's representations, we must consider all the facts that AHMA knew, and the facts that it could have learned through the exercise of ordinary prudence. <u>Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.</u>, 250 F.3d 570, 574 (7th Cir. 2001). Whether reliance is reasonable is a question of fact. <u>Davis</u>, 396 F.3d at 882; <u>Firstar Bank, N.A. v. Faul Chevrolet, Inc.</u>, 249 F. Supp. 2d 1029, 1045 (N.D. Ill. 2003); <u>Schrager v. North Community Bank</u>, 328 Ill. App. 3d 696, 767 N.E.2d 376, 386, 262 Ill. Dec. 916 (Ill. App. 1st Dist. 2002). However, the reasonableness of a party's reliance "can be determined as a matter of law when no trier of fact could find that it was reasonable to rely on the alleged statements or when only one conclusion can be drawn." <u>Cozzi</u>, 250 F.3d at 574.

The record before the court is not extensive, and consists primarily of affidavits and printouts from websites. Reed objects to AHMA's reliance on affidavits, specifically the affidavit submitted by Farrell, on the grounds that they are self-serving. Most affidavits are self-serving, which alone "does not permit a district judge to denigrate a plaintiff's evidence when deciding whether a material dispute requires trial." <u>Wilson v. McRae's, Inc.</u>, 413 F.3d

692, 694 (7th Cir. 2005). A court should disregard an affidavit if it contradicts prior sworn testimony in an attempt to manufacture genuine issues of material fact. *See* United States v. Funds in the Amount of $30,670.00, 403 F.3d 448, 466 (7th Cir. 2005). The affidavits AHMA has submitted support its position, and in this sense they are self-serving in the same manner that MacDonald's affidavit serves Reed's cause. But they do not contradict prior statements; we do not disregard them as sham affidavits. Neither do the affidavits lack any factual support in the record. Butts v. Aurora Health Care, Inc., 387 F.3d 921, 925 (7th Cir. 2004) ("It is true that self-serving statements in affidavits *without factual support in the record* carry no weight on summary judgment")(emphasis in original). Affidavits should be used with caution when determining issue of intent. But affidavits may be sufficient to make intent a disputed fact, which requires that summary judgment be denied. Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wisconsin, Inc., 991 F.2d 1249, 1260-61 (7th Cir. 1993).

Prior to signing the separation agreement Farrell sought assurances from MacDonald that Reed was not violating the show agreement, and that it did not plan to violate the agreement. As set forth above in the factual background, Farrell expressed to MacDonald AHMA's concerns regarding Reed's participation in the Builders Show, the Security Show and the Home Automation Show. With respect to the Builders Show, MacDonald told Farrell that Reed was only exchanging promotional support with the Builders Show and was not a sponsor. Farrell sought additional information on the meaning of "exchanging promotional support," and he also mentioned a subsequent phone conversation with MacDonald, who recalls no such conversation (plf. facts ¶¶ 21, 22). The record does not show that the parties ever settled on the precise parameters of Reed's involvement with the Builders Show, but it

is clear that MacDonald represented that Reed was not violating the show agreement. It is also evident that MacDonald did not tell Farrell that Reed had a sponsorship contract with the Builders Show (*see* plf. ex. 9), even though he knew it existed (def. ex. B ¶¶ 12-13). Reed claims that it was a presenter, which it contends is not the same as a sponsor (def. ex. A ¶ 49).

At the February 17-18 meeting, MacDonald again assured Farrell that Reed was not violating the show agreement, and had no intention of doing so by conducting competing shows prior to the termination date (def. ex. A ¶ 12). AHMA emphasizes that it relied on MacDonald's representations, and would not have signed the separation agreement if Reed did not promise to comply with the show agreement and not participate in the competing shows. The parties vigorously dispute what was said during the meetings regarding Reed's involvement with the other trade shows. According to Farrell, MacDonald assured him that Reed did not sponsor the Builders Show, and that Reed would comply with the show agreement with respect to the Security Show and Home Automation Show (plf. ex. 1 ¶¶ 48, 54, 58). In stark contrast, MacDonald claims that he only briefly discussed these matters with Farrell and did not concede that Reed's involvement with any of the three trade shows violated the show agreement (def. ex. W ¶¶ 10-11). This is a situation where the competing affidavits create issues of fact as to what the parties actually said.

