IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMERICAN HARDWARE<br>MANUFACTURERS ASSOCIATION,<br><br>Plaintiff,<br><br>vs.<br><br>REED ELSEVIER INC., *et al.*,<br><br>Defendants. | No. 03 C 9421 |
| REED ELSEVIER INC., a Massachusetts<br>corporation,<br><br>Counter-Plaintiff,<br><br>vs.<br><br>AMERICAN HARDWARE<br>MANUFACTURERS ASSOCIATION, a<br>Delaware not-for-profit corporation,<br>TIMOTHY FARRELL, and<br>WILLIAM P. FARRELL, SR.,<br><br>Counter-Defendants. | |

MEMORANDUM OPINION AND ORDER

Plaintiff American Hardware Manufacturers Association ("AHMA") brought suit against Reed Elsevier, Inc., Reed Exhibitions, and Association Expositions & Services (collectively "Reed"); and Freeman Decorating Co., and Freeman Decorating Services, Inc. (collectively "Freeman"), alleging various counts of common law and statutory breaches stemming from the breakdown of plaintiff's business relationship with defendants. In a previous order we granted, in part, defendants' motion to dismiss plaintiff's first amended complaint. On July 21, 2006, plaintiff filed its second amended complaint. Defendants now move to dismiss Counts I (Fraud) and V (Breach of Fiduciary Duty) in their entirety and

certain aspects of Count IV (Breach of Contract). For the following reasons we grant, in part, defendants' motion to dismiss.

## BACKGROUND

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we accept the complaint's well-pleaded factual allegations as true, including the inferences reasonably drawn from them. McDonald v. Household Int'l., 425 F.3d 424, 425 (7th Cir.2005). The complaint will be dismissed only if the plaintiff "failed to allege any set of facts upon which relief may be granted." Pickrel v. City of Springfield, Ill., 45 F.3d 1115, 1118 (7th Cir.1995). See also Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Therefore, we take the following facts from plaintiff's complaint.[1]

In the mid-1970s, plaintiff decided to sponsor and conduct "Hardware Industry Week," a compilation of industry conferences, meetings, educational seminars, social events, and a trade show, in Chicago. In 1975, in conjunction with "Hardware Industry Week," plaintiff entered into a written agreement with Reed ("show agreement"), whereby plaintiff would sponsor and conduct the National Hardware Show ("the show") and Reed would manage the show. Plaintiff's complaint suggests that the show agreement entitled AHMA to "control and oversight of all decisions necessary for the success of the Show, [] ability to select the location of the Show, and [] right to share significantly in all revenue derived from the Show." (2nd am.cplt., ¶ 18).

We pause to note that although motions analyzed under a Rule 12(b)(6) standard generally accept all well-pleaded allegations as true, "'we are not obliged to ignore any facts set forth in the complaint that undermine the plaintiff's claim or to assign any weight to

---

[1] Because we have already set forth a complete background in American Hardware Manufacturers Association v. Reed Elsevier, Inc., 2004 U.S. Dist. LEXIS 28007 (N.D.Ill.2004) ("AHMA I"), we limit our background to issues relevant to the analysis of this order.

unsupported conclusions of law.'" R.J.R. Serv., Inc. v. Aetna Cas. & Sur. Co., 895 F.2d 279, 281 (7th Cir. 1989) (citing Gray v. County of Dane, 854 F.2d 179, 182 (7th Cir.1988)). Thus, if the exhibits attached to plaintiff's complaint (such as the show agreement) contradict its allegations, the written instruments trump the allegations. Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend, 163 F.3d 449, 454 (7th Cir.1998). *See also* Thompson v. Illinois Dep't of Professional Regulation, 300 F.3d 750, 754 (7th Cir.2002). "In fact, '[a] plaintiff may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment'" *Id.* at 455 (citing Matter of Wade, 969 F.2d 241, 249 (7th Cir.1991)).

The parties' relationship was governed by the show agreement – AHMA sponsored and Reed managed the show from 1977 through 2003. In 1998, Reed entered into a nationwide contract with Freeman, whereby Freeman would act as the general contractor for many of Reed's trade shows, including the show at issue. Originally a ten-year contract, the Reed-Freeman contract has since been extended to 2009. According to plaintiff, Freeman agreed to pay Reed undisclosed kickbacks and barter exchanges to secure the nationwide contract. The Freeman contract also allowed for "cost-shifting," whereby Reed, as the show manager, would receive goods and services from Freeman, the general contractor, and then allow Freeman to pass the costs for those goods and services onto the trade show exhibitors.

Although plaintiff and Reed did not share a perfectly harmonious business relationship, the show's success increased annually for 26 years. Beginning in 2000, however, the exhibit space decreased every year due to a decline in participation by exhibitors of the show. Jointly commissioned studies showed that the cost of exhibiting was the primary reason for the precipitous drop in exhibitor enrollment.

Plaintiff's complaint centers on the contract between Reed and Freeman, suggesting

that the practices of cost-shifting, kickbacks and barter exchanges led to the increased costs to exhibitors, and thus, the ultimate decline of the show. In fact, plaintiff estimates the cost-shifting expense to the show's exhibitors at a 20% increase in the cost of Freeman's goods and services. Plaintiff also alleges that the undisclosed practices between Reed and Freeman violated provisions of the show agreement because Reed failed to pay or share all expenses, disclose all revenue, share all revenue, and/or consult plaintiff before making revenue decisions. Based on such failures, plaintiff alleges that Reed breached the show agreement and its fiduciary duty, and Reed and Freeman committed fraud against AHMA.[2]

## DISCUSSION

In **AHMA I** we dismissed plaintiff's breach of contract claim in part, and its breach of fiduciary duty claim, but declined to dismiss plaintiff's common law fraud claim. We must now determine whether plaintiff's second amended complaint has sufficiently addressed our concerns to maintain a breach of contract and/or breach of fiduciary claim. We also address whether defendants have persuasively argued that plaintiff's fraud claim – based on the same allegations as in the successful first amended complaint – should now be dismissed.

### Breach of Contract Claim

In **AHMA I** we inquired as to whether the show agreement negated plaintiff's claim to a percentage of all revenues from the show. In other words, did the show agreement – attached as an exhibit to the complaint – undermine plaintiff's argument that the parties agreed to share all revenue from the show? We found that the plain language of the show agreement, and its subsequent amendments, foreclosed plaintiff's argument that Reed was

---

[2] Plaintiff's second amended complaint also contains allegations of violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, civil conspiracy, unjust enrichment, violations of the Lanham Act, unfair competition, trademark infringement, tortious interference with prospective economic advantage and contractual relationships, and accounting. Because those claims are not at issue in this order, we will not address them now.

contractually bound to share all revenue with AHMA. And, because paragraph 10(d) of the show agreement required Reed to provide an accounting certificate only for the portion of revenue payments made to AHMA, plaintiff also failed to state a claim that Reed was contractually obligated to attest to all revenue it received from the show. We declined to dismiss the breach of contract claim based on plaintiff's argument that Reed breached the show agreement by failing to pay all expenses, as required under paragraph 10(a). We also recognized that plaintiff sufficiently pled breach of provision 11(a) of the show agreement.

Plaintiff has added two sets of allegations in an attempt to revive its breach of contract claim. First, it suggests that the show agreement and related agreements entitle plaintiff to a percentage of all revenue generated through the show. At the very least, plaintiff argues, the show agreement, in connection with the parties' course of conduct, establishes that the contract was ambiguous with respect to revenue-sharing. Second, it asserts that contracts other than the show agreement obligated Reed to share all revenue with plaintiff. We address each in turn.

The contract has not changed since the filing of plaintiff's original complaint. Thus, we decline to alter our earlier findings that plaintiff successfully pled breach of contract with respect to Reed's duty to pay all expenses under paragraph 10(a) of the show agreement and to abstain from conducting a similar trade show under paragraph 11(a).

Nor do we veer from our earlier interpretation of Reed's disclosure and revenue-sharing obligations under the show agreement. Paragraph 10(a) states that Reed is not only responsible for collecting all revenue, but is also entitled to "retain all amounts remaining after payment of such expenses and all sums due to [AHMA] hereunder." Following 10(a), paragraphs 10(b) and 10(c) indicate that the revenue to plaintiff under the contract is a percentage of the "gross revenue...received from the sale or rental of space at each Show."

Nowhere in the show agreement or subsequent amendments or addendums is there a contractual obligation to share all income. To the contrary, the second amendment states that the parties "have from time to time agreed to allocate specific items of expense or revenue, as applicable in a manner different from that provided in the Agreement." As we previously held, "these agreements did not purport to address the allocation of all revenue, but rather specific sources of revenue." <u>AHMA I</u>, 2004 U.S. Dist. LEXIS 28007, at *29.[3] Neither do paragraphs 4 or 5 save plaintiff's argument. Both refer to operations, not revenue, specifically addressing Reed's responsibility to AHMA with respect to lighting, noise, and booth design restrictions. Only paragraph 10 discusses revenue, and it is clear from the plain language that Reed was not contractually obligated to share or disclose all show revenue to AHMA.

Plaintiff's complaint alleges: "Although one subparagraph of the original Show Agreement has been argued to suggest that Reed's obligations of disclosure and sharing of revenue related only to the sale of exhibit space, the intent of the drafters of the Show Agreement was for – and the parties' agreement was for – AHMA to retain the authority to approve or disapprove all sources of revenue proposed by Reed, and, if approved, for AHMA and Reed to share all revenue from the Show." (2nd am.cplt., ¶ 125). Plaintiff's complaint continues with examples of additional agreements and confirmations of such agreements, including oral agreements and examples of the parties' course of conduct. Unfortunately for plaintiff, intent is determined by the plain language of the contract and extrinsic evidence is inadmissible to determine intent unless the language of the contract is ambiguous. <u>CIVIX-DDI</u>,

---

[3] Plaintiff argues that the second amendment does not negate its allegations, maintaining that "[t]he Second Amendment addresses only the *allocation* of specific sources of revenue, not the parties agreement to *share* all revenue" (plf's response, at 6). We disagree. The show agreement indicated that Reed would be liable for all expenses, except for those incurred directly by AHMA without Reed's consent. There was no set allocation of expenses in the show agreement. Therefore, because the second amendment treats expenses and revenues the same, the only logical way to read it is as sharing specific items of expense or revenue, not altering the allocation of such apportionment.

LLC v. National Ass'n of Realtor, 2006 WL 3210504, *6 (N.D.Ill.2006). Illinois courts presume that the written contract speaks the intentions of the parties. Air Safety, Inc. v. Teachers Realty Corp., 706 N.E.2d 882, 884 (Ill.1999); Davis v. G.N. Mortg. Corp., 396 F.3d 869, 878 (7th Cir.2005).

And just as plaintiff cannot use extrinsic evidence to determine the intent of the parties, plaintiff cannot use such evidence to create an ambiguity in the contract. Nothing in the contract is susceptible to more than one meaning, and therefore, the contract is not ambiguous. Air Safety, Inc., 706 N.E.2d at 884. That the parties disagree on the intent behind the contract is of no assistance to plaintiff. Camico Mut. Ins. Co. v. Citizens Bank, 2006 WL 1006014, *2 (N.D.Ill.2006). Ambiguity is determined as a matter of law (Barnett v. Ameren Corp., 436 F.3d 830, 833 (7th Cir.2006)), and we find that the show agreement is not ambiguous. Therefore, we cannot admit parol evidence to create ambiguity (Air Safety, Inc., 706 N.E.2d at 884; ITQ Lata, LLC v. MB Financial Bank, N.A., 317 F.Supp.2d 844, 850-51 (N.D.Ill.2004)), especially where, as here, the parties included an integration clause at paragraph 13. *See* Air Safety, Inc., 706 N.E.2d at 885 (where parties include an integration clause, "they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence"). Therefore, we hold, once again, that the show agreement does not contractually obligate Reed to disclose or share all revenue from the show with AHMA.

Unlike its first amended complaint, plaintiff's revised complaint alleges that various other agreements constituted contracts obligating Reed to disclose and/or share all show revenue with AHMA. Specifically, plaintiff points to oral confirmations of the alleged agreement in May 1985 and April 1987 and annual written confirmation each time Reed purportedly presented and reviewed items of revenue to gain AHMA's approval (2nd am.cplt.,

¶¶ 132-138). Defendants contend that such agreements violate the statute of frauds and lack consideration, and therefore, are not binding as a matter of law.

In Illinois, the Fraud Act states: "No action shall be brought...to charge any person...upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized." 740 ILCS 80/1 (2006). A contract in violation of the statute of frauds is unenforceable. Meyer v. Logue, 427 N.E.2d 1253, 1255 (Ill.App.Ct.1981).

Plaintiff makes several arguments in an effort to circumvent defendants' statute of frauds defense. None is persuasive. First, plaintiff argues that the statute of frauds does not apply because "every year, the parties reviewed and AHMA approved (or disapproved) all sources of revenue related to the hardware show and every source of revenue was annually subject to cancellation" (plf's response, at 8). Therefore, plaintiff contends, the contract was possible to perform within one year. Plaintiff is correct that the Illinois statute of frauds makes an oral contract unenforceable only if it is impossible to perform the contract within one year. Hirtzer v. Avery Dennison Corp., 265 F.Supp.2d 936, 938 (N.D.Ill.2003) (citing Hartbarger v. SCA Servs., Inc., 558 N.E.2d 596, 606 (1990)). Plaintiff, however, has once again failed to point us to such an annual contract. The show agreement was clearly a multi-year agreement. The alleged oral contracts occurred in 1985 and 1987, and therefore could not be the annual contracts to which plaintiff refers. The only possible annual contract could be Reed's reports to AHMA specifying the revenue items to be approved or disapproved. The only allegation with respect to such reports reads: "Indeed, on an annual basis Reed purportedly filled its

obligations to AHMA by reporting to AHMA (at the Show/Conference Committee meetings) all sources of revenue related to the Show. At that time, AHMA annually exercised its authority to review and approve or disapprove each source of revenue. At the same time (and on a nearly annual basis), Reed proposed new sources of revenue for the Show. On numerous occasions AHMA rejected Reed's proposals for a new source of revenue. In each circumstance, Reed accepted the decision of AHMA. This process is reflected in minutes of the meeting held annually by the parties"(2nd am.cplt. ¶ 138). Conduct cannot imply contractual obligation and nowhere does plaintiff allege that such reports included the obligation for Reed to disclose all sources of revenue to plaintiff.

Second, plaintiff argues that it adequately pled a writing. In order to satisfy the statute of frauds, however, "the writing must contain all essential terms of the contract, and the signed writing must refer expressly to the other writings, or the other writings must be connected, physically or otherwise, to show that they relate to the same contract." Prodomos v. Howard Sav. Bank, 692 N.E.2d 707, 710 (Ill.App.Ct. 1998). *See also* Morton Intern., Inc. V. Sequa Corp., 2001 WL 897562, *5 (N.D.Ill. 2001). Drawing all inferences in favor of plaintiff, plaintiff has failed to allege that the annual reports included the essential terms of a contract obligating Reed to share and/or disclose all revenue. Even if the annual financial information provided to AHMA by Reed constituted a writing for the purposes of the statute of frauds, it did not provide for the essential elements of a contract. And neither the May 1985, nor the April 1987 agreement was written or signed.

In an effort to stave off the statute of frauds defense, plaintiff next argues that dismissal based on statute of frauds is inappropriate at this stage. While at least one court has so held, (Morris v. Katz, 1988 WL 107321, *4 (N.D.Ill.1988)), both state and federal courts have in fact

relied on the statute of frauds in dismissing breach of contract claims. *See, e.g.*, Prodromos, 692 N.E.2d 707; Dickens v. Quincy College Corp., 615 N.E.2d 381 (Ill.App.Ct.1993); Milazzo v. O'Connell, 925 F.Supp. 1331 (N.D.Ill.1996). *See also* Fischer v. First Chicago Capital Markets, Inc., 195 F.3d 279 (7th Cir.1999) (oral agreement allegedly confirming an open-ended provision of an earlier written contract was barred by the statute of frauds). Unless plaintiff can point to allegations in its complaint saving the breach of contract claim from the statute of frauds, we see no reason to prolong its litigation.

Next, plaintiff asserts that allowing defendants to utilize a statute of frauds defense is inappropriate because it would allow Reed to perpetrate a fraud. Plaintiff rightfully cites to T.L. Swint Industries, Inc. v. Premiere Sales Group, Inc., 16 F.Supp.2d 937 (N.D.Ill.1998), Grundy County Nat. Bank v. Westfall, 301 N.E.2d 28 (Ill.App.Ct.1973), and Gibson v. Arnold, 288 F.3d 1242 (10th Cir.2002) to support its assertion that Illinois courts, among others, will not permit the statute of frauds to be used where the effect will be to accomplish a fraud. *See e.g.*, T.L. Swint Industries, Inc., 16 F.Supp.2d at 940. The case at hand, however, does not present the same sort of problem present in the cited cases. For example, in T.L. Swint Industries, at the time the parties entered into the unsigned contract at issue, defendants owed plaintiff a significant sum of money. The unsigned contract was entered in an effort to assist defendant by forbearing defendant's debt to plaintiff. Therefore, the court held that it would be inequitable for defendant to use the statute of frauds to avoid the debt altogether. In the case at hand, the parties entered into a signed agreement (show agreement) to share specific revenue, not all revenue. Plaintiff offered no further consideration to share all revenue,[4] and thus T.L.

---

[4] The parties disagree over whether plaintiff has sufficiently pled consideration for the alleged oral agreements to share all revenue. Although we decline to determine whether consideration must be pled to survive a motion to dismiss the breach of contract claim, we do find that plaintiff's failure to plead such consideration worked against it in its attempt to circumvent the statute of frauds.

Swint Industries is inapposite. Nor do the facts of Grundy or the analysis of Oklahoma law in Gibson assist plaintiff. As the facts of the case at hand are not "such that it would be a virtual fraud to permit the defendant to interpose the statute," (Wessel v. Eilenberger, 119 N.E.2d 207, 210 (Ill.1954)), we are not persuaded by plaintiff's argument.

Finally, plaintiff asserts that its full performance and Reed's partial performance take the contract out of the statute of frauds. Specifically, plaintiff argues:

> Here, the SAC alleges full performance by AHMA under the parties' agreements, and substantial performance by Reed – the only exceptions are the asserted breaches. In particular, the SAC alleges that AHMA performed all of its obligations under the parties' agreements – principally by "acquiescing" to Reed's representations and, in many instances, approving certain items of revenue, disapproving certain items of revenue in other instances, and by permitting Reed to pursue and share in approved items of revenue related to the Show. (SAC ¶¶36, 169). AHMA further alleges that Reed performed its obligations not to make any unilateral decisions with respect to revenue related to the hardware show with one exception – the sharing and disclosure of kickback and commission payments. (SAC ¶150).

(plf's response, at 14). Again plaintiff is correct in theory – complete performance by one party to an oral contract bars application of the statute of frauds. Noesges v. Servicemaster Co., 598 N.E.2d 437, 441 (Ill.App.Ct.1992). *See also* Morris, 1988 WL 107321, at *3; Meyer, 427 N.E.2d at 1256. Illinois courts have rationalized such an exception by noting that "'when one party, in reasonable reliance on the contract, performs all of its obligations, it would be unfair to allow the other party to accept the benefits under the contract but to avoid its reciprocal obligations by asserting the Statute of Frauds.'" Noesges, 598 N.E.2d at 441 (citing American College of Surgeons v. Lumbermens Mutual Casualty Co., 491 N.E.2d 1179, 1193 (Ill.App.Ct.1986).

Plaintiff has, however, failed to persuade us that it performed anything outside of its required duties under the show agreement. That the parties discussed and agreed to certain new revenue streams is already encompassed in the Second Amendment to the show agreement,

which states that "[t]he parties acknowledge that they have from time to time agreed to allocate specific items of expense or revenue, as applicable, in a manner different from that provided in the Agreement...." (show agreement, at 21-22). Full performance of obligations under a previous contract cannot act as full performance of an additional contract or modification. Thus, plaintiff's argument that the alleged oral contract was executed, not executory, also fails. And finally, the fact that as late as 1991 the parties entered into the First Addendum, which suggests that the revenue distribution was unchanged from the original show agreement,[5] belies plaintiff's breach of contract claims.

In summation, we find that plaintiff cannot maintain a breach of contract claim based on either the written show agreement or any oral contracts noted in its second amended complaint. Nor does the filing of Richard White's deposition testimony save plaintiff's breach of contract claim. Generally, we will not look beyond the four corners of the complaint in determining whether plaintiff has stated a claim. Palda v. General Dynamics Corp., 47 F.3d 872, 875 (7th Cir.1995). In the 12(b)(6) analysis we are to consider only the pleadings – reliance upon any additional evidence would require us to convert the 12(b)(6) motion into a motion for summary judgment. Thompson, 300 F.3d at 753. We decline to do that.

Breach of Fiduciary Duty

In AHMA I, we held that plaintiff's first amended complaint failed to support a claim for breach of fiduciary duty beyond Reed's execution of exhibitors' contracts. Such a duty was contained in paragraph 7 of the show agreement: "Exhibitor contracts pertaining to Shows shall be executed by [Reed] as agent for itself and [AHMA]." We declined, however, to find a

---

[5]The relevant paragraph reads: "...the Show and the Building Products Show shall be treated as separate events under the financial provisions of the Agreement and revenue due to [AHMA] from each of the events shall be calculated separately, each in accordance with the formula contained in paragraph 10(c) of the Agreement; specifically, [AHMA] shall be entitled to receive...[a percentage] received from the sale or rental of space at each Building Products Show" (show agreement, first addendum, at ¶3).

broader fiduciary relationship arising out of Reed's course of conduct. Specifically, we declined to find special circumstances whereby Reed held a dominant position over AHMA, thus imposing a fiduciary duty upon Reed. Plaintiff has revised its complaint in an attempt to revive the breach of fiduciary duty claim. Specifically, plaintiff added allegations of its ownership interest in the Show and the special relationship between itself and Reed.

First, plaintiff argues that its ownership interest in the Show created a fiduciary relationship as a matter of law between itself and Reed. By its citations to Illinois case law, plaintiff implies that, along with Reed, it entered into a joint venture to create and conduct the Show. Defendants do not contest, nor could they, that such a relationship would create a fiduciary relationship between the parties. *See* Cheng v. Wang, 1998 WL 27140, *16 (N.D.Ill.1998); Ambul v. Swanson, 516 N.E.2d 427, 431 (Ill.App.Ct.1987). Rather, defendants assert that plaintiff's alleged ownership interest is directly contradicted by the show agreement. Specifically, defendants point to paragraph 14, which states, in pertinent part:

> It is understood that the National Hardware Show is the business enterprise of [Reed] and if at any time during the term of this Agreement or thereafter during the period of one year following the expiration hereof, [Reed] intends to sell the rights to the Show to a third party..., it shall notify [AHMA] in writing of such intention. For a period of 30 days after the date of receipt of such notification, [AHMA] shall have the exclusive right and option to purchase the rights to the Show, subject to [Reed's] obligations with respect thereto, for cash equal to the bona fide price actually offered for such rights in writing, and acceptable to [Reed].

(show agreement, at ¶ 14).

We must first determine whether plaintiff has adequately pled a joint venture. Under Illinois law such a relationship may be inferred from the facts and circumstances of the case, with the intent of the parties serving as the most significant element. Ambul, 516 N.E.2d at 429. "In general, the following elements are determinative of such an intent: (1) an express or implied agreement to carry on some enterprise; (2) a manifestation of intent by the parties to

be associated as joint venturers; (3) a joint interest as shown by the contribution of property, financial resources, effort, skill or knowledge by each joint venturer; (4) some degree of joint proprietorship or mutual right to exercise control over the enterprise; and (5) provision for the joint sharing of profits and losses." *Id.* The show agreement is an express agreement to carry on the show. It states that each party will contribute its expertise and resources to the show. Specifically, AHMA was to conduct and sponsor, and Reed was to manage the show (show agreement, ¶1). Plaintiff pled joint development and ownership of all information and databases regarding exhibitors, attendees, attendee pre-registrants and AHMA's authority to decide the show's dates, location, exhibit space rate, sources of revenue, attendance policies, and general conditions (2nd am.cplt., ¶ 174).

Finally, plaintiff has sufficiently pled profit and loss sharing. Defendants' argument that the show agreement demonstrates that the parties did not share profits or losses fails to defeat plaintiff's joint venture argument. First, the show agreement itself calls for the sharing of at least some of the profits (show agreement, ¶ 10(a) ("For its services hereunder, [Reed] shall be entitled to retain all amounts remaining after payment of such expenses and all sums due to [AHMA] hereunder")). And even if it did not, the existence of an express written agreement is only one of several factors to consider when determining whether a joint venture – and thus a fiduciary relationship – existed. Trustmark Ins. Co. v. General Cologne Life Reinsurance of America, 2001 WL 1268539, *4 (N.D.Ill.2001) (internal citations omitted). Although we earlier found that plaintiff did not sufficiently allege a breach of contract claim for failure to share in all profits or loss, plaintiff has sufficiently pled such an arrangement, exhibited by the parties' course of conduct with respect to profit sharing. Therefore, at this stage, although not pled by such a name, we find that plaintiff has adequately pled a joint venture.

Defendants' citation to paragraph 14 of the show agreement also fails to defeat plaintiff's fiduciary duty claim. If we view the show as a joint venture between AHMA and Reed, Reed's ability to sell the rights to the show (show agreement, ¶14) must mean the rights to sell the name "National Hardware Show." One element of a joint venture is the contribution of some value by each joint venturer. Property – including a trademark – can be owned by one joint venturer without rendering the business enterprise something less than a joint venture. In order to succeed on a breach of fiduciary duty claim, plaintiff will have to prove its ownership interest in the show, which may be an uphill battle in light of paragraph 14. We will not, however, foreclose that opportunity at this stage.

Even where a fiduciary relationship does not arise as a matter of law (as it would for joint venturers), such a relationship might "arise as a result of the special circumstances of the parties' relationship where one party places trust in another so that the later [sic] gains superiority and influence over the former." <u>Autotech Technologies Ltd. Partnership v. Autmationdirect.com, Inc.</u>, 2005 WL 3180147, *6 (N.D.Ill.2005) (internal quotations omitted). In our previous order we found that plaintiff had failed to allege any facts indicating that Reed held such a dominant position over AHMA that a fiduciary relationship would be found based on special circumstances. Although plaintiff included such allegations in its second amended complaint, because we allow plaintiff's breach of fiduciary duty claim to continue under the joint venture theory, we need not address whether plaintiff sufficiently pled special circumstances.

<u>Common Law Fraud</u>

In our previous order, we held that plaintiff sufficiently stated a claim for common law fraud. Although plaintiff has not deleted any of its allegations with respect to that claim,

defendants encourage us to reconsider our previous determination, arguing that plaintiff's reliance on defendants' alleged false statements was unreasonable as a matter of law.

As we noted previously in AHMA I, a common law fraud claim requires plaintiff to allege: "(1) a false statement of material fact; (2) the party making the statement knew or believed it to be untrue; (3) the party to whom the statement was made had a right to rely on the statement; (4) the party to whom the statement was made did rely on the statement; (5) the statement was made for the purpose of inducing the other party to act; and (6) the reliance by the person to whom the statement was made led to that person's injury." Vasquez v. Sears, Roebuck & Co., 1999 WL 965556, *5 (N.D.Ill.1999) (quoting Cramer v. Ins. Exch. Agency, 675 N.E.2d 897 (Ill.1996)). We found that plaintiff sufficiently pled such elements. And defendants failed to persuade us that plaintiff's failure to sufficiently plead a breach of contract or fiduciary duty claim should automatically lead to dismissal of the fraud claim.

A common law fraud claim based on an omission or concealment of a material fact, like here, requires a duty to speak, which occurs in one of two circumstances: "'1) when the defendant's acts contribute to the plaintiff's misapprehension of a material fact and the defendant intentionally fails to correct plaintiff's misapprehension, or 2) when the defendant owes some fiduciary duty to the plaintiff to make a full and fair disclosure and fails to correct a misapprehension of a material fact.'" AHMA I, 2004 U.S. Dist. LEXIS 28007 at *38-39 (internal citations omitted). With regard to plaintiff's first amended complaint, we found the allegations insufficient in pleading a fiduciary duty. We held, nonetheless that "plaintiff's allegations contend that it was Reed's actions – its provision of financial data regarding the show – that created the misapprehension that there was no other revenue derived from the show. Allegedly, Reed intentionally failed to correct this misapprehension to ensure AHMA's continued commitment to the show." *Id.*, at *39. And therefore, we held that plaintiff pled

damages as a result of such an omission. *Id.* In analyzing the second amended complaint, we have found that plaintiff has sufficiently pled a fiduciary relationship and therefore has pled a duty to speak under either of the aforementioned paths.

Defendants contend, however, that plaintiff's reliance on defendants' false statements – here, omissions – was unreasonable as a matter of law. Specifically, defendants point to paragraph 10(d) of the show agreement to argue that plaintiff could not, as a matter of law, have had a reasonable misapprehension that show audit reports provided under that paragraph disclosed all revenue to plaintiff. Paragraph 10(d) states, "Within 60 days after the conclusion of each Show, [Reed] shall deliver to [AHMA] a certificate from an independent certified public accountant that attests to the fact that the payments made by [Reed] to [AHMA] in respect of the Show covered by the certificate were correctly computed in accordance with the provisions of this Agreement." In essence, defendants contend that because the show agreement unambiguously limits Reed's disclosure obligations to only a portion of the revenue (a contention with which we agree), any misapprehension that Reed was disclosing all revenue is unreasonable as it is directly contradicted by the contract language.

To determine whether plaintiff reasonably relied on Reed's assurances and omissions, we consider all facts that plaintiff knew, and those facts it could have learned through the exercise of ordinary prudence. Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc., 250 F.3d 570, 574 (7th Cir.2001). The issue of reliance is generally a question of fact for the jury, but may "be determined as a matter of law when no trier of fact could find that it was reasonable to rely on the alleged statements or when only one conclusion can be drawn." *Id.* Defendants rely on Cozzi, along with L.R.J. Ryan v. Wersi Electronics, 3 F.3d 174 (7th Cir.1993), and Northern Trust Co. v. VIII South Michigan Associates, 657 N.E.2d 1095 (Ill.App.Ct.1995), to argue that a party cannot reasonably rely on statements that contradict the express language

of a contract. (Reed's brief, at 18). While those cases do in fact make such a holding, the case at hand can be distinguished. In the cases cited by defendants, the language of the contract expressly contradicted plaintiffs' contentions. We find no such incompatibility here. Paragraph 10(d) is not directly contradicted by plaintiff's contention that Reed did (or represented that it did) disclose the entire bill of revenue to AHMA. *See* Truserv Corp. v. Chaska Building Center, Inc., 2003 WL 924509 (N.D.Ill.2003).

Logically, defendants' argument extends the notion in Cozzi beyond its reach. Just because Reed was not obligated to disclose all revenue (or any revenue outside of the revenue received from the sale or rental of exhibit space) does not necessarily mean that Reed did not disclose additional revenue streams. In fact, plaintiff alleges that Reed disclosed all revenue except for the Freeman revenue. (*See, e.g.*, 2nd am.cplt., ¶¶ 138, 150). Thus, as a matter of law we cannot say it was unreasonable for AHMA to rely on Reed's oral assurances and conduct to believe that Reed was disclosing all revenue, even though it was not contractually obligated to do so. At this juncture we decline to dismiss plaintiff's common law fraud claim.

## CONCLUSION

For the reasons stated above, we grant defendants' motion to dismiss plaintiff's breach of contract claim to the extent it claims that Reed was obligated to disclose and share all Show revenue with plaintiff. We deny defendants' motion to dismiss plaintiff's fiduciary duty and common law fraud claims.

JAMES B. MORAN
Senior Judge, U. S. District Court

Feb. 13, 2007.