**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AMERICAN HARDWARE | ) |
| MANUFACTURERS ASSOCIATION, | ) |
| Plaintiff, | ) |
| | )    No. 03 CV 9421 |
| v. | )    Judge Blanche Manning |
| | ) |
| REED ELSEVIER, INC., *et al.*, | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

American Hardware Manufacturers Association has sued defendants Reed Elsevier, Inc.,

two of its divisions, Reed Exhibitions and Association Expositions & Services (collectively

"Reed"), as well as Freeman Decorating Co. and Freeman Decorating Services, Inc. (collectively

"Freeman"), over the annual National Hardware Show that American Hardware and Reed staged

each year until they parted ways in 2003. Freeman served as Reed's general contractor. The

defendants now seek summary judgment on several of American Hardware's claims, including

claims that Reed breached various agreements and conspired with Freeman to defraud American

Hardware. In addition, Reed and Freeman have moved to strike American Hardware's responses

to their Local Rule 56.1 statements, and Reed has moved to file supplemental authority. For the

following reasons, Reed and Freeman's motions are granted.

**Motions to Strike [971-1] & [978-1]**

As a preliminary matter, the court will first address the motions to strike filed by Reed

and Freeman. Reed and Freeman move to strike American Hardware's Local Rule 56.1

statements on the grounds that they are: (1) non-responsive, irrelevant, and argumentative; (2)

contain statements or assumptions related to contract claims the court has previously dismissed;

(3) cite to evidence that does not support the assertions for which they are offered; (4) deny facts without citing to supporting evidence; and (5) contain improper legal arguments and conclusions. Before addressing these contentions, the court will review the local rules which dictate the parties' responsibilities in submitting their fact statements on summary judgment.

Local Rule 56.1 statements help the court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000). Local Rule 56.1(b) requires the party opposing summary judgment to submit a *concise* response to each of the moving party's statements and a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment. *See* L.R. 56.1(b)(3). The opposing party's statement must support any denial with "specific references to the affidavits, parts of the record, and other supporting materials relied upon." *Id*.

In addition, a response may not consist solely of "purely argumentative denials," *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000), or "evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon*, 233 F.3d at 528. The court need not "wade through improper denials and legal argument in search of a genuinely disputed fact." *Id*. at 529. Finally, the court may disregard statements that do not properly cite to the record. *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005) ("a district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed").

Here, many of American Hardware's responses fall short of the requirements of Local Rule 56.1(b) in that they are not responsive to the defendants' fact statements, embed additional facts in response to the defendants' fact statements, or contain purely argumentative denials. For example, Reed states, "The NHS was sold out from 1985 through 1999 or 2000." Reed's Statement of Facts [856-1] at ¶ 21. American Hardware responds:

> AHMA objects to Paragraph 21 as compound. Subject to that objection, Denied. Reed's use of the defined term "NHS," which purposefully conflates Reed's claimed ownership of the mark "National Hardware Show" with its claimed ownership of a trade show, is disputed and renders the statement misleading and contradicted by record facts. Contrary to the implication by Reed in its use of the defined term, in 1977, AHMA and Reed Publishing Corporation formed a new trade show venture for the hardware/home improvement industry that was conducted and sponsored by AHMA and managed by Reed. That new venture was known by many names.

American Hardware's Response to Reed's Statement of Facts [918-1] at ¶ 21. For all its verbosity, the evidence that American Hardware cites to support its denial does not address the sole fact asserted in Reed's statement of fact—that the hardware show was sold out during the specified period.

American Hardware's filing is filled with these sorts of nonresponsive denials, and required the court to spend a considerable amount of time deciphering the filing. American Hardware's failure to comply with Local Rule 56.1 does not automatically result in judgment for the defendants, who bear the ultimate burden of persuasion to show that they are entitled to judgment as a matter of law. *Raymond*, 442 F.3d at 608. However, attempts to create a confusing record in the hopes of creating fact questions are unhelpful and simply lead to delay in resolving the substantive issues raised in the summary judgment motions.

As a consequence, the motions to strike those responses that fall short of the requirements of Local Rule 56.1(b)(3)(A) are granted.

## BACKGROUND

In 1977 American Hardware and Reed entered into a written Show Agreement, under which the parties agreed that American Hardware would sponsor the hardware show and Reed would manage it. *See* Show Agreement (attached as Exhibit A to Second Amended Complaint [341-1]). Among other things, the Show Agreement contained a formula for the parties to share "gross revenue from the sale or rental of space at each Show." *Id.* at ¶ 10(b)-(c). It also provided that Reed would pay all expenses incurred in conducting the hardware show. *Id.* at ¶ 10(a). After each hardware show, Reed was required to provide American Hardware with a certificate from an independent certified public accountant attesting to the fact that the revenues Reed shared with American Hardware under the Show Agreement were correctly computed. *Id.* at ¶ 10(d).

Reed hired Freeman to serve as the hardware show's general contractor, a role Freeman undertook in 1982 when it purchased the company Reed had originally hired to be the hardware show's general contractor. Upon the expiration of the original agreement, Reed and Freeman entered into additional contracts in 1990 and 1994 in order to extend Freeman's role as general contractor. In 1998, Reed and Freeman extended Freeman's role again as general contractor, not only for the hardware show but also for all of Reed's trade shows. Each of these new contracts required Freeman to pay Reed certain commissions and provide it with free or discounted services, as is common in the industry.

American Hardware's relationship with Reed profited both entities. Their show's success grew each year until 2000, when demand for exhibit space began to drop. When demand dropped again in 2001, American Hardware became increasingly concerned and began questioning the prices Freeman was charging exhibitors. In September 2001, American Hardware called a meeting with Freeman and Reed to discuss exhibitor costs at the hardware show and ways to reduce those costs. American Hardware contends that it was during the September 2001 meeting that Freeman officials first admitted to "cost-shifting," under which Freeman allegedly recouped the costs of the commissions and discounts it provided to Reed by shifting those costs onto hardware show exhibitors, which had the effect of raising exhibition costs by as much as 20%. Reed and Freeman dispute that such an admission occurred.

In 2002 American Hardware concluded that it no longer wished to collaborate with Reed on the hardware show. On February 26, 2003, American Hardware and Reed signed a Separation Agreement which, among other things, terminated the Show Agreement after the August 2003 hardware show, ended the parties' collaboration after 2003, and permitted each party to hold its own hardware show subject to certain restrictions. *See* Separation Agreement (attached as Exhibit B to the Second Amended Complaint [341-1]). The Separation Agreement also contained a mutual release under which each party released the other from liability for any conduct predating the February 26, 2003, execution of the Separation Agreement. *Id.* at ¶ 7(a), (b). Reed began conducting its solo hardware show in Las Vegas in May 2004, where it continues to be held annually. American Hardware held its one and only solo show in Chicago in April 2004.

American Hardware filed the instant lawsuit on December 30, 2003. The Second

Amended Complaint alleges that Reed schemed to exact kickbacks from Freeman, the cost of

which Freeman passed on to show exhibitors, driving costs up and attendance down. American

Hardware seeks rescission of its Separation Agreement with Reed, alleging that it was

fraudulently induced into signing the agreement by Reed's failure to disclose its kickback scheme

(although American Hardware alleges a claim of fraudulent inducement, it did not do so under a

numbered count as it did with the remainder of its claims). It also seeks damages based upon,

among things, civil conspiracy to defraud (Count III), breach of the Show Agreement (Count IV),

tortious interference with prospective economic advantage (Count XI), and, alternative to its

fraudulent inducement claim, breach of the Separation Agreement (Count XIII). Before the court

are Freeman and Reed's motions seeking summary judgment on those counts.

## ANALYSIS

### I. Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex

Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court must evaluate admissible evidence in the

light most favorable to the nonmoving party, and may not make credibility determinations or

weigh evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). To avoid summary

judgment a non-moving party "must produce more than a scintilla of evidence to support its

position" that a genuine issue of material fact exists. *Pugh v. City of Attica*, 259 F.3d 619, 625

(7th Cir. 2001).

## II.     Fraudulent Inducement

Reed argues first that it is entitled to summary judgment on American Hardware's claim of fraudulent inducement, under which American Hardware seeks to rescind the Separation Agreement it entered into with Reed on February 26, 2003.  American Hardware seeks to rescind the Separation Agreement because the agreement contained mutual releases under which both Reed and American Hardware agreed not to sue each other for "any and all matters" that occurred before the date of the agreement.  Because many of American Hardware's claims are premised on conduct that predates the mutual release, American Hardware may pursue those claims only if it succeeds in rescinding the Separation Agreement.

In order to rescind the Separation Agreement and escape the effect of the mutual release contained within it, American Hardware asserts that pre-contractual statements made by Reed senior vice president Dennis MacDonald fraudulently induced it to sign the Separation Agreement.  According to American Hardware, as a consequence of Reed's fraudulent inducement, it is entitled to rescind the Separation Agreement and, therefore, is not bound by the mutual releases contained within it.

A thorough understanding of American Hardware's fraudulent inducement argument necessitates a review of the parties' positions as articulated in briefs filed in 2005 regarding Reed's motion for partial summary judgment.  As detailed in those briefs, American Hardware contends that it was fraudulently induced into signing the Separation Agreement by statements made by Reed in response to American Hardware's concerns that Reed had secretly been involved in staging competing trade shows in violation of the Show Agreement.  As early as 1977, Reed had agreed not to "conduct, sponsor, or manage" a trade show related to hardware or

home improvement products other than American Hardware's show.  *See* Show Agreement (attached as Exhibit A to Second Amended Complaint [341-1]) at ¶ 11(a).

However, in January 2003 American Hardware began to suspect that Reed had violated its agreement not to conduct a competing show.  Specifically, American Hardware received an e-mail from the Midwest Builders Show touting that the show was "[b]rought to you by . . . Reed Business Information."  *See* American Hardware's Statement of Additional Facts [136-1] ¶ 7 and Exhibits Submitted in Opposition to Motion for Partial Summary Judgment [130-1] at Ex. 6.

Concerned that Reed was violating ¶ 11(a) of the Show Agreement, American Hardware chief executive officer, William Farrell, wrote to MacDonald on January 27, 2003, asking about Reed's involvement in the Builders Show.  MacDonald responded in an e-mail dated February 4, 2003, that the Builders Show "does not fall within the description contained in paragraph 11(a) of our 1977 agreement . . . Reed Business Information is simply exchanging promotional support for this local event."  American Hardware's Statement of Additional Facts [136-1] ¶ 16 and Exhibits Submitted in Opposition to Motion for Partial Summary Judgment [130-1] at Ex. 10.

Dissatisfied with that response, Farrell sent a second letter to MacDonald dated February 6, 2003, in which he asked what MacDonald meant by "simply exchanging promotional support," and stated that Reed's involvement with the Builders Show struck him as being "tantamount to sponsorship of the show, which, of course, would constitute a major problem relative to our Show Agreement."  According to American Hardware, MacDonald responded to Farrell by phone, telling him that Reed was merely a presenter, not sponsor, of the Builders Show.  American Hardware's Statement of Additional Facts [136-1] ¶ 22.

In the meantime, American Hardware investigated whether Reed had conducted any other shows involving the hardware or home improvement trades.  As a result of the investigation, American Hardware suspected that Reed's involvement in two other shows—the International Security Conference and the Home Automation Show—also violated ¶11(a) of the Show Agreement.  Farrell discussed Reed's involvement in all three shows during meetings with MacDonald in New York on February 17 & 18, 2003, at which American Hardware and Reed discussed terminating the Show Agreement at the conclusion of the 2003 American Hardware show.  According to American Hardware, MacDonald addressed the Builders Show first by initially reiterating that Reed was not a sponsor of that show, but finally agreed that the Builders Show was hardware-related and, therefore, Reed "would not be involved or participate in any way in the 2003 Midwest Builders Show."  American Hardware's Statement of Additional Facts [136-1] ¶ 33 and Exhibits Submitted in Opposition to Motion for Partial Summary Judgment [130-1] at Ex. 1 ¶ 54.  As for the Security and Home Automation shows, MacDonald allegedly responded that "Reed intended to and would comply with the terms of the Show Agreement, including paragraph 11(a) . . . and make all necessary scheduling changes."  American Hardware's Statement of Additional Facts [136-1] ¶ 40 and Exhibits Submitted in Opposition to Motion for Partial Summary Judgment [130-1] at Ex. 1, ¶ 58.

Following the meetings in New York, American Hardware and Reed executed a Separation Agreement on February 26, 2003.  Under its terms, the parties agreed to operate under the Show Agreement until August 16, 2003.  In addition, American Hardware and Reed each released and agreed not to sue the other for:

> any and all matters, including without limitation, all matters
> relating to, arising out of or in connection with the operation,
> management or conduct of the Show, the Show Agreement or
> otherwise releated to the Show Agreement, for the period from the
> beginning of time through the date hereof . . .

Separation Agreement (attached as Exhibit B to the Second Amended Complaint [341-1]) at

¶ 7(a), (b). The Separation Agreement also prohibited Reed from being involved in other

hardware-related shows in any of the following ways: "engage in, sponsor, produce, conduct, or

manage . . . or provide any management, consulting, financial, administrative or other services to

any person or entity engaged in such activities" for a period of 24 months beginning with the

signing of the Separation Agreement. *Id.* at ¶ 20(a).

American Hardware contends that each of MacDonald's responses to its inquiries about

the Builders, Security and Home Automation shows was fraudulent, and induced it to sign the

Separation Agreement. However, before addressing whether American Hardware has identified

evidence satisfying each element of a claim of fraudulent inducement, the court must first

address whether such a claim is even viable in light of Illinois' economic loss doctrine. Under

the economic loss doctrine, a plaintiff may not maintain a tort claim that is actually just a breach

of contract claim in disguise. *See Murphy Bros. Carnival Equip., L.L.C. v. Corp. for Int'l Bus.*,

No. 08 CV 4105, 2009 WL 3152827, at *4 (N.D. Ill. Sept. 28, 2009) ("tort law does not provide

a remedy for the breach of a duty arising out of a contract."). The policy behind the doctrine is

that parties to a contract should allocate liability for economic losses within their contract. *See*

*Mars, Inc. v. Heritage Builders of Effingham, Inc.*, 763 N.E.2d 428, 434 (Ill. App. Ct. 2002)

("the economic-loss rule is founded on the theory that parties to a contract may allocate their

risks by agreement and do not need the special protections of tort law to recover damages caused

by a breach of contract").  As a result, the economic loss doctrine prohibits a plaintiff from maintaining a claim for fraudulent inducement if the allegedly fraudulent statement was merely a promise by the defendant to fulfill the terms of the contract.  *See, e.g., Below v. Norton*, 751 N.W.2d 351, 359 (Wis. 2008) ("For this narrow fraud in the inducement exception to apply, the misrepresentation must have induced the plaintiff to enter into the contract and must not have been specifically related to the subject matter of the contract. . . .  Put another way, for this narrow exception to apply, the misrepresentation must be 'extraneous to, rather than interwoven with, the contract.'") (internal quotation marks and citation omitted).

Therefore, to be entitled to rescind the Separation Agreement for fraudulent inducement and escape the effect of the mutual release contained in that agreement, American Hardware must show that the fraudulent statements that allegedly induced it do not concern a term of the Separation Agreement.  This it cannot do.  According to American Hardware's own version of the facts, the alleged statements were commitments made by MacDonald that Reed would not sponsor other shows involving the hardware or home improvement trades.  That same commitment is contained within the Separation Agreement, as quoted above.  Accordingly, MacDonald's allegedly fraudulent statements concerned a term of the contract and, therefore, cannot be the basis of a fraudulent inducement claim.  Because, as a matter of law, American Hardware cannot maintain its fraudulent inducement claim, it is not entitled to the remedy of rescission.[1]

---

[1]The court acknowledges that in an order dated November 29, 2005, Judge Moran denied a motion for summary judgment filed by Reed, in part, because he concluded that American Hardware's fraudulent inducement allegations presented a disputed question of material fact that could not be resolved on a motion for summary judgment.  However, Judge Moran's order did not address the effect of Illinois' economic loss doctrine on American Hardware's fraudulent

Even if Illinois' economic loss doctrine did not preclude American Hardware's fraudulent inducment claim, American Hardware could not succeed on that claim because it cannot establish that its reliance on the allegedly fraudulent statements was reasonable. According to American Hardware's version of events, when it confronted Reed about Reed's participation in the Builders, Security, and Home Automation shows, MacDonald responded that Reed's participation did not violate its agreement to refrain from participating in other shows within the hardware and home improvement trades. Given Reed's position—that its conduct did not violate the parties' agreement—American Hardware could not have reasonably believed that MacDonald's oral commitments to continue refraining from participating in competing shows meant that Reed would sever its participation in the Builders, Security, and Home Automation shows.[2] After all, Reed had already articulated its position that its participation in those shows did not violate the parties' agreement. Accordingly, as a matter of law, MacDonald's statements that it would continue to abide by the parties' agreement could not have led a reasonable person to believe that, as a result, Reed would sever its ties to the Builders, Security, and Home Automation shows. *Tower Investors, LLC v. 111 E. Chestnut Consultants, Inc.*, 864 N.E.2d 927,

inducement claim. Upon revisiting the issue, and in light of the more fully developed record that has been presented by the parties during briefing of the pending motions for summary judgment, the court concludes that American Hardware's fraudulent inducement claim cannot withstand the economic loss doctrine as a matter of law.

[2]American Hardware asserts that, as to the Builders Show, MacDonald stated not only that Reed's participation did not violate the Show Agreement, but also that Reed would end its participation "in any way" in the show. MacDonald has denied making that statement but, even if he did, nowhere in its response brief has American Hardware asserted that the statement was false, *i.e.*, that Reed continued to participate in the show after MacDonald's commitment to end Reed's participation. Thus, American Hardware has not met its burden of identifying evidence that this statement was fraudulent.

939-40 (Ill. App. Ct. 2007) (party cannot establish that it was fraudulently induced when it was fully aware of facts that made reliance unreasonable). Therefore, for this additional reason American Hardware cannot establish its claim of fraudulent inducment.

Because American Hardware cannot maintain its claim for being fraudulently induced into signing the Separation Agreement, and because it has asserted no other basis for rescinding the Separation Agreement, Reed is entitled to summary judgment on the issue of rescission. As a result, the court need not address Reed's alternative arguments in favor of summary judgment on the issue of rescission.

## B. Breach of Show Agreement (Count IV)

In Count IV of its Second Amended Complaint, American Hardware alleges that Reed breached the Show Agreement and various supplements to the Show Agreement, and sets out several theories supporting its breach of contract claim against Reed. In a previously-issued order, Judge Moran rejected some of American Hardware's theories regarding its contract claims. *See* December 28, 2004, Order on Motion to Dismiss [61-1]. Of those that remain, Reed seeks summary judgment on three: (1) failure to share all revenue derived from the sale or rental of space; (2) failure to pay all expenses; and (3) failure to comply with the operational provisions of the Show Agreement.

For the following reasons, because Reed is entitled to summary judgment on American Hardware's fraudulent inducement claim, it is also entitled to summary judgment on American Hardware's claims of breach of the Show Agreement based on conduct that predates the Separation Agreement. It is also entitled to summary judgment on *any* claim that it breached the Show Agreement.

13

### A.     Failure to Share All Revenue

American Hardware contends that Reed breached the Show Agreement by failing to share the commissions it received from Freeman.  According to American Hardware, Reed was obligated to share all of the revenue it generated from selling or renting space at the annual hardware show, and was therefore also required to share the alleged kickbacks Reed received from Freeman because those kickbacks were tied to the sale or rental of exhibit space.  Reed disputes that the commissions and discounts it received from Freeman were tied to the sale or rental of exhibit space, and therefore it was not obligated under the Show Agreement to share those revenues from Freeman.

The court begins by determining the parties' obligations under the terms of the Show Agreement.  Where a contract is unambiguous, the court interprets it as a matter of law.  *See Automation by Design, Inc. v. Raybestos Prod. Co.*, 463 F.3d 749, 753 (7th Cir. 2006).  As Judge Moran detailed in his December 28, 2004, order, the Show Agreement obligated American Hardware and Reed to share revenue from the sale or rental of space, but did not obligate them to share revenue from other sources unless they entered into a separately-executed agreement to share other revenue.  *See* December 28, 2004, Order [61-1] at 16-17; Second Amendment to the Show Agreement (attached as Ex. A. to the Second Amended Complaint [341-1]) at 2-3.  Therefore, to avoid summary judgment, American Hardware must either show that the commissions from Freeman were derived from the sale or rental of space, or that it and Reed reached a separate agreement to share the commissions from Freeman.

First, American Hardware asserts that it was entitled to a share of the commissions Reed received from Freeman because those commissions were "inexorably linked to exhibit space

14

sales." Reed Response [917-1] at 19. But American Hardware has identified no facts to support its assertions and, in fact, the record undermines any conclusion that Freeman's revenues were derived directly from the sale or lease of space. Indeed, American Hardware has admitted that a general contractor such as Freeman "essentially performs the decorating for trade shows and expositions." American Hardware Responses to Freeman's Statements of Fact [915-1] ¶ 12. More specifically, under Freeman's contract with Reed, its services were to include providing standard furnishings, "new generation" furniture, floor coverings, drapery, standard rentals, signs, installation and dismantling labor, drayage,[3] audio visual, custom rental units, cleaning, electric, and plumbing. *See* Reed & Freeman Contract (attached as Ex. 71 to American Hardware's Statement of Additional Facts [915-1] & [1006-1]) at ¶ 1. Freeman's services may have given exhibitors the look they desired for their space, but there is no evidence that Freeman actually sold or rented the space to exhibitors.

Alternatively, American Hardware identifies what it contends is evidence that it and Reed reached a separate agreement to share the revenues Reed received from Freeman. Specifically, American Hardware points to a December 5, 1983, letter from Robert Krakoff, president of Reed's predecessor, Cahners Exposition Group, to William Farrell. The letter reads in pertinent part as follows:

> Please accept this letter as confirmation of the division between Cahners Exposition Group and the American Hardware Manufacturers Association of complimentary benefits

---

[3] According to a printout of a Glossary of Terms obtained by American Hardware from Freeman's website, drayage is the process of moving freight from the dock doors at a convention center to the booth locations within the exhibit halls, and the return of the freight to the dock after the exhibition has finished. *See* American Hardware Statement of Material Facts in Support of its Motion for Summary Judgment, [837-1], Ex. 49 at 2.

derived from activities executed by Cahners for the National Hardware Show and the Winter National Hardware & Home Center Show.

Cahners Exposition Group will split evenly (50/50) with the AHMA complimentary hotel rooms, rental cars, and airline tickets received as a result of business agreements relative to either the National Hardware Show or the Winter National Hardware & Home Center Show, after the direct requirements of the operating staff of CEG and AHMA are accommodated.

Krakoff December 5, 1983 letter (attached as Ex. 172 to American Hardware's Statement of Additional Facts [918-1]).

American Hardware argues that the commissions Reed received from Freeman fell under the "complimentary benefits" language of the letter, and therefore Reed was obligated to share those commissions with American Hardware. However, the letter goes on to specify the types of "complimentary benefits" Reed was obligated to share, which includes "complimentary hotel rooms, rental cars, and airline tickets received . . . after the direct requirements of the operating staff . . . are accommodated." Revenue from Freeman's decorating services can hardly be equated to complimentary hotel and travel accommodations. Accordingly, the Cahners letter does not constitute a separate agreement to share commissions that Reed received based upon Freeman's decorating services.

American Hardware argues that the Cahners letter also obligated Reed to share cash payments it received from hardware show vendors. However, like revenue from a decorator, revenue from a florist or other vendor cannot be equated to complimentary hotel and travel accommodations, and therefore falls outside the scope of any obligation created by the Cahners letter.

### B.    Failure to Pay All Expenses

American Hardware next argues that Reed failed to pay all expenses incurred in staging the hardware show, as it was obligated to do under the Show Agreement. Specifically, American Hardware contends that as a result of the kickback scheme, Reed received goods and services from Freeman for free, and avoided paying the expense of those goods and services by shifting the costs onto exhibitors.

Setting aside the question as to whether American Hardware could establish damages from this alleged breach, to determine whether Reed shirked an obligation under the Show Agreement, the court must first determine Reed's obligation under the terms of that agreement. According to the Show Agreement, Reed was responsible "for paying all expenses, except those incurred directly by [American Hardware] without the consent of [Reed], incurred in conducting the Shows." Under Illinois law, an expense is "incurred" if a party is liable or responsible for paying the expense. *USG Interiors, Inc. v. Commercial & Architectural Prod., Inc.,* 609 N.E. 2d 811, 813 (Ill. App. Ct. 1993) ("'[i]ncur' means to become liable or subject to").

Any free goods and services Reed received from Freeman were expenses *avoided*, not expenses incurred, since Reed was never liable or responsible for paying for the free goods and services. *Id.* Accordingly, American Hardware has identified no facts to support this theory of breach of the Show Agreement, and Reed is therefore entitled to summary judgment on this issue.

### C.    Civil Conspiracy (Count III)

Next, Reed and Freeman both seek summary judgment on American Hardware's civil conspiracy claims against them. American Hardware alleges that Freeman conspired with Reed

17

to provide discounts to Reed in order to retain Reed's business, and then recouped those commissions and discounts by raising rates charged to exhibitors. American Hardware argues that both Reed and Freeman concealed the commissions and discounts as part of their scheme to defraud American Hardware out of money it was rightly owed under the terms of the Show Agreement. *Id*. at ¶ 56.

The elements of civil conspiracy under Illinois law are: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act. *Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. 2004). "The function of a conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's acts." *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994).

Liability for civil conspiracy is joint and several, and only one tortfeasor need commit the overt act in order for both parties to be liable for civil conspiracy: "Once a defendant knowingly agrees with another to commit an unlawful act or a lawful act in an unlawful manner, that defendant may be held liable for any tortious act committed in furtherance of the conspiracy, whether such tortious act is intentional or negligent in nature." *Id*. at 895. However, there is no such thing as accidental, inadvertent or negligent participation in a conspiracy; a defendant must understand the general objectives of the conspiracy, accept them, and agree to help further those objectives in order to be liable. *Id*. at 894. For that reason, evidence of an agreement is a necessary element of a civil conspiracy claim. *Mnyofu v. Bd. of Ed. of Rich Township*, No. 03-CV-8717, 2007 WL 1308523, *11 (N.D. Ill. April 27, 2007).

Because of the secretive nature of a conspiracy, it is almost never susceptible to direct proof. *See McClure v. Owens Corning Fiberglass Corp.*, 720 N.E.2d 242, 258 (Ill. 1999). Where a conspiracy cannot be demonstrated by direct evidence, it may be established from circumstantial evidence and inferences drawn from evidence, "coupled with common-sense knowledge of the behavior of persons in similar circumstances." *Id.* However, to stave off summary judgment on a conspiracy claim, the non-movant must provide some factual evidence of a "meeting of the minds" beyond mere speculation. *Blazquez v. Bd. of Ed. of the City of Chicago*, No. 05 CV 4389, 2007 WL 2410369, *21 (N.D. Ill. Aug. 20, 2007).

As a threshold matter, under the mutual release Reed cannot be held liable for conspiracy based on events occuring in the period of time predating the Separation Agreement. With respect to post-Separation Agreement conduct, Reed and Freeman are entitled to summary judgment on the conspiracy claim because none of American Hardware's evidence establishes a conspiracy. For instance, American Hardware cites documents and testimony from Reed employees to show that Reed intended to conceal commissions and discounts. While the evidence offers insight into Reed's intent, it does not address Freeman's intent. Specifically, Reed's former president and CEO, Richard E. White, described purposely omitting from Reed and Freeman's primary contract the terms that dealt with discounts and commissions, and putting them instead in "a supplementary memorandum to the agreement [so that] it never had to be produced when people might ask for evidence of our relationship with Freeman." White Deposition Transcript (attached as Ex. 10 to American Hardware's Statement of Additional Facts [918-1]) at 417. The testimony is evidence of Reed's intent, but does not establish that Freeman understood that it was

helping Reed hide sources of revenue that Reed was allegedly obligated to share with American

Hardware.

American Hardware also relies on testimony from White that in the fall of 2001, he

directed Freeman's chairman and CEO, Donald Freeman, to keep mum about the commissions

and discounts it offered to Reed.  White described the conversation as one in which he

deliberately spoke in generalities and avoided any specifics:

> I didn't talk about contracts.  I didn't talk about precedent.  I didn't talk about
> practices. . . .  I broadly said . . . that we had not disclosed to the [A]HMA that we
> were receiving payments from Freeman, that we had our reasons for doing that,
> and we did not want him disclose this information to the [A]HMA. . . .  Mr.
> Freeman had been briefed on that situation, which he indicated knowledge of
> when we spoke, and he indicated that he understood when I was communicating
> to him.

White Deposition Transcript (attached as Ex. 10 to American Hardware's Statement of

Additional Facts [918-1]) at 108-09.

White's need to "brief" Freeman on the need to conceal the commissions and discounts,

and White's reliance on generalities and avoidance of specifics during the briefing, does not

support American Hardware's contention that Freeman was aware of and reached a "meeting of

the minds" to help further Reed's alleged scheme.  *Blazquez,* 2007 WL 2410369 at *21; *Lowe v.*

*Letsinger*, 772 F.2d 308, 314 (7th Cir. 1985) ("one cannot conspire to conceal the existence of

something that one does not know exists").  To the contrary, White's testimony shows only that

Freeman knew that Reed wanted it to keep quiet about the commissions, not that Freeman

knowingly participated in a scheme to conceal from American Hardware a source of revenue

Reed was obligated to share:  "to the best of my knowledge, no one ever sat down from Reed

with someone from Freeman and plotted to create a revenue stream that would not be recognized

by the show." White Deposition Transcript (attached as Ex. 10 to American Hardware's Statement of Additional Facts [918-1]) at 381. Indeed, any conclusion about what Freeman knew would be speculative.

Next, American Hardware cites to an exchange between Reed and Freeman officials in early July 2002 responding to a request by William Farrell that Freeman write a letter confirming that Freeman's method of charging exhibitors did not result in cost-shifting. Reed urged Freeman not to respond, but Robert Lozier, a vice-president of Freeman, responded that "I don't see how I cannot reply to [Farrell's] request. *I do not see this as a concern for anyone involved*." (emphasis added). *See* Lozier E-Mail of July 3, 2002 (attached as Ex. 93 to American Hardware's Statement of Additional Facts [918-1]). Lozier's response does not establish that Freeman knew Reed was concealing sources of revenue that American Hardware was entitled to know about, let alone that Freeman was helping Reed conceal the revenue.

Finally, American Hardware cites as evidence of a conspiracy two agreements between Freeman and Reed that they signed around the same time as American Hardware and Reed entered into the Separation Agreement. In the first, the parties agreed that Reed would begin paying for items for the 2003 show that it had previously received for free from Freeman. In the second, the parties agreed that Reed would continue paying for these items for the shows to be held in the years 2004-09. However, according to American Hardware, despite entering into those two agreements, Freeman continued providing the items to Reed for free. According to American Hardware, these agreements were "sham agreements and were prepared only to perpetrate the conspiracy. Certainly, a jury could conclude as much." Response [914-1] at 18.

To survive summary judgment, a party must identify evidence that actually proves its claims. "Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors." *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). American Hardware has offered nothing more than its speculation about Reed and Freeman's motives for their agreements regarding the 2003 and 2004-09 shows. Speculation alone does not create a material factual dispute foreclosing summary judgment. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("Here, all the plaintiffs have to go on is a collective hunch about the defendant's motives, which in itself will not survive a motion for summary judgment.")

Accordingly, Freeman and Reed are both entitled to summary judgment on the civil conspiracy claims against them.

**D.     Tortious Interference with Prospective Economic Advantage (Count XI)**

Reed also seeks summary judgment on American Hardware's claim of tortious interference with prospective economic advantage. The allegations of this court are that Reed tortiously interferred with American Hardware's ability to mount a successful solo hardware show by engaging in the following conduct:  (1) causing Freeman to shift costs to exhibitors to the point where they stopped attending Reed and American Hardware's joint hardware shows; (2) making and publishing false statements about the separate hardware show American Hardware conducted in 2004 after entering into the Separation Agreement; and (3) announcing on Reed's website that numerous exhibitors and attendees were signed up to participate in Reed's 2004 hardware show in Las Vegas over American Hardware's show in Chicago when, in fact, those exhibitors and attendees had not signed up for Reed's show.

To sustain a cause of action for intentional interference with prospective economic advantage, a plaintiff must prove: (1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference. *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill.2d 460, 483-4, 693 N.E.2d 358, 370 (1998). Reed argues that it is entitled to summary judgment on this claim because American Hardware has failed to identify evidence that it had any reasonable expectation of business that it lost, or that it suffered any damages.

*1.     Reasonable Expectation of Entering into a Valid Business Relationship*

American Hardware argues that it had a reasonable expectation of entering a valid business relationship with prior hardware show exhibitors by virtue of the fact that it had "long-standing relationships and commitments" from them. SAC at ¶ 217. To support this claim, it submits lists of exhibitors at its 1990 and 2003 shows.

In Illinois a "'reasonable expectation' requires more than the hope or opportunity of a future business relationship." *Bus. Sys. Eng'g, Inc. v. Int'l Bus. Machines Corp.*, 520 F. Supp. 2d 1012, 1022 (N.D. Ill. 2007). On summary judgment, American Hardware "must bring forward enough evidence to persuade a rational jury that [it] had a reasonable expectation of a business relationship with some third party that would have been consummated but for [Reed's] unjustifiable interference." *Profile Products, LLC v. Soil Management Technologies, Inc.*, 155 F. Supp. 2d 880, 886 (N.D. Ill. 2001). Standing alone, a past contractual relationship fails to demonstrate a reasonable business expectancy. *MPC Containment Sys. v. Moreland*, No. 05 CV

6973, 2008 WL 2875007, *15 (N.D. Ill. July 23, 2008) (defense contractor who had previously supplied tanks to the Army had no reasonable expectation that it would win future contracts to supply tanks); *see also Int'l Serv. Assocs., Inc. v. Acro Mgmt. Of Wash.*, No. 94 CV 1807, 1994 WL 583302, *7 (N.D. Ill. Oct. 21, 1994) (a track record of past contracts is not enough to state a claim for tortious interference).

American Hardware's evidence that Reed interfered with its business expectancy for its separate hardware show in 2004 suggests no more than a "hope or opportunity of a future business relationship." *Bus. Sys. Eng'g*, 520 F. Supp. 2d at 1022. For example, the lists of exhibitors from prior shows do not speak to the quality or quantity of American Hardware's ties to the exhibitors, and therefore provide no insight into the likelihood that those exhibitors would choose to exhibit at American Hardware's 2004 show. American Hardware's lack of affidavits or other evidence from prior exhibitors elucidating their relationship to American Hardware is "necessarily fatal" to its claim. *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 684-85 (7th Cir. 1999) (lack of "independent factual support" such as affidavits from former customers was "necessarily fatal to their claim" because they failed to show the intent of these customers).

## E. Breach of Separation Agreement (Count XIII)

Finally, Reed seeks summary judgment on American Hardware's claim that Reed breached the parties' Separation Agreement by selling exhibit space at Reed's 2004 show before July 4, 2003. Although the Separation Agreement permitted each party to "begin to promote future Exhibitions" as of the date it was signed, February 26, 2003, it prohibited them from either "directly or indirectly" selling exhibit space or disseminating, executing, or accepting contracts

24

for a 2004 hardware show before July 4, 2003. *Id.* In addition, neither party could "assign exhibit space" for a 2004 hardware show until August 17, 2003. *Id.*

American Hardware cites two e-mails that it contends are evidence that Reed breached the Separation Agreement by selling exhibit space before July 4, 2003. The first is dated April 3, 2003. In it, a Reed sales manager advises a potential exhibitor that Reed's 2004 hardware show website was operational and available for browsing, and asks the exhibitor to contact him if "you would be interested in that show or our 2003 show in Chicago in August." American Hardware's Statement of Additional Facts [918-1] at Ex. 140. In the second e-mail, dated May 28, 2003, the sales manager advises the exhibitor that he will send information about Reed's 2004 hardware show "early in July," and asks what size booth the exhibitor would like to request as "we are currently drawing our floor plan for the 2004 event and wanted to know what size our customers were interested in." *Id.* at Ex. 142.

The court has carefully reviewed the cited e-mails. The e-mails contain no discussion of price, location of booths, or exhibitor contract terms. Indeed, according to the May 28, 2003, e-mail, Reed would not disseminate such information to exhibitors until early July, consistent with its obligation under the Separation Agreement to withhold disseminating, executing, or accepting contracts for a 2004 hardware show until July 4, 2003. The cited e-mails show only that Reed was promoting its 2004 show, as permitted as of the signing of the Separation Agreement. The e-mails are therefore not evidence that Reed breached the Separation Agreement.

Accordingly, Reed is entitled to summary judgment on Count XIII.

**F.      Fraud (Count I) and Unjust Enrichment (Count VI)**

Reed did not seek summary judgment on either American Hardware's claim of fraud (Count I) or of unjust enrichment (Count VI).  However, neither claim is legally viable.  In the only portion of Count I not barred by the mutual release in the Separation Agreement, American Hardware alleges that Reed concealed revenue by submitting a false financial statement on September 17, 2003.  However, the allegations are merely that Reed failed to meet its contractual obligation to share revenue and, therefore, is merely a claim of breach of contract disguised as a tort claim.  *See Murphy Bros.*, 2009 WL 3152827, at *4 (N.D. Ill. Sept. 28, 2009) ("Tort law does not provide a remedy for the breach of a duty arising out of a contract.").  Accordingly, summary judgment is granted to Reed on Count I

Likewise, the allegations in Count VI that Reed was unjustly enriched by retaining undisclosed revenues is merely a claim that Reed breached the parties' contract by failing to share revenues as required.  *See Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 688 (7th Cir. 2004) (unjust enrichment claims cannot be maintained where the parties' relationship is governed by contract).  Accordingly, summary judgment is also granted to Reed on Count VI.

## CONCLUSION

For the foregoing reasons, the motions for summary judgment of Reed [854-1] and Freeman [847-1] are granted on the following claims of American Hardware's Second Amended Complaint:  fraudulent inducement, civil conspiracy (Count III), breach of contract (Count IV), tortious interference with prospective economic advantage (Count XI), and breach of the Separation Agreement (Count XIII).  Summary judgment is also granted to Reed on the claims

fraud (Count I) and unjust enrichment (Count VI) and, consistent with the grand of summary judgment on the fraudulent inducement claim, on the claims of breach of fiduciary duty (Count V) and for an accounting (Count XII) that pre-date the Separation Agreement. Finally, summary judgment is granted on the following claims that post-date the Separation Agreement: (i) failure to failure to share all revenue derived from the sale or rental of space; (2) failure to pay all expenses; and (3) failure to comply with the operational provisions of the Show Agreement.

In addition, the motions to strike American Hardware's improper responses to Freeman and Reed's Local Rule 56.1 statements, [971-1] and [978-1], are granted.

Finally, Reed's motion to supplement the record with additional authority [1079-1] is granted.


ENTER:

DATE: January 4, 2010

*Blanche M. Manning*

Blanche M. Manning
United States District Judge