# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 9421 | **DATE** | 1/16/2011 |
| **CASE TITLE** | Amer. Hardware Mfrs. Assn. vs. Reed Elsevier, Inc. | | |

**DOCKET ENTRY TEXT**

The Court rules as stated below on the remaining issues in the parties' motions *in limine*.

■ [ For further details see text below.]   Docketing to mail notices.

## STATEMENT

In this order, the Court deals with various *in limine* issues.

1.  In two earlier decisions in this case, Judge James Moran ruled (among other things) that the parties' 1977 agreement was not ambiguous and that the agreement and its later amendments did not obligate Reed to share all revenues from the trade show with AHMA. *See* Dec. 28, 2004 decision at 16-17; Feb. 13, 2007 decision at 6-7. Those rulings are the law of the case. AHMA has provided no basis to revisit or overturn them at this juncture.

2.  Those decisions, however, do not address the admissibility of other evidence or argument regarding whether Reed was obligated to disclose or share revenues, commissions, or discounts relating to the trade show, and they do not suggest that the 1977 agreement undermines a fiduciary duty claim by AHMA based on a joint venture theory. Indeed, in his February 13, 2007 decision, Judge Moran determined that AHMA had stated a claim for breach of fiduciary duty in light of the 1977 agreement as well as other factors. He concluded that the existence of the 1977 agreement was one, but only one, of several factors to be considered in determining the existence of a joint venture. *See* Feb. 13, 2007 decision at 14-15. These decisions are likewise the law of the case. Reed had provided no basis to revisit or overturn these rulings at this juncture.

3.  During the final pretrial conference, from what the Court recalls, AHMA suggested that the 1977 agreement was not integrated and also pointed out that the agreement had later been amended. The Court understood this as a basis for suggesting that extrinsic evidence regarding the meaning of the 1977 agreement is admissible. The Court rejects this argument. Even if the agreement lacked an express integration clause, that would not, under Illinois law, render it incomplete or unintegrated. *See, e.g., Davis v. G.N. Mtg. Corp.*, 396 F.3d 869, 879 (7th Cir. 2005) (Illinois law). The 1977 agreement was in fact integrated; on its face, it was a complete expression of the parties' agreement. *See id.* at 878. Indeed, the agreement contained a

provision stating, "This Agreement constitutes the entire understanding between the parties . . . ." 1977 Agreement ¶ 13. Finally, The fact that an agreement is later amended has no bearing on whether it was an integrated agreement at the time it was initially made (a contrary rule would border on the absurd).

4. Under Illinois law, extrinsic evidence is admissible to show the meaning of a contract only if the contract is ambiguous – i.e., reasonably susceptible of different constructions. *See Davis*, 396 F.3d at 879; *Cromeens, Holloman, Sibert, Inc v. AB Volvo*, 349 F.3d 376, 394 (7th Cir. 2003) (Illinois law). In responding to Reed's motion, AHMA pointed to no term of the agreement that it contended was ambiguous, nor has the Court located any such term on its own. The Court concludes that extrinsic evidence is inadmissible to show the meaning of the 1977 agreement.

5. This does not mean, however, that evidence outside the 1977 agreement is inadmissible to show the existence of a joint venture. Indeed, as noted earlier, Judge Moran ruled (and this Court reaffirms) that the existence of the 1977 agreement is only one of several factors to be considered in determining whether the parties had a joint venture at some relevant point in time.

6. The Court does not address whether what might be called extrinsic evidence concerning the 1977 agreement – specifically, evidence about the parties' discussions prior to executing the agreement – might be admissible to show the existence or non-existence of a joint venture or for some purpose other than to interpret the agreement. The parties have not briefed that issue, or at least they have not briefed it sufficiently. The Court directs the parties to file brief memoranda (no more than 4 pages) on this topic by no later than 4:00 p.m. on January 17. (The Court notes that in Reed's motion *in limine* and its recent proffer regarding the testimony of Cordell Overgaard, Reed erroneously conflates the issue of whether extrinsic evidence is admissible to interpret the 1977 agreement and the issue of whether such evidence is admissible to show, or whether the evidence in the case is sufficient to show, a joint venture. These are logically distinct points.)

7. Contrary to Reed's argument, Judge Moran did not address the admissibility of "course of conduct" or "conspiracy" evidence to prove AHMA's fraud, breach of fiduciary duty or unjust enrichment claims or to defend against Reed's defamation claim. The Court is persuaded that such evidence is relevant for these purposes, subject to the limitations provided in Federal Rule of Evidence 403. In addition, contrary to Reed's argument, Judge Moran's December 28, 2004 decision does not impose limitations on the scope of AHMA's fraudulent inducement claim. *See* Reed Mots. in Limine at 2 (citing Dec. 28, 2004 decision at 10).

8. Expert testimony regarding ownership of the trade show or its assets or the meaning of the 1977 agreement is inadmissible as an improper opinion interpreting the parties' legal obligations. The Court has previously concluded, however, that Richard White, a former Reed executive, may testify as a fact witness regarding what Reed understood. *See* Dec. 29, 2010 decision ¶ 7. As the Court indicated, it is unpersuaded that White's testimony in this regard is based solely, or even primarily, on his interpretation of the 1977 agreement.

9. AHMA's expert David Cheifetz may testify regarding the key assets of a trade show. He has sufficient expertise and a sufficient foundation to render opinions on these points, and the issue is one that is relevant.

10. Expert or lay testimony that the 1977 agreement obligated Reed to disclose and share all show-related revenue with AHMA is inadmissible because it is contrary to Judge Moran's rulings discussed earlier.

| STATEMENT |
|---|

11.     The Court turns next to AHMA's motion *in limine* regarding the admissibility of Overgaard's testimony "regarding the intent behind, and negotiation of, the 1977 agreement."  AHMA Mots. in Limine at 19.  AHMA's primary argument is that Reed allowed Overgaard to disclose privileged communications – specifically, communications with Reed executives concerning their purpose and goal in negotiating the 1977 agreement – but nonetheless asserted the privilege when AHMA sought to question other Reed attorneys regarding the meaning of the agreement and when it sought documents regarding the intent or meaning of the agreement.

    a.  The latter of these points is a non-starter.  The Court agrees with Reed that its general objection to disclosure of privileged material made in its response to AHMA's document requests is not inconsistent.  AHMA has not shown that Reed ever specifically objected on privilege grounds to producing information regarding the 1977 negotiations.  *See* Reed Resp. to AHMA Mots. in Limine at 20.

    b.  The Court rejects, however, Reed's argument that when it permitted Overgaard to disclose communications from a now-deceased Reed executive, that did not involve privileged information because Overgaard was acting in a business capacity at the time of the underlying dealings.  Illinois law presumes that communications between a client and an attorney are privileged, *see, e.g., In re Marriage of Decker*, 153 Ill. 2d 298, 328-29, 606 N.E.2d 1094, 1108-09 (1992), and Reed has failed to rebut the presumption.  Indeed, Overgaard testified at his deposition that his role was that of legal counsel.  And the information he disclosed at his deposition was a confidential communication from his client, even if AHMA supposedly understood for other reasons what Reed's purpose was in negotiating the 1977 agreement.

    c.  AHMA argues that Reed's waiver opened up the privilege regarding the entire subject matter of the meaning of the 1977 agreement but that Reed nonetheless acted inconsistently with this by objecting on privilege grounds to testimony by other Reed attorneys regarding the meaning of the 1977 agreement.  AHMA contends that Reed should not be permitted to selectively introduce privileged communications.

    d.  The Court notes initially that the time for AHMA to raise that point was when the inconsistency became apparent, not on the virtual eve of trial via a motion *in limine*.  In any event, Reed's conduct was not inconsistent.  The other attorneys in question, Henry Horbaczewski and Julie Goldweitz, did not work for Reed in 1977, and they had nothing to do with the negotiation of the 1977 agreement.  As Reed points out, ordinarily-inadmissible extrinsic evidence is, by definition, evidence preceding or contemporaneous with the making of a contract, *see* Reed Resp. to AHMA Mots. in Limine at 21 (citing *Falconbridge U.S., Inc. v. Bank One Illinois, N.A.*, 240 B.R. 733, 734 (N.D. Ill. 1999)).  Horbaczewski and Goldweitz could not possibly have any information regarding those points:  Horbaczewski became Reed's general counsel in 1986 and first saw the 1977 agreement in 1985; and Goldweitz joined Reed in 1993.

    e.  Accordingly, Reed waived the privilege regarding the subject matter of the negotiation of the 1977 agreement, but that did not open the door to communications years later regarding the meaning of that agreement.  The knowing disclosure of privileged information requires disclosure of other privileged information "only if the disclosed and withheld materials concern the same subject matter and ought in fairness to be considered together."  *In Re Aftermarket Filters Antitrust Litig.*, No. 08 C 4883, 2010 WL 4622527, at *6 (N.D. Ill. Nov. 4, 2010) (concerning Fed. R. Evid. 502(a)).  Subject matter waiver "'is reserved for those unusual situations in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary.'"  *Id.* (quoting Fed R. Evid. 502 advisory comm. note).  In this case, information about the purpose of the 1977 agreement or the meaning of its terms from persons who were nowhere near the scene until years

later does not fall within the scope of Reed's waiver of the privilege via Overgaard's testimony.

12.     The discussion above does not mean, however, that testimony regarding Overgaard's discussions with the now-deceased Reed executive is admissible. Reed wishes to elicit from Overgaard statements by those executives to the effect that Reed owned the hardware show. Such statements are inadmissible hearsay, offered to prove the truth of the matter asserted in the statements. *See* Fed. R. Evid. 801(c). The Court is persuaded based on the arguments in AHMA's memoranda and at the pretrial conference that these statements are not properly admissible for any non-hearsay purpose.

13.     The same is true of testimony by other past and present Reed personnel regarding statements made by the deceased Reed executives. Such testimony is excluded as inadmissible hearsay. (The Court notes that Reed's argument to the contrary, in which Reed tries to draw a link between what the deceased executives said and what more recent personnel believed, is at odds with its argument regarding the scope of its waiver of the attorney-client privilege that these two matters are distinct.)

14.     After AHMA and Reed entered into their "Separation Agreement" in 2003, Reed entered into two agreements with Freeman Decorating that, as characterized by AHMA, purported to eliminate the practice of Freeman providing payments and free goods and services to Reed at the trade show. AHMA says, however, that Reed and Freeman did not follow these agreements and never intended to do so. AHMA wants to introduce evidence regarding these agreements to show that they were a sham intended to paper over Reed's dispute with AHMA and to support the claim that Reed fraudulently induced AHMA to enter into the Separation Agreement. The Court agrees with Reed that the agreements themselves are inadmissible as subsequent remedial measures: the jury undoubtedly would regard the agreements as a quasi-admission of prior misconduct by Reed and Freeman, which is one of the key contested issues for trial. *See* Fed. R. Evid. 407. The purportedly alternate purpose for which AHMA seeks to introduce the agreements is virtually impossible to distinguish from the sort of purpose declared improper by Rule 407 – AHMA says that they were "a paper trail in furtherance of Reed's fraud scheme," the same alleged "decades-long fraud scheme" that underlies many or most of AHMA's claims in this case. *See* AHMA Resp. to Reed's Mots. in Limine at 36. And even were that not so, the Court would exclude this evidence under Rule 403, because the danger of unfair prejudice to Reed, as well as the potential for jury confusion and waste of time, far outweighs the probative value of this evidence. *See* Fed. R. Evid. 403. For the same reasons, the Court also excludes pursuant to Rule 403 evidence regarding AHMA's contention that after executing the 2003 agreements, Reed and Freeman allegedly returned to the earlier practice that AHMA contends was improper and fraudulent.

15.     Reed has filed a submission stating that it will not offer evidence regarding the net worth of William Farrell or Timothy Farrell. *See* Dec. 30, 2010 order ¶ 7. Reed states that the only net worth evidence that it intends to offer in connection with its claim for punitive damages concerns AHMA: its publicly-filed 2008 form 990. Based on these commitments, Reed asks the Court to vacate its prior order bifurcating from the remaining issues the question of the amount of punitive damages to award. In a footnote to its submission, however, Reed says that it still intends to offer "the historical financial analyses performed by Messrs. Epstein and Litvak" and other evidence "of AHMA's and the parties' finances" with respect to certain trade shows. *See* Reed Mt. Regarding Bifurcation at 2 n.1. Without knowing precisely what Reed means by these unexplained and rather cryptic statements, the Court is not prepared to vacate its bifurcation order.