UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN HARDWARE MANUFACTURERS ASSOCIATION, | ) ) ) | |
| | ) | No. 03 C 9421 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Judge Matthew F. Kennelly |
| | ) | |
| REED ELSEVIER INC., *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**REED'S MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 50(A)
AND FOR JUDGMENT ON PARTIAL FINDINGS UNDER RULE 52(C)**

**REED ELSEVIER INC.**

Michael I Rothstein
Caesar A. Tabet
Christopher D. Liguori
Karina Zabicki DeHayes
Timothy A. Hudson
TABET DIVITO & ROTHSTEIN LLC
209 South LaSalle Street, 7th Floor
Chicago, IL 60604
Telephone: (312) 762-9450

Dated: January 31, 2011

By this motion, defendant Reed Elsevier Inc. ("Reed") respectfully seeks judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a) against plaintiff American Hardware Manufacturers Association ("AHMA") on several claims, and judgment on partial findings pursuant to Fed. R. Civ. P. 52(c) against AHMA on the availability of the equitable remedy of rescission. In support of this motion, Reed states as follows:

## ARGUMENT

I. **BECAUSE NO REASONABLE JURY COULD FIND IN AHMA'S FAVOR ON ITS ALLEGATION THAT REED FRAUDULENTLY INDUCED AHMA TO ENTER INTO THE SETTLEMENT AGREEMENT, THE COURT SHOULD ENTER RULE 50(A) JUDGMENT AS A MATTER OF LAW AGAINST AHMA ON ALL CLAIMS THAT PRE-DATE THE SETTLEMENT AGREEMENT.**

Before AHMA can obtain the $566 million jury verdict that it seeks on claims that pre-date February 26, 2003, AHMA first must establish that Reed fraudulently induced AHMA to enter into the Settlement Agreement, which included a mutual release of all claims.[1] The Settlement Agreement plainly states that AHMA "hereby releases, covenants not to sue and forever discharges Reed … from any and all claims … for the period from the beginning of time through the date hereof." (Reed Ex. 202 at ¶ 7(b).) Because no reasonable jury could find in AHMA's favor on the issue of fraudulent inducement and AHMA presented no evidence to justify its 10-month delay in seeking rescission, the Court should enter judgment as a matter of law against AHMA on all of its pre-release claims.

    A. **Even if Reed's involvement in other trade shows breached the Settlement Agreement, the release remains valid and AHMA cannot resurrect the released claims unless it proves fraudulent inducement and the Court exercises its equitable powers to rescind the entire contract.**

Mere breach of the Settlement Agreement – even a material breach – is not sufficient to set aside the release. While in some circumstances a material breach by one party may excuse

---

[1] There is no dispute that AHMA knew about each of the alleged practices that form the basis of its pre-release claims at the time it entered into the Settlement Agreement – indeed, AHMA repeatedly confronted Reed about those practices on multiple occasions before the Settlement Agreement was executed. (Tr. at 532; Reed Ex. 173.)

1

further performance by the other, a release "is a contract whereby a party *abandons* a claim." *Int'l Ins. Co. v. Sargent & Lundy*, 242 Ill. App. 3d 614, 622 (1st Dist. 1993) (emphasis added). Unlike a covenant not to sue, which "affect[s] only the right to bring suit and not the underlying cause of action itself," a release "extinguishes" the claim. *Id.* at 627. Thus, there is no further performance to be excused. *See, e.g., Sears, Sucsy & Co. v. Ins. Co. of N. Am.*, 396 F. Supp. 820, 822 (N.D. Ill. 1975) (applying Illinois law) (failure to pay promissory note made in partial consideration for release does not invalidate the release; proper remedy is to sue on the note).

Rather, under Illinois law, a party must justify the rescission of the entire agreement to set aside a settlement agreement. *See Solar v. Weinberg*, 274 Ill. App. 3d 726, 733 (1st Dist. 1995); *see also Medina v. City of Chicago*, No. 00-c-00001, 2001 U.S. Dist. LEXIS 14650, at *5 (N.D. Ill. Sept. 14, 2001) (a party cannot "keep the parts of the agreement [it] likes . . . and jettison the one part [it] now dislikes"). A breach of contract justifies rescission only where the breach is "so fundamental as to defeat the objects of the parties in making the agreement." *Solar*, 274 Ill. App. 3d at 733. Here, AHMA admitted that the release was <u>not</u> among AHMA's three principal objectives for the Settlement Agreement. (Tr. at 757: AHMA's three principal objectives were to end its relationship with Reed, to obtain the freedom to pursue any direction it wanted in the future, and to obtain the ability to start an independent hardware show.) Indeed, AHMA admitted that it achieved its three principal objectives notwithstanding Reed's alleged breach. (Tr. at 757-58.) Based on the undisputed evidence, no reasonable jury could find that Reed's purported breach alone meets the strict standard for rescission described above.

### B. AHMA has not presented sufficient evidence to establish fraudulent inducement and to avoid judgment as a matter of law under Rule 50.

To resurrect its released claims, AHMA must establish that the entire Settlement Agreement should be rescinded based on fraudulent inducement. As explained below, AHMA

2

has failed to introduce sufficient evidence as to several required elements of its fraudulent inducement claim. Each failure of proof independently warrants entry of judgment as a matter of law pursuant to Rule 50(a).[2]

### 1. AHMA has not presented sufficient evidence that Reed intended to induce AHMA to enter into the Settlement Agreement.

AHMA's claim for fraudulent inducement is part of its fraud claim (Count I) as well as an affirmative defense to Reed's claims. AHMA's fraudulent inducement claim relates to an alleged vague, undocumented, oral promise on February 17 and 18, 2003 that Reed "will not participate" in the Midwest Builders Show, the International Security Conference, the Home Automation Show, or "any other trade show that would violate paragraph 11(a) of the '77 agreement." (Tr. at 510–511.) AHMA claims that this vague, undocumented, oral promise induced it to enter into the Settlement Agreement eight days later, on February 26, 2003. (*Id.* at 519; 524.)

To prevail on its fraudulent inducement claim, AHMA must establish by clear and convincing evidence that Reed made the alleged oral promise with "an intent to induce the other party to act." *See Hoseman v. Weinschneider*, 322 F.3d 468, 476 (7th Cir. 2003) (applying Illinois law). To the contrary, the evidence has established that *Reed* was willing to continue the parties' relationship under the 1977 Show Agreement, but that *AHMA* was persistently pursuing a full Settlement Agreement that would allow AHMA to conduct its own hardware show:

---

[2] Under Rule 50(a), a court may resolve a jury issue against a party and enter judgment as a matter of law when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient basis to find for the party on that issue." *See* Fed. R. Civ. P. 50(a). A mere "scintilla" of evidence in support of an issue is not sufficient to defeat a Rule 50(a) motion. *Hall v. Forest River, Inc.*, 536 F.3d 615, 619 (7th Cir. 2008); *Filipovich v. K&R Express Sys.*, 391 F.3d 859, 863 (7th Cir. 2004). Rather, "the question is simply whether the evidence as a whole, when combined with all reasonable inferences permissibly drawn from that evidence, is sufficient to allow a reasonable jury to find in favor of the plaintiff." *Hall*, 536 F.3d at 619.

3

- On February 20, 2002, AHMA sent a letter to ConvExx stating that AHMA was "on an extremely fast track" because AHMA wanted to conduct its own hardware show in 2002. (Reed Ex. 126; Tr. at 561–563.)

- On July 25, 2002, AHMA's Board of Directors unanimously voted "to follow the previously approved strategy to terminate the Show Agreement." There is no mention of any conditions on Reed's involvement in the three other trade shows. (Reed Ex. 148 at p. 7.)

- On July 25, 2002, William Farrell sent a letter to Mike Rusbridge of Reed stating that he had received the "full support and approval" of AHMA's Show Committee "to pursue the early termination" of the 1977 Show Agreement and "would like to expedite that whole process." (Reed Ex. 149; Tr. at 581-582.)

- In July 2002, AHMA was "pushing" the settlement to "get it done fast." (Tr. at 582.)

- On August 30, 2002, AHMA informed Reed that the "termination of the AHMA/Reed relationship is in the mutual best interest of our organizations" and that termination "would allow for the pursuit of each of our organization's divergent goals." AHMA recommended a "mutual and general release of claims" and did not mention any conditions on Reed's involvement in the three other trade shows. AHMA also stated that it would "endeavor to minimize the provisions involved in the termination agreement in order to allow our respective organizations to operate freely thereafter, and to achieve this with all possible expediency." (Reed Ex. 155; Tr. at 584-585.)

- On October 8, 2002, AHMA sent Reed a draft Settlement Agreement and stated that it wanted "to execute the termination agreement as soon as possible." (Reed Ex. 166 at 9; Tr. at 600–601.)

- On October 15, 2002, Reed ended settlement negotiations with AHMA and stated that Reed was "prepared to work under the existing agreement" and to "work jointly toward next year's show." (Reed Ex. 167.)

- On December 2, 2002, William Farrell summarized for AHMA's Show Committee the history of AHMA's "failed termination attempts." The Committee then discussed AHMA's options, including "termination of the Show Agreement" or "litigation with Reed." Members of the Committee stated that termination of the relationship was "essential" and that AHMA "must work quickly to terminate the Show Agreement and prepare a strategic plan to launch the AHMA Hardware Show in head-to-head competition with Reed." The Committee determined "decisively to terminate the relationship with Reed." (Reed Ex. 171 at pp. 2-4.)

- On December 9, 2002, AHMA's Executive Committee unanimously approved a formal motion and "resolved to terminate the show agreement as soon as possible and establish the AHMA hardware show thereafter." William Farrell admitted that Reed did not induce AHMA to pass that unanimous motion. (Reed Ex. 172 at p. 6; Tr. at 650.)

- William Farrell admitted that he had received full authority from AHMA's Board of Directors in December 2002 and needed no additional authority to approve the Settlement Agreement. (Tr. at 652-653.)

- On February 6, 2003, with prior knowledge of Reed's involvement in the Security Show/Home Automation Show and in the Midwest Builders Show, William Farrell sent a letter to Dennis MacDonald stating that he had "full authority from AHMA's Board of Directors and Executive Committee to negotiate a termination agreement; in fact, I have a directive from the Board to 'make it happen' or propose an alternative." (AHMA Ex. 201.)

- None of the correspondence between AHMA and Reed, none of the draft settlement agreements, none of the AHMA Board minutes and no other documents reflect the alleged oral promise or the alleged inducement, and William Farrell is not aware of any such documents. (Tr. at 666.)

AHMA thus has not presented sufficient evidence to permit a reasonable jury to find that Reed induced AHMA to enter into the Settlement Agreement, especially when the overwhelming evidence establishes that AHMA initiated the termination effort and that it did not need encouragement or inducement to enter into the Settlement Agreement.[3]

### 2. AHMA has not presented sufficient evidence that it justifiably relied on the alleged oral promise.

AHMA also must establish by clear and convincing evidence that it entered into the Settlement Agreement "in reliance on the truth of the statement" made by Reed. *See Hoseman*, 322 F.3d at 476. Moreover, AHMA must show that its reliance was justifiable "in light of all the facts of which plaintiff had actual knowledge *as well as those of which he might have availed himself by the exercise of ordinary prudence*." *Teamsters Local 282 Pension Trust Fund v. Angelos*, 839 F.2d 366, 370 (7th Cir.1988) (applying Illinois law; emphasis in original; internal quotations omitted). AHMA has not presented sufficient evidence that it actually relied on the alleged oral promise, or that such reliance was justifiable.

---

[3] *See Seefeldt v. Millikin Nat'l Bank of Decatur*, 154 Ill. App. 3d 715, 720 (4th Dist. 1987) (affirming grant of summary judgment on fraud claim because record was clear that plaintiffs were not "encouraged" by the defendant to enter into the transaction, and the transaction was not "instigated" by the defendant).

5

First, as explained above in Section I(B)(1), no reasonable jury could find that AHMA proved by clear and convincing evidence that it actually relied on MacDonald's alleged, undocumented statement when AHMA made its decision to terminate its relationship with Reed and enter into the Settlement Agreement. Apart from William Farrell's bare statement that he "wouldn't have been able to sign" the Settlement Agreement without Reed's alleged promise (Tr. at 524), the evidence overwhelmingly established that AHMA did not rely on the alleged statement in entering into the Settlement Agreement. Indeed, AHMA's board made its unanimous decision in December 2002, more than two months before the alleged oral promise. (Reed Ex. 171 at p. 4; Reed Ex. 172 at p. 6.) As William Farrell testified, AHMA did not and could not rely, and the alleged oral promise had no bearing whatsoever, on the AHMA board's unanimous and "decisive" decision in December 2002 to enter into the Settlement Agreement with Reed. (Tr. at 650-651.)

Second, no reasonable jury could conclude that AHMA's purported reliance on Reed's alleged oral promise was justifiable. Reliance is not justified where, as here, "ample opportunity existed to discover the truth." *Neptuno Treuhand-und Verwaltungsgesellschaft MBH v. Arbor*, 295 Ill. App. 3d 567, 575 (1st Dist. 1998). "A person may not enter into a transaction with his eyes closed to available information and then charge that he has been deceived by another." *Chicago Export Packing Co. v. Teledyne Indus., Inc.*, 207 Ill. App. 3d 659, 663 (1st Dist. 1990). Rather, "[w]hen afforded the opportunity of knowing the truth or falsity of the alleged representation, a party is chargeable with that knowledge" and, "[i]f the party does not avail himself of the means of knowledge open to him, he cannot be heard to say he was deceived by misrepresentation." *Goetz v. Avildsen Tool & Machines*, 82 Ill. App. 3d 1054, 1066 (1st Dist. 1980). It is undisputed that AHMA knew that Reed's participation in the three other trade shows

6

was publicly announced on each show's website at all times, and there is no evidence that Reed concealed its continued involvement in those shows in any way, at any time. For example:

- AHMA knew that Reed's participation in the three shows was publicly announced on each show's website. (Tr. at 490-491, 499-503, 681; AHMA Exs. 196, 484, 485, 489.) Prior to the alleged oral promise, Tim Farrell printed hard copies of these websites that reflected Reed's involvement and presented them to William Farrell. (Tr. at 488-489, 498, 681.)

- Between the time of the alleged promises and the time that AHMA signed the Settlement Agreement, AHMA did not review those websites and offered no evidence that it did anything whatsoever to determine if Reed had ended its participation in those shows. (Tr. at 683.) There is no evidence that anyone checked the public websites or any other source.

- AHMA never contacted anyone associated with the Midwest Builders Show or checked the show's website to confirm whether Reed had ended its participation in that show. (Tr. at 682-684, 927-928.) Reed's involvement in the Midwest Builders Show was announced on the first page of that show's website on every day of every year that the website was up through 2008. (Tr. at 901, 923-924.)

Had AHMA checked the websites or contacted the other shows at any time prior to entering into the Settlement Agreement, it would have learned that Reed was continuing to participate in those shows. Based on the foregoing, no reasonable jury could conclude that AHMA justifiably relied on Reed's alleged statement that it would stop its participation in the other shows.

      **3.    AHMA has not presented sufficient evidence that the alleged oral promise was material, or that Reed's involvement in the other shows was a material breach of Reed's contractual obligations.**

AHMA also must show by clear and convincing evidence that the alleged false promise was material. *See Hoseman*, 322 F.3d at 476. Under Illinois law, "a misrepresentation is 'material' if the plaintiff would have acted differently had he been aware of it, or if it concerned the type of information upon which he would be expected to rely when making his decision to act." *Miller v. William Chevrolet/Geo*, 326 Ill. App. 3d 642, 649 (1st Dist. 2001). Here, no reasonable jury could find that the alleged oral promise was material to AHMA's decision to enter into the Settlement Agreement. AHMA cannot identify any way in which it was damaged as a result of Reed's involvement with the three other trade shows. (Tr. at 753-756.) Further,

7

Reed's involvement in the Security Show/Home Automation Show could not be material to AHMA's decisions in 2003 because AHMA knew about Reed's involvement in those shows (along with detailed descriptions of the exhibitors, attendees and products displayed at those shows) since 1998. (Reed Ex. 82 at pp. 220-222; Tr. at 601-610.)

Likewise, Reed's involvement in the Midwest Builders Show could not be material to AHMA's decisions because Reed's involvement in that show "had no bearing whatsoever" on the Home Builder Association's decision to conduct that show, and the Home Builders Association intended to proceed with the Midwest Builders Show in March 2003 regardless of Reed's participation. (Tr. at 909-910.) Indeed, the 2003 Midwest Builders Show was a fraction of the size of the 2003 National Hardware Show, and Reed simply exchanged promotional support, receiving only $6,200 in profit. (Tr. at 908, 917-18, 920, 922; 1261-62.) No reasonable jury could find that Reed's publishing division's production of a show guide for which it made $6,200 in profit is a sufficiently material basis to resurrect AHMA's $500 million in released claims.

Moreover, the evidence established that Reed's alleged promise not to participate in the other shows in fact was not material to AHMA. The other trade shows at issue were not even identified on AHMA's internal lists of competitive industry trade shows:

- The shows do not appear on AHMA's list of "Industry Trade Shows for 2001-2003" wherein AHMA identifies dozens of separate industry trade shows that it believes are competitive. (Reed Ex. 116.)

- The shows do not appear on AHMA's list of "2003 Competitive Trade Shows Conducted in First Quarter" or AHMA's list of "Trade Shows – 2003" which William Farrell sent to AHMA's Show Committee on November 27, 2002. (Reed Ex. 170, at 2; Tr. at 613-614.)

- The shows do not appear among the "competitive events" identified in the Competitive Intelligence Analysis of the AHMA Hardware Show's 2004 Strategic Plan. (Reed Ex. 229 at pp. 7-10; Tr. at 703-705.)

In addition, although William Farrell testified that AHMA's Board of Directors required that all terms and conditions of the Settlement Agreement be in writing and be explained to the Board

(Tr. at 582-583), it is undisputed that no documents whatsoever reflect in any manner the alleged vague, oral promise that Reed would not participate in the three other shows, or conditions the Settlement Agreement on Reed's non-participation in those three shows. (Tr. at 666.) Nor does William Farrell recall ever reporting Reed's alleged oral promise to AHMA's Board of Directors. (Tr. at 669.)

For all the reasons set forth above, no reasonable jury could find that the alleged false promise was a material consideration in AHMA's decision to enter into the Settlement Agreement.

> **4. AHMA has not presented sufficient evidence to allow a reasonable jury to conclude that Reed's involvement in the three other shows even breached Reed's contractual obligations.**

AHMA's fraudulent inducement claim includes the alleged oral promise that Reed would not participate in "any other trade show that would violate paragraph 11(a) of the [Show Agreement]." (Tr. at 510–511.) But paragraph 11(a) prohibits Reed's participation only in a show that "*primarily* relates to hardware, lawn, garden and/or home improvement products" (Reed Ex. 10, emphasis added). AHMA has not presented evidence from which a reasonable jury could conclude that the other trade shows are "primarily" related to the prohibited products.

To the contrary, Madge Douglas, the person who created the 2003 Midwest Builders Show, testified that (1) the Midwest Builders Show was not a show for displaying hardware, lawn and garden, or home improvement products; (2) the products exhibited at the show were not home improvement products, but rather were "new home building products;" and (3) only 0-5% of the show consisted of tools. (*Id.* at 911:12-16.) Similarly, Richard Chace, the CEO and Executive Director of the trade association that sponsored the 2003 Security Show/Home Automation Show testified that the show was not primarily related to home improvement products. (Tr. at 1239-42.)[4]

---

[4] As disinterested witnesses, the testimony of Madge Douglas and Richard Chace should be considered in support of this motion. Indeed, on a Rule 50 motion, the Court "should give

9

In addition, AHMA's expert witness, Michael McClelland, admitted that he "never attempted to quantify the extent to which the ISC related to hardware home improvement products," and that he does not know "whether the hardware home improvement products displayed at the security show were more or less than 10 percent of all products displayed." (Tr. at 1233-1234.) McClelland testified similarly with respect to the Home Automation Show and the Midwest Builders Show. (Tr. at 1245, 1267–1268.)

Because AHMA presented no evidence whatsoever regarding the extent to which the products exhibited at the other trade shows were home improvement products, and the disinterested witnesses testified that none of those shows primarily related to home improvement products, no reasonable jury could find that the shows satisfy the requirement under paragraph 11(a) of the Show Agreement that other shows must "primarily" relate to the relevant products.

Moreover, regardless of whether Reed's involvement in the other shows was a technical breach of paragraph 11(a), no reasonable jury could find that Reed's involvement in those shows was a *material* breach of the contract for the reasons explained above. Because AHMA has failed to present sufficient evidence to allow a reasonable jury to find in AHMA's favor on several elements of its fraudulent inducement claim, the Court should enter judgment pursuant to Rule 50(a) against AHMA on that claim and on all of AHMA's claims that are barred by the release.

**II.  THE COURT SHOULD ENTER JUDGMENT ON PARTIAL FINDINGS AGAINST AHMA ON THE AVAILABILITY OF RESCISSION – AND JUDGMENT AS A MATTER OF LAW ON ALL OF AHMA'S PRE-RELEASE CLAIMS – BECAUSE AHMA HAS PRESENTED NO CREDIBLE EVIDENCE TO JUSTIFY ITS 10-MONTH DELAY IN SEEKING RESCISSION.**

The Court should enter judgment on partial findings pursuant to Rule 52(c) against AHMA on the availability of equitable rescission – and therefore enter judgment as a matter of

---

credence to … evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Davis v. Wis. Dep't of Corr.*, 445 F.3d 971, 976 n. 1 (7th Cir. 2006).

law on AHMA's pre-release claims – for the independent reason that AHMA has not presented any credible evidence justifying its 10-month delay in seeking the remedy of rescission.

Under Rule 52(c), a court may find against a party on a non-jury issue and enter judgment on partial findings when "a party has been fully heard on an issue" and under the controlling law the party's claim or defense "can be maintained or defeated only with a favorable finding on that issue." *See* Fed. R. Civ. P. 52(c). Unlike a motion for judgment as a matter of law under Rule 50(a), when a court considers a motion for judgment on partial findings, the non-movant is not entitled to any inference in its favor. *Pinkston v. Madry*, 440 F.3d 879, 890 (7th Cir. 2006). Rather, the Court must weigh the evidence, consider the witnesses' credibility, and determine where the applicable burden of proof lies. Rule 52(c) authorizes the judge, having heard all the evidence the plaintiff has to offer, to make findings of fact adverse to the plaintiff, including determinations of credibility, without waiting for the defense to put on its case, since the evidence presented by the defendant would be unlikely to help the plaintiff. *See Wsol v. Fiduciary Mgmt. Assocs.*, 266 F.3d 654, 656 (7th Cir. 2001). A Rule 52(c) motion is appropriate to resolve issues to be decided by the Court even if the Court also conducts a jury trial.[5]

As this Court well knows, rescission of a contract is an extraordinary equitable remedy. Rescission is available only when a litigant acts "promptly" to disavow the contract; otherwise, the equitable remedy of rescission is foreclosed:

> For anyone who seeks to rescind a contract on the grounds of fraud in this state, time is clearly of the essence. Illinois law has long recognized that the victim of contract fraud who wishes to rescind that contract must not only announce his or her election promptly but must *act* on that intention with like promptness.

---

[5] *See Long v. Howard Univ.*, 512 F. Supp. 2d 1, 10-11 (D.D.C. 2007), *aff'd*, 550 F.3d 21 (D.C. Cir. 2008); *Progressive Cas. Ins. Co. v. Luna*, No. 05-cv-4194, 2007 U.S. Dist. LEXIS 41436, at **1-3 (S.D. Ill. June 7, 2007) (bifurcating jury claims and requests for equitable relief and proceeding under Rule 52 for non-jury claims).

*Swartz v. Schaub*, 826 F. Supp. 274, 277 (N.D. Ill. 1993) (emphasis in original). If a party does not act "promptly" to disavow the contract and seek rescission, but rather attempts to avail itself of the benefits of the contract, then it loses the right to rescission. *Id.* at 278 (9-month delay is not prompt, and rescission is therefore unavailable); *see also Luciani v. Bestor*, 106 Ill. App. 3d 878, 881-83, 436 N.E.2d 251, 254-55 (3d Dist. 1982) (7-month delay is not prompt, and rescission is therefore unavailable); *Madison Assocs. v. Bass*, 158 Ill. App. 3d 526, 540 (1st Dist. 1987) (6-month delay is not prompt, and rescission is therefore unavailable). As explained in *Madison Associates v. Bass*:

> [A]s soon as an individual learns of the fraud, he is required to disaffirm or abandon the transaction with all reasonable diligence. If he acts as though the transaction is still binding, he waives all benefits of relief from the misrepresentations.

*Madison Assocs.*, 158 Ill. App. 3d at 540.

AHMA has not presented any credible evidence to establish that its 10-month delay was prompt, as required by Illinois law. To the contrary, the evidence has established that:

- From February 26, 2003 through December 30, 2003, Reed's participation in the allegedly competing shows was publicly announced and available on the shows' websites at all times. (*See* Section I (B)(2).)

- AHMA gave no notice of any purported violation concerning Reed's involvement in these other shows between February 26, 2003 and December 30, 2003. (Tr. at 706.)

- AHMA never attempted to resolve any disputes concerning Reed's involvement in these other shows between February 26, 2003 and December 30, 2003. (Tr. at 707.)

Rather than promptly seek rescission of the Settlement Agreement, AHMA instead pursued its business plan to compete for Reed's 400 largest customers. (Reed Ex. 210; Tr. at 690-692.) For more than a year, from February 26, 2003 through AHMA's hardware show in April 2004, AHMA competed head-to-head with Reed. (Tr. at 699-700, 705.) Without the Settlement Agreement, this competition would not have been permitted.

In sum, AHMA achieved the three principal objectives it sought through the Settlement Agreement: (1) it terminated its relationship with Reed; (2) it freed itself to pursue any direction it would choose in the future; and (3) it gained the ability to start its own independent hardware show. (Tr. at 757-758.) AHMA conducted its own hardware show and competed against Reed's National Hardware Show for *more than a year* after entering into Settlement Agreement and *more than a year* after the other shows were publicly held with Reed's public participation. AHMA also obtained (and provided) full mutual and general releases of *all claims*, just as it had originally proposed on August 30, 2002. It would be inequitable to allow AHMA to receive and retain all of its principal benefits under the Settlement Agreement while allowing AHMA to jettison the one part it now dislikes, the full release of its claims against Reed.

Because AHMA accepted and fully used the benefits of the Settlement Agreement for more than 10 months, AHMA cannot now seek to rescind the Agreement and contend that it never should have existed. Reed therefore respectfully requests that the Court enter judgment on partial findings pursuant to Rule 52(c) against AHMA on the issue of rescission and enter judgment as a matter of law on all of AHMA's pre-release claims.

### III. THE COURT ALSO SHOULD ENTER JUDGMENT AS A MATTER OF LAW AGAINST AHMA ON ITS POST-RELEASE CLAIMS.

#### A. AHMA has not presented any evidence of damages relating to its claim that Reed breached the 2003 Settlement Agreement (Count XIII).

AHMA claims that Reed breached the Settlement Agreement by (1) participating in the Midwest Builders Show, and (2) improperly using AHMA's trademark in the 2004 Tradeshow Week Data Book and on a Reed website. (*See, e.g.*, AHMA's Proposed Jury Instruction No. 82.) Merely showing that a contract has been breached without demonstrating actual damages does not suffice under Illinois law to establish a claim for breach of contract. *See TAS Distributing*

*Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 631 (7th Cir. 2007), *citing W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 759 (1st Dist. 2004).[6]

AHMA failed to present any evidence that it suffered damages as a result of Reed's alleged breaches of the Settlement Agreement, as required under Illinois law. *See, e.g., Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 149 (2005); *Monarch Gems v. Malca-Amit USA, LLC*, No. 04-7664, 2007 U.S. Dist. LEXIS 76832, at *36-*37 (N.D. Ill. Sept. 27, 2007). AHMA also failed to present a reasonable basis for computation of its damages to a reasonable degree of certainty. *TAS Distributing*, 491 F.3d at 632-33. Indeed, neither Michael McClelland (AHMA's competing show expert) nor Jeff Litvak (AHMA's damages expert) offered any opinions regarding any damages suffered by AHMA on its breach of the Settlement Agreement claims or any method for determining damages. Nor can AHMA identify any way in which it was damaged as a result of Reed's involvement with the three other trade shows. (Tr. at 753-756.) Consequently, no reasonable basis exists upon which to calculate the damages necessary for AHMA to prove its claim, and no reasonable jury could find that AHMA has suffered damages that are ascertainable with any reasonable degree of certainty.

**B. AHMA has not presented any evidence of customer deception or confusion as required for its false advertising claim (Count VII) and its trademark infringement and unfair competition claims (Counts VIII, IX, X, and II).**

To prove its claim for false advertising under the Lanham Act (Count VII), AHMA must establish that Reed made a statement that "actually deceives or is likely to deceive a substantial segment" of show customers. *See First Health Group Corp. v. United Payors & United Providers, Inc.*, 95 F. Supp. 2d 845, 847-48 (N.D. Ill. 2000); *see also Hot Wax, Inc. v. Turtle*

---

[6] Likewise, breach of a covenant not to compete is insufficient to warrant monetary relief under Illinois law unless the plaintiff first shows that it suffered an injury. *See Marathon Petro. Co. v. Chronister Oil Co.*, 687 F. Supp. 437, 439 (C.D. Ill. 1988); *Hamer Holding Gr., Inc. v. Elmore*, 244 Ill. App. 3d 1069, 1080 (1st Dist. 1993).

14

*Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999). Here, AHMA has presented no evidence of consumer deception, nor has AHMA attempted to avoid this requirement by establishing that the alleged statements were literally false or by seeking only injunctive relief. Nor has AHMA presented any evidence whatsoever regarding General Tools, Great American Marketing, or Pro Group. *See First Health*, 95 F. Supp. 2d at 847-48 (discussing limited exceptions). Reed is therefore entitled to judgment as a matter of law on AHMA's false advertising claim.

Likewise, to establish trademark infringement or unfair competition under the Lanham Act (Count VIII), or under common law or the Illinois Consumer Fraud and Deceptive Business Practices Act (Counts IX, X, and II), AHMA must show that Reed's use of AHMA's mark "is likely to cause confusion among consumers." *Segal v. Geisha NYC LLC*, 517 F.3d 501, 506 (7th Cir. 2008); *World Impressions, Inc. v. MacDonald's Corp.*, 235 F. Supp. 2d 831, 841 (N.D. Ill. 2002). (Lanham Act standard applies to state law claims); *Henry v. O'Keefe*, No. 01-08698, 2002 U.S. Dist. LEXIS 20028, at \*\*19-21 (N.D. Ill. Oct. 18, 2002) (same). AHMA made no attempt to establish that Reed's alleged use of AHMA's trademark was likely to cause confusion in the marketplace. Therefore, the Court should enter judgment as a matter of law against AHMA on its trademark and unfair competition claims.

## CONCLUSION

Based on all of the foregoing, Reed respectfully requests that the Court grant its motion; enter judgment as a matter of law against AHMA on AHMA's fraudulent inducement claim and on all of AHMA's claims pre-dating February 26, 2003; enter judgment on partial findings against AHMA on the availability of the equitable remedy of rescission; enter judgment as a matter of law against AHMA on its claims for breach of Settlement Agreement, false advertising, trademark infringement, and unfair competition; and grant all other relief proper in the circumstances.

                                                                                 Respectfully submitted,

                                                                                 **REED ELSEVIER INC.**

                                                                                 s/ Michael I Rothstein

Michael I Rothstein                                               One of Its Attorneys
Caesar A. Tabet
Christopher D. Liguori
Karina Zabicki DeHayes
Timothy A. Hudson
TABET DIVITO & ROTHSTEIN LLC
209 South LaSalle Street, 7th Floor
Chicago, IL 60604
Telephone: (312) 762-9450

# CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on January 31, 2011, he caused a true and correct copy of **Reed's Motion for Judgment as a Matter of Law Under Rule 50(a) and for Judgment on Partial Findings under Rule 52(c)**, to be served electronically upon the parties listed below.

William P. Farrell, Jr.
Scott J. Fisher
Michael A. Nicolas
NEAL, GERBER & EISENBERG LLP
2 N. LaSalle Street, Suite 2200
Chicago, Illinois 60602-3801
E-mail: wfarrell@ngelaw.com
E-mail: sfisher@ngelaw.com
E-mail: mnicolas@ngelaw.com
Service by CM/ECF System

Gordon B. Nash, Jr.
DRINKER BIDDLE & REATH LLP
191 N. Wacker Drive, Suite 3700
Chicago, Illinois 60606-1698
Email: Gordon.Nash@dbr.com
Service by CM/ECF System

s/ Michael I Rothstein

Michael I Rothstein
Caesar A. Tabet
Christopher D. Liguori
Karina Zabicki DeHayes
Timothy A. Hudson
TABET DIVITO & ROTHSTEIN LLC
209 South LaSalle Street, 7th Floor
Chicago, IL 60604
Telephone: (312) 762-9450