Reed argues that the sponsorship contract between Reed and the Builders Show is irrelevant because AHMA did not rely on MacDonald's denial of sponsorship. Paragraph 24 of AHMA's statement of additional facts states that at the February 17-18 meeting "Farrell raised the issue of Reed's involvement in the Builders Show and reiterated AHMA's concern that Reed's involvement, sponsorship or not, violated the terms of the paragraph 11(a) of the Show Agreement." Farrell states that MacDonald denied Reed's sponsorship of the Builders

Show, and stated that it had never been a sponsor and that it did not intend to ever be a sponsor (plf. ex. 1 ¶ 47). But, according to MacDonald, there was only a brief conversation and it touched on the focus of the Builders Show, rather than Reed's involvement with that show (def. ex. W ¶ 11). The statement that Reed's involvement concerned AHMA, "sponsorship or not," does not accurately represent the affidavits, which only convey that Farrell expressed "AHMA's concern that Reed's involvement violated the terms of paragraph 11(a) of the Show Agreement" (plf. ex. 1 ¶ 47; 2 ¶ 15). But this discrepancy does not submarine AHMA's assertion, or the relevance of the contract between Reed and the Builders Show. In addition to barring sponsorship, paragraph 11(a) also prohibited Reed from managing and conducting a competing trade show. The content of the sponsorship contract between Reed and the Builders Show, taken with the parties' disparate versions of what was said between MacDonald and Farrell, creates issues of fact regarding the nature of Reed's involvement with the Builders Show, regardless of the designation "sponsorship contract."

Reed also contends that AHMA's reliance on MacDonald's statements is not reasonable because those statements do not appear in the separation agreement. The separation agreement is silent as to the specific competing shows, but it speaks directly to the broader proposition that Reed would not conduct any competing shows in violation of the terms of the show agreement. This is not a case where the written documents reveal the truth, and the prior oral statements contradict the writings. *See* Astor Chauffeured Limousine v. Runnfeldt Inv., 910 F.2d 1540, 1545 (7th Cir. 1990). AHMA claims that MacDonald told Farrell that Reed was not violating the show agreement and did not intend to violate the show agreement. The separation agreement includes the show agreement and it reflects MacDonald's pre-contractual promises to abide by the show agreement. The prior oral statements and the

separation agreement are thus consistent.

According to Reed, AHMA claims that MacDonald made "Show Cancellation Promises," but it is just as easy to label MacDonald's statements "Promises to Abide by the Show Agreement," which are consistent with the terms of the separation agreement. The latter depiction is more accurate because Farrell did not only ask Reed to cancel the Midwest Builders Show, Security Show and Home Automation Show. Instead, he inquired whether those shows violated the show agreement. Indeed, in the February 6, 2003, letter to MacDonald, Farrell wrote: "Simply comply with the terms of the Show Agreement between the Execution Date and the Effective Date and the issue will be moot" (plf. ex. 12). Here, the broader proposition to not violate the show agreement encompasses the narrower ground, to not participate in specific shows that competed with the Hardware Show.[9] To the extent that MacDonald's promises echo the show agreement, and thus anticipate the separation agreement, they are material and relevant, unlike the collateral pre-contractual statements made in Seward v. B.O.C. Div. of General Motors Corp., 805 F. Supp. 623, 631 (N.D. Ill. 1992). Thus, Reed's proposition that it is unreasonable to rely on pre-contractual oral representations when there is an express integration clause is not persuasive.

Reed further argues that AHMA's reliance was not reasonable because it could have discovered through an independent investigation that Reed was not complying with the show agreement. Reed specifically contends that between February 17 and 26, 2003, AHMA could have investigated whether Reed actually cancelled the trade shows. Here the manner in which Reed characterizes AHMA's argument is relevant. As mentioned above, Farrell did not only

---

[9] This observation is consistent with our prior finding that "provisions in the separation agreement support representations that Reed would not participate in a competing trade show during the term of the show agreement." AHMA, 2004 WL 3363844, *8.

ask MacDonald to cancel competing shows, he requested compliance with the show agreement. After viewing AHMA's argument in a more accurate light, the persuasiveness of MacDonald's criticism of AHMA's failure to investigate dwindles. Had MacDonald told Farrell that the shows competed with the Hardware Show, and that Reed would cancel the competing shows, then AHMA's failure to ensure that the competing shows were actually cancelled would be difficult to accept as reasonable conduct. But, according to MacDonald, he represented that the shows did not compete.

A party may rely on another's representations without conducting an independent investigation when the party does not possess the same ability to discover truth as the party making the representations. Schrager, 767 N.E.2d at 386. Reed and not AHMA had the sponsorship contract. When courts find a party's reliance to be unreasonable, it is often the case that the party had the truth presented to it in a contract, which it failed to read and instead relied on pre-contractual assertions. See Davis, 396 F.3d 869; Cozzi, 250 F.3d at 574-75 ("As long as the complaining party could have discovered the fraud by reading the contract and had the opportunity to do so Illinois courts have refused to extend the doctrine of fraudulent inducement to invalidate contacts."). According to AHMA, it relied on the pre-contractual representations in large part because the separation agreement (and specifically the show agreement) did not contradict those promises. In this vein, nothing in the separation agreement set off alarms, warning of the falsehoods contained in MacDonald's prior misrepresentations.

AHMA could have asked the Builders Show directly for details of its relationship with Reed, but that independent investigation seems beyond necessary in light of MacDonald's assertion that there was no sponsorship relationship and no violation of the show agreement.

Farrell did inquire about the other shows, and the party most likely to know whether he should be concerned told him not to worry. Astor, 910 F.2d at 1550. The parties dispute the implications of the sponsorship contract, but resolution of that dispute depends on other circumstances that have not been fully presented, which renders summary judgment improper. Schrager, 767 N.E.2d at 387.

In addition to arguing that AHMA's reliance was unreasonable because of what it did not know, but could have learned through an independent investigation, Reed also claims that AHMA's reliance was unreasonable based on what it actually knew. According to Reed, AHMA's reliance on MacDonald's statements is unreasonable because Reed informed AHMA on three occasions that it was involved in the Security Show. After several organizational and personnel changes within Reed, Farrell requested from MacDonald an outline of MacDonald's duties and an organizational chart (def. facts ¶¶ 52-53; def. ex. J). Farrell specifically noted that MacDonald appeared to be responsible for the "Securities Show" (def. ex. J). MacDonald replied and explained that he recently assumed responsibility for the securities shows after the office that previously managed them closed (def. ex. K). Reed states that AHMA also learned of Reed's involvement with the Security Show in 1998, when Reed proposed that the Security Show and Home Automation Show be co-located with the Hardware Show (def. facts ¶ 56; def. ex. N). In the co-location proposal, Reed described the events, exhibitors and attendees at the Security Show and Home Automation Show (def. ex. L). The products included "Motion Detectors, CCTV equipment, Alarm Monitoring Equipment, Electronic Access Control, Home Theater and Lighting Controls" (id.). The proposal also noted that only five out of the three thousand Hardware Show exhibitors participated in the Security Show and Home Automation Show. The attendees are described as professional tradesmen (id.). The parties did not adopt

Reed's co-location proposal, but AHMA never suggested that the Security Show competed with the Hardware Show or violated the Show Agreement (def. facts ¶ 65). Finally, at a 2001 AHMA Show meeting attended by MacDonald, a calendar listing Reed's worldwide trade shows, including the Security Show, was distributed (def. facts ¶ 66). Turning to AHMA's knowledge of the Builders Show, Reed points to Farrell's January 27, 2003, letter as proof that AHMA knew about the show and therefore could not reasonably rely on MacDonald's representations that the Builders Show did not compete with the Hardware Show. In response, AHMA denies that it knew Reed regularly participated in the Security Show (plf. ex. 1 ¶ 104), and emphasizes MacDonald's representation that Reed did not sponsor the Builders Show (*id.* at ¶¶ 48-49).

Reed thus claims that AHMA's knowledge indicates that AHMA did not believe the shows competed, and that its reliance on MacDonald's statements was unreasonable. The fact that AHMA failed to raise immediate objections upon learning that Reed was conducting other shows, does not itself make AHMA's reliance unreasonable. Reed is a worldwide leader in the trade show industry, so AHMA should not have been surprised to learn that it was involved with other trade shows. No details concerning the nature of the Security Show accompanied MacDonald's brief mention of the event in 1995 and 1998. At the February 17-18 meeting, MacDonald allegedly represented that the Security Show did not compete with the Hardware Show. Thus, despite knowing that Reed was involved in the Security Show, AHMA did not have any reason to suspect that it competed with the Hardware Show by being primarily related to hardware, lawn, garden and/or home improvement products. With respect to the Builders Show, AHMA knew that Reed was involved with the show but it did not know about the sponsorship contract.

Reed cites <u>Dixie-Portland Flour Mills v. Nation Enterprises</u>, 613 F. Supp. 985 (C.D. Ill.

1985) and <u>Peterson Indus., Inc. v. Lake View trust and Savings</u>, 584 F.2d 166 (7th Cir. 1978)

in support of its claim that AHMA's reliance was unreasonable because it knew about the

shows. But in those cases, the plaintiffs' fraud claims failed because after completing

independent investigations they discovered facts directly contrary to the representations the

defendants made to them. *See* <u>Dixie-Portland</u>, 613 F. Supp. at 990; <u>Peterson Indus.</u>, 584 F.2d

at 168. AHMA's investigation consisted of looking at Reed's websites, and specifically at the

web pages related to the Builders Show, Security Show and Home Automation Show (plf. ex

1 ¶ 42; plf. ex 2 ¶ 10). Based on this information, Farrell believed that the shows were

primarily related to hardware, lawn, garden and/or home improvement products (plf. ex. 1 ¶

43). It was obvious to Farrell that Reed was involved with the shows, but he did not know

whether Reed's participation violated the terms of the show agreement (*id.* at ¶ 44). Farrell

then communicated with MacDonald, who, according to Farrell, assured him that there was

no violation and that Reed would not participate in any competing shows.

Making all reasonable inferences in AHMA's favor, AHMA engaged in a limited

investigation that raised its suspicions, which MacDonald then allayed. Illinois law clearly

states that "if you ask the defrauder point blank, you need not investigate further." <u>Ash v.</u>

<u>Georgia-Pacific Corp.</u>, 957 F.2d 432, 436 (7th Cir. 1992). Yet, a party is reckless if it closes its

eyes to a known risk and proceeds in the face of a manifest danger. <u>AMPAT/Midwest, Inc. v.</u>

<u>Illinois Tool Works, Inc.</u>, 896 F.2d 1035, 1042 (7th Cir. 1990). AHMA may have held lingering

doubts in connection with Reed's involvement in competing shows after Farrell and

MacDonald communicated in early February. However, AHMA sought to eliminate those

doubts during the February 17-18 meeting, when it asked Reed to confirm its adherence to the

show agreement. MacDonald allegedly told Farrell that Reed would not participate in the Builders Show (plf. facts ¶ 33), and that Reed would make necessary scheduling changes for the Security Show and Home Automation Show (plf. facts ¶ 40). MacDonald denies making those statements (def. ex. W ¶¶ 13, 18), and also asserts that Farrell never claimed that the Security Show competed with the Hardware Show (def. ex. A. ¶ 41). AHMA was entitled to trust the word of its bargaining partner. <u>AMPAT/Midwest</u>, 896 F.2d at 1042. After asking Reed point-blank if it was violating the show agreement, AHMA did not need to embark on additional investigation or "dig beneath apparently adequate assurances." *Id.* Further, seeking assurances at the February 17-18 meeting is inconsistent with recklessly, or worse, intentionally, disregarding a manifest risk that Reed violated and intended to continue violating the show agreement.

AHMA has produced evidence that creates a genuine factual dispute as to whether Reed was violating the show agreement with the Builders Show, Security Show and Home Automation Show when MacDonald assured Farrell the contrary was true, and that he was planning to conduct competing shows in violation of the show agreement during negotiations for the separation agreement. It was reasonable for AHMA to not insist on naming the specific shows in the contract when MacDonald assured Farrell that those specific shows did not compete. In this sense, the omission of the specific shows supports AHMA's claim of reliance in that if it did not rely on and believe MacDonald's representations, then it would have insisted upon specific mention of the Builders Show, Security Show and Home Automation Show in the separation agreement.

<u>Falsity of the Statements</u>

Having found that AHMA could reasonably rely on MacDonald's statements, and that there exists a genuine issue of material fact as to the reasonableness of AHMA's reliance, we

now consider whether there are any material disputes concerning the veracity of MacDonald's statements. At issue are MacDonald's representations about the nature of the Builders Show, Security Show and Home Automation Show, and, specifically, statements regarding the products displayed, exhibitors and attendees.

Pursuant to paragraph 11(a) of the show agreement, Reed promised not to participate in any show that primarily related to hardware, lawn, garden, and/or home improvement products. Emphasizing the term "primarily," Reed argues that a show does not violate the show agreement if it merely contains some hardware, lawn, garden and/or home improvement products. According to Reed, the Security Show focused on security systems and devices, such as retina scanners and infrared cameras, and the Builders Show targeted the residential home building industry by offering products sold directly to building and remodeling contractors. Reed characterizes the attendees of the Hardware Show to be buyers for or suppliers to retail outlets, but depicts the attendees for the Security Show to be security professionals and custom installers of security equipment (def. facts ¶ 45). Reed claims that the attendees at the Builders Show included residential home building executives, tradespeople involved in home building, lenders to the housing industry, legal professionals specializing in real estate, and similar parties who focus in the housing industry (*id.* at ¶ 79). In response, AHMA contends that whether or not the Builders Show, Security Show or Home Automation Show primarily related to hardware, lawn, garden and/or home improvement products is a question that should not be determined on summary judgment based on the limited record before the court.

Reed describes the attendees at the Builders Show to be, "Builders, Remodelers, Land Planners, Architects, Landscape Architects, Engineers, Purchasing Agents, IT Specialists, Consultants, Suppliers, Distributors and others" (def. ex. C ¶ 8). According to AHMA, these

categories also comprise the Hardware Show audience (plf. facts. ¶ 49). The 2003 Hardware Show visitor profile includes hardware stores, home centers, builders, remodelers, contractors, architects, designers, manufacturing representatives, importers/exporters, wholesalers, and distributors (plf. ex. 17). Reed argues that the 2003 visitor profile is limited because it begins with the phrase, "Retailers include" (*see* plf. ex. 17), which reinforces its position that the focus of the Hardware Show was the retail market. Even though the visitor profile begins with the description "retailers include," which arguably characterizes the succeeding categories as "retailers," the Hardware Show and Builders Show still share a number of categories. Further, it is difficult to depict several categories, such as builders, remodelers and architects, as retailers, which militates against using the phrase "Retailers include," to limit the scope of the Hardware Show to the retail market. Reed also contends that the shows do not compete because the products exhibited targeted different markets.

In contrast to Reed's position, AHMA views the products displayed at the Security Show, Home Automation Show and Builders Show to constitute hardware and home improvement products. With respect to the Builders show, AHMA also contends that building products make up a major portion of products exhibited at the Hardware Show, and in support it highlights several exhibits attached to Reed's motion. It first points to Reed's calendar of events, which describes the Hardware Show as "the leading showcase for the complete spectrum of home improvement and building products and services" (def. ex. H). Next, the official directory and buyer's guide for the 2003 Hardware Show lists "Building Products" as one of seven product categories (def. ex. F at 5). AHMA also highlights a presentation given by MacDonald that addressed concerns in the buildings products segment (plf. facts. ¶ 63). AHMA further contends that MacDonald agreed that the Builders Show

primarily related to hardware and home improvement products (plf. facts ¶ 30). But MacDonald denies that he ever made such a concession (def. ex. W ¶ 12). Reed does not dispute that the Hardware Show has included a building supplies category for decades (plf. facts ¶ 59), but claims that the building supplies are retail products in the retail distribution chain that are sold at retail (def. resp. to plf facts ¶ 60).

Reed's citations to the affidavits of MacDonald and Peter Schwartz, CEO of the Home Builders Association of Greater Chicago, do not show that the Hardware Show is unequivocally retail-oriented, and fail to demonstrate that there is no possible competition with the Builders Show. It is true that Farrell describes the Hardware Show's principal audience in terms of retailers seeking to identify innovative products for their consumers (def. ex. F at 5). But this only affirms that the Hardware Show focused on retailers. It does not preclude the attendance of non-retailers who also attended the Builders Show, or the display of products that were also exhibited at the Builders Show. Moreover, the retail/non-retail distinction should not overshadow the central issue of whether the Builders Show primarily related to hardware, lawn, garden and/or home improvement products. In sum, there are material issues of fact as to whether the Hardware Show and Builders Show competed, and thus whether Reed's participation in the Hardware Show violated the show agreement.

Prior to discussing whether the Security Show and Home Automation Show compete, we must first determine if they are separate shows. Reed contends that the Home Automation Show was merely a pavilion in the Security Show, not a distinct show. The 2003 Security Show directory supports that claim (*see* def. ex. G at 27). However, Reed also states that the Home Automation Show was co-located with the Security Show (*see* plf. ex. 14; def. mem. at 2 n.2). Reed defines co-location as "an industry term. It refers to the running of separate trade shows

at the same time and in the same general geographic location" (def. ex. A ¶ 31). Reed's definition thus creates an issue of fact as to whether the Home Automation Show was actually a separate show. At this stage, without additional information as to the precise nature of a pavilion,[10] it is improper to group the Home Automation Show with the Security Show. Still, the two shows may be discussed in the same context because much of Reed's promotional material discusses the shows together, and conclusions drawn from this material with respect to one show necessarily implicates the other.

Turning first to the Security Show, AHMA claims that the focus of the show, residential and commercial security products, primarily relates to home improvement products. It also finds that the Security Show and Home Automation Show shared attendees with the Hardware Show. We note that, similar to the Builders Show, AHMA claims that during the February 17-18 meeting MacDonald did not dispute that the Security Show and Home Automation Show primarily related to home improvement products (plf. facts. ¶ 39). But MacDonald asserts that he never agreed to AHMA's characterization of the shows (def. ex. W ¶ 16).

The addition of security equipment in a home would improve the home by making it safer, but this does not necessarily mean that retina scanners are home improvement products. "Home improvement" is an ambiguous term, and we are not prepared to settle on a final and concrete definition that will likely constrain rather than guide this matter in the future. If the products at the Security Show and Home Automation Show could be categorized as home

---

[10] In his affidavit MacDonald states that he does not consider pavilions to be separate trade shows or expositions, and defines a pavilion as "an organization of like technologies, products, or services organized in a common area within a trade show or exposition" (def. ex. W ¶ 46). This definition alone is insufficient, especially in light of Reed's explanation that co-location involves the combining of separate shows in a single space. Moreover, even if the Home Automation Show is not a separate show, and is instead a component of the Security Show, this fact alone would not mean that the Security Show does not compete with the Hardware Show.

improvement products, then those shows likely competed with the Hardware Show.    The record does not show that residential and commercial security products could not be home improvement products.  Product categories at the Hardware Show included Home Security, Personal Security, and Safety products.  Those groups were, however, subcategories within broader categories (Electrical Lighting, Housewares, and Hardware, respectively) (def. ex. F at 209).  We cannot determine, based on the record, whether or not the products exhibited at the Hardware Show were sufficiently similar to products at the Security Show, but the similarity in name is sufficient to create issues of material fact.

In support of its claim that the Home Automation Show primarily related to home improvement products, AHMA points to a seminar held at the 2005 Hardware Show that was entitled "Home Improvement through Automation" (plf. ex. 38).  The description for that seminar begins: "Home automation is a growing market in the home improvement industry" (*id.*).  This is strong evidence in favor of finding that the Home Automation Show is primarily related to home improvement products, but the seminar AHMA highlights was from the 2005 Hardware Show, and thus has limited relevance to the 2003 show.  Moreover, in support of its claim that the product categories in the Home Automation Show and Hardware Show were identical, AHMA references the home page for the 2002 Security Show that was held in Orlando (plf. ex. 16).  The information on the website is not relevant absent any verification that the product categories at the 2002 Orlando show were the same as those in the 2003 Security Show held in Las Vegas.

Comparing the Hardware Show directory with the directory for the Security Show and Home Automation Show reveals many differences in products exhibited.  But the issue does not turn on whether the products were different.  Instead, the relevant inquiry is whether the

Security Show and Home Automation Show primarily related to the home improvement industry. Substantial similarities in products exhibited could lead to an affirmative answer, whereas significant differences might yield the opposite. The analysis is more complicated than simply comparing "tile grout coating, tile care products [and] drywall tools" (def. ex. F at 107) and "rope hammocks, fabric bed hammocks in two-point, full swing design, and four-point lounge designs (*id.* at 38) from the Hardware Show with "X-ray security screening systems and metal detectors" (def. ex. G at 168) and "wireless systems for the security, access control and personal emergency reporting markets" (*id.* at 172) from the Security Show and Home Automation Show. Several exhibitors at the Home Automation Show offered products and services that seem primarily related to home improvement products.[11]

With respect to the attendees, the 2003 visitor profile for the Security Show specifies the broad target audience as security dealers/installers and end-users of residential security and commercial equipment. That group includes architects/architectural engineers, builders, business owners, electrical contractors, locksmiths, HVAC consultants, safety managers, financial managers, and other industry professionals (plf. ex. 14).[12] These groups share similarities with the attendees at the 2003 Hardware Show (*compare* plf. ex. 14 *with* plf. ex. 17). Whether these similarities evidence competition between the shows is impossible to determine based on the record in its current state. We can only glean so much from website printouts and affidavits. Those submissions do, however, demonstrate a factual dispute as to whether,

---

[11]*See* def. ex. G at 62 (Beam Industries: "World-leading central vacuum system manufacturer"); *id.* at 140 (Hayden Industries: products necessary to finish a home for central vac.); *id.* at 200 (OnQ Technologies: "new products for home networking, home entertainment, home management, and home infrastructure."); and *id.* at 220 (Russound: audio/visual and connectivity products for the residential systems market).

[12] The visitor profile for the 2006 Security Show (plf. ex. 32) is by itself not relevant.

under the terms of the show agreement, the shows competed.  Empirical data related to the actual attendees and exhibitors at the shows, as well as a more comprehensive listing of the products exhibited, will help determine if there was actual competition based on whether Reed's shows were primarily related to hardware, lawn, garden and/or home improvement products.[13]

## Scheme to Defraud

AHMA must also show that Reed's misrepresentations were part of a scheme to defraud.  Courts have not settled on a standard definition for the scheme-to-defraud element.  However, promissory fraud has been held actionable "only if it either is particularly egregious or, what may amount to the same thing, it is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance" Desnick, 44 F.3d at 1354. Thus, a single promise will not support a promissory fraud claim unless it is particularly egregious.  In Luttrell v. Wyatt, 305 Ill. 27, 137 N.E. 95, 98 (Ill. 1922), the court found promissory fraud based on "a number of false representations" that induced the plaintiff's reliance. The word "scheme" also suggests that the defendant must possess a pre-existing intent to defraud.  See Roger L. Price & Mark L. Johnson, *Understanding the Scheme to Defraud" Exception to Promissory Fraud in Illinois*, 90 ILL. B.J. 536, 538 (2002) (identifying pre-existing intent to defraud as an element

---

[13] For example, AHMA's exhibits 20-21 provide data that explain who attended the Hardware Show, both in terms of retailers and non-retailers, and also specific categories within those two groups.  These exhibits show that non-retailers comprised the majority of attendees.  For 2002, 45,514 non-retailers attended and 15,199 retailers attended. And for 2003, there were 11,007 non-retailers and 5,776 retailers.  We note that Reed objects to these exhibits as misleading, based on its impression that several of the business categories, such as manufacturers' representatives and wholesalers and distributors in the non-retail group were actually "part of the retail distribution channel" (def. ex. W ¶ 46).  In addition to the ambiguity of "retail distribution channel," we also observe that the Hardware Show attendee registration form specifically categorizes manufacturers' representatives and wholesalers and distributors as non-retailers (plf. ex. 22).  Ultimately, we hesitate to rely on exhibits 20-21, absent additional foundation, but still highlight them here to illustrate useful empirical data that will help resolve whether the shows actually competed.

of a promissory fraud claim). Drawing on <u>Desnick</u>, we believe that a scheme to defraud is evidenced by a pattern or number of coordinated falsehoods or misrepresentations that are made with an intent to deceive and which ultimately induce reliance.

AHMA contends that MacDonald's statements were part of a scheme to defraud because MacDonald knew that Reed sponsored the Builders Show and that its involvement with the Security Show and Home Automation Show violated the show agreement. According to AHMA, MacDonald stated that Reed would comply with the show agreement after AHMA asserted that it would not sign the separation agreement without Reed's compliance (plf. facts ¶¶ 43, 45).

Making all reasonable inferences in AHMA's favor, the record shows that MacDonald represented on several occasions to Farrell that Reed was in compliance with the show agreement, and that it did not intend to violate the agreement. On February 4, 2003, MacDonald told Farrell that Reed only exchanged promotional support with the Builders Show. During the February 17-18 meetings AHMA alleges that MacDonald repeatedly asserted Reed's present and future compliance with the show agreement. MacDonald denies he conceded that any show competed with the Hardware Show, or that he agreed to make any changes to Reed's exhibition calendar. The competing affidavits create disputes that require credibility determinations, which we cannot make at the summary judgment stage.

MacDonald's statements were not mere puffery, but were instead statements of fact relating to existing contractual obligations under the show agreement. Viewing the record in the light most favorable to AHMA, there is a genuine factual dispute as to whether MacDonald promised to comply with the show agreement, when he knew that Reed was not in compliance with the agreement and that it intended to continue violating the agreement. In <u>Stamatakis</u>

Indus., Inc. v. King, 165 Ill. App. 3d 879, 881-82, 520 N.E.2d 770, 117 Ill. Dec. 419 (Ill. App.

1st Dist. 1987), a scheme to defraud was present when the defendants repeatedly promised to

comply with a contract requiring that he buy equipment when he knew that he could not pay

for the equipment. Similarly, there is a genuine factual dispute whether Reed promised not

to conduct competing shows when those shows were actually in the works. MacDonald made

the false statements in order to secure a release for the violations that he said did not exist.

MacDonald's misrepresentations were thus part of a larger scheme, and may be characterized

as "stations on the way to taking [AHMA] to the cleaners." Desnick, 44 F.3d at 1354-55.

### Knowledge of the False Statements

AHMA must also show that MacDonald actually knew that his statements were false,

or were made with reckless disregard as to their truth. MacDonald's knowledge that his

statements were false is implied in the finding that a scheme to defraud exists (to the extent

necessary to survive the summary judgment motion). MacDonald acknowledges that he "did

generally discuss that the Show Agreement would continue until August 16, 2003, that the

parties would not conduct competing shows before that time, that Reed intended to comply

with the Show Agreement, and that Reed had no intention of improperly competing" (def. ex.

A 12). MacDonald knew of the sponsorship contract with the Builders Show, but did not

disclose it to Farrell. Fraudulent intent can be inferred because MacDonald did not disclose

this important fact and decided instead to report that Reed was only exchanging promotional

support with the Builders Show. Ultimately, considering the factual disputes that have already

been discussed, the contents of MacDonald's mind and the genuineness of his beliefs are

factual matters that cannot be resolved at this stage.

In the amended complaint, AHMA directed three of the thirteen counts against Freeman. The court dismissed two of the three counts against Freeman, and now only the conspiracy count (Count III) remains. In its motion to dismiss, Freeman argues that the conspiracy claim is based on acts or omissions leading up to the separation agreement, and that when AHMA released Reed, it also released Freeman. The ruling on Reed's motion to dismiss did not reach Freeman's argument, and Freeman has again raised its release argument by joining Reed's motion for summary judgment. Freeman contends that the release of a joint tortfeasor releases all other joint tortfeasors for the same injury. AHMA counters that it did not excuse Freeman's conduct because Freeman is not specifically mentioned in the separation agreement. AHMA further contends that there is a genuine issue of material fact as to the validity of the release. On the latter front AHMA is correct, and a ruling on whether the release extends to Freeman would be premature.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment is denied.

_JAMES B. MORAN_
Senior Judge, U. S. District Court

Nov. 29, 2005.