UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN HARDWARE MANUFACTURERS ASSOCIATION, | ) ) ) | |
| | ) | No. 03 C 9421 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Judge Matthew F. Kennelly |
| | ) | |
| REED ELSEVIER INC., *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

# REED'S POST-EVIDENCE MOTION FOR
# RULE 50(A) JUDGMENT AS A MATTER OF LAW
# AND RULE 52(C) JUDGMENT ON PARTIAL FINDINGS

**REED ELSEVIER INC.**

Michael I Rothstein
Caesar A. Tabet
Christopher D. Liguori
Karina Zabicki DeHayes
Timothy A. Hudson
TABET DIVITO & ROTHSTEIN LLC
209 South LaSalle Street, 7th Floor
Chicago, IL 60604
Telephone: (312) 762-9450

Dated: February 10, 2011

By this motion, defendant Reed Elsevier Inc. ("Reed") respectfully seeks judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a) and judgment on partial findings pursuant to Fed. R. Civ. P. 52(c) against plaintiff American Hardware Manufacturers Association ("AHMA"). In support of this motion, Reed states as follows:

## ARGUMENT

**I. AHMA CANNOT PREVAIL ON ITS CLAIM THAT REED BREACHED THE COVENANTS NOT TO COMPETE, BECAUSE AHMA HAS NOT ESTABLISHED THAT THE OTHER SHOWS IN WHICH REED PARTICIPATED DETRACTED FROM THE COMMERCIAL SUCCESS OF THE NATIONAL HARDWARE SHOW, AS REQUIRED BY ILLINOIS LAW.**

AHMA claims that Reed breached the covenants not to compete found at paragraph 11(a) in the Show Agreement and paragraph 20(a) of the Settlement Agreement by participating in the Midwest Builders Show, the International Security Conference, and the Home Automation Show in March 2003. That claim must fail as a matter of law, because AHMA has not presented any competent evidence that those shows competed with the 2003 National Hardware Show in the sense that they detracted from the commercial success of the Show. Nor has AHMA attempted to rebut the evidence from Reed's expert witness that the shows did not compete in this fashion.

Rather, AHMA has attempted to establish only that each of the other shows "primarily relates" to home improvement products or the home improvement industry, *regardless* of whether it adversely affected the National Hardware Show. The testimony of AHMA's witnesses is not sufficient under Illinois law to establish that Reed's participation in the other shows breached the covenants not to compete. Under Illinois law, a covenant not to compete is unenforceable if it purports to restrict activities to a greater extent than is necessary to protect a legitimate interest of the parties. *See Boyar-Schultz Corp. v. Tomasek*, 94 Ill. App. 3d 320, 323 (1981); *Health Professionals, Ltd. v. Johnson*, 339 Ill. App. 3d 1021, 1032 (2003); *Liautaud v. Liautaud*, 221 F.3d 981, 986-87 (7th Cir. 2000); *Marathon Petroleum Co. v. Chronister Oil*

*Company*, 687 F. Supp. 437, 439 (C.D. Ill. 1988); Restatement (Second) of Contracts § 188. Regardless of what the other shows "primarily related" to, if the other shows did not detract from the commercial success of the National Hardware Show, AHMA cannot claim a legitimate interest in preventing Reed from participating in those shows and the clauses are unenforceable.

> **A. Under Illinois law, a covenant not to compete is unenforceable if it restricts activities to an extent greater than is necessary to protect a legitimate interest arising from the underlying transaction.**

"[B]ecause Illinois courts abhor restraints on trade, restrictive covenants are carefully scrutinized." *Liautaud*, 221 F.3d at 986. It is well settled that a covenant not to compete is not enforceable on its own but rather must be ancillary to a valid transaction. *Id.* (quoting *More v. Bennett*, 140 Ill. 69 (1892)). Moreover, a covenant not to compete "(1) must not be greater than necessary to protect [the party benefitting from the covenant], (2) must not be oppressive to [the party restricted by the covenant], and (3) must not be injurious to the general public." *Id.* at 987; *see also Health Professionals*, 339 Ill. App. 3d at 1190; *Boyar-Schultz Corp.*, 94 Ill. App. 3d at 323. In this regard, Illinois law is consistent with the Restatement (Second) of Contracts:

> A promise to refrain from competition that imposes a restraint that is ancillary to an otherwise valid transaction or relationship is unreasonably in restraint of trade if (a) the restraint is greater than is needed to protect the promisee's legitimate interest, or (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public.

Restatement (Second) of Contracts § 188. The above requirements apply to a covenant's restrictions "in terms of time, geographical scope and *activity*." *Health Professionals*, 339 Ill. App. 3d at 1032 (emphasis added); *see also* Restatement at § 188 cmt. d.

When a covenant not to compete purports to impose an activity restriction that is greater than is necessary to protect the legitimate interest of the benefitting party or that is oppressive to the restricted party, the covenant is unenforceable as a matter of law. *See Arcor, Inc. v. Haas*, 363 Ill. App. 3d 396, 405-06 (2005) (covenant prohibited defendant from having any

involvement in any business that sells products competitive to those of plaintiff, as opposed to prohibiting defendant from selling specific products to plaintiff's customers; held unenforceable); *Liautaud*, 221 F.3d at 988 (covenant prohibited expansion of defendant's sandwich business regardless of whether defendant used trade secrets that were the subject of the underlying agreement; held unenforceable); *Marathon*, 687 F. Supp. at 441 (covenant prohibited defendants from opening a competing gas station even if the new station did not diminish the goodwill sold along with the previous station; held unenforceable). Alternatively, where possible, courts reject a broad interpretation of a covenant not to compete that would render the covenant unenforceable in favor of a narrower, acceptable interpretation. *See Health Professionals*, 339 Ill. App. 3d at 1035-36 (acknowledging broad interpretation of covenant, but interpreting covenant narrowly "in light of the entire agreement and its purpose").

    **B.    AHMA has not presented evidence either to establish that the other shows in which Reed participated detracted from the commercial success of the National Hardware Show, or to rebut Reed's evidence that the shows did not compete in this manner.**

Here, the covenants not to compete are ancillary to the Show Agreement and the Settlement Agreement. If the covenants not to compete are to be enforceable, their activity restrictions must not be broader than necessary to protect AHMA's only possible legitimate interest: the commercial success of the National Hardware Show. But, as set forth below, the evidence establishes that the other shows did not detract from the commercial success of the Hardware Show. In fact, AHMA has admitted that it is not seeking damages as a result of Reed's participation in the other shows. (Tr. at 2521-22.)

Reed's expert witness, Steven Davis performed a quantitative analysis of exhibitor overlap, exhibitor migration, and attendee overlap between the other shows and the National Hardware Show, and established that virtually no overlap existed. (Tr. at 2897-2920.) Based on

3

this objective analysis, he opined that none of the other shows competed with or detracted from the commercial success of the National Hardware Show. (Tr. at 2893.) On cross-examination, AHMA did not challenge Davis's analysis or his conclusions. (Tr. at 2933.)

In contrast, AHMA's expert witness, Michael McClelland, offered no opinions on whether any of the contested shows detracted from the commercial success of the National Hardware Show. He testified that before this case he has never been asked to provide an opinion as to whether a trade show competes with another trade show, and that he did not conduct any investigation to determine whether or not exhibitors viewed the National Hardware Show and the other shows as substitutes. (Tr. at 1246-47; 1272-73.) At trial, he admitted that he performed no analysis of actual competition:

- Of approximately 1900 exhibitors at the 2003 National Hardware Show and 1100 exhibitors at the 2003 International Security Conference, McClelland admitted that only nine exhibitors overlapped, which McClelland agreed was a "pretty small percentage." (Tr. at 1250-51.) McClelland does not know whether the nine overlapping exhibits displayed different products at the two shows. (Tr. at 1252.)

- McClelland did not talk to any exhibitors about what end-users they were targeting and did not find out whether the exhibitors were targeting different distribution channels at the International Security Conference. (Tr. at 1251.)

- With respect to attendees, McClelland looked at who was invited rather than who actually attended, and he made no attempt to quantify attendee overlap rates between the International Security Conference and the National Hardware Show for 2003. (Tr. at 1252.)

- McClelland made no attempt to determine whether the International Security Conference and the National Hardware Show were substitutes for one another or whether the International Security Conference was economically detrimental to the National Hardware Show. (Tr. at 1252-53.)

- Similarly, McClelland made no attempt to quantify exhibitor or attendee overlap between the Midwest Builders Show and the National Hardware Show. (Tr. at 1271-72.)

Rather than analyze competition, McClelland testified as to his opinion regarding whether the other shows "primarily related" to the "home improvement industry" or "home improvement

4

products."

AHMA's non-expert witnesses labeled the other shows as "competing" in their testimony (*e.g.*, Tr. at 502 (Farrell, Sr.); Tr. at 2087-88 (T. Farrell)), but they provided no testimony relating to whether the other shows detracted from the commercial success of the Hardware Show. To the contrary, Bill Farrell, Sr. admitted that he could not identify any exhibitor who decided not to attend the 2003 National Hardware Show because of Reed's involvement in the other shows. (Tr. at 754.) Tim Farrell apparently equated "competes" with the products at a show being home improvement products. (Tr. at 2089.) Not surprisingly, AHMA is seeking no damages based on the alleged breach of the non-compete provisions. (Tr. at 2521-22.)

It is thus uncontroverted that the International Security Conference, the Home Automation Show, and the Midwest Builders Show did not detract from the commercial success of the National Hardware Show. As a result, the restrictive covenants in the 1977 Show Agreement (PX 10, ¶ 11(a)) and the 2003 Settlement Agreement (PX 202, ¶ 20(a)) were unenforceable under Illinois law as applied to these shows, regardless of whether the shows "primarily related to hardware or home improvement products or industries." Applying such a restriction to shows that did not detract from the commercial success of the National Hardware Show greatly exceeds what is necessary to protect any legitimate interest resulting from the Show Agreement or the Settlement Agreement. Therefore, Reed is entitled to judgment as a matter of law on all claims alleging violation of these provisions.

II. **BECAUSE AHMA HAS NOT PRESENTED LEGALLY SUFFICIENT EVIDENCE OF THE EXISTENCE OF A RELEVANT FIDUCIARY DUTY, HERE AHMA'S BREACH OF FIDUCIARY DUTY CLAIM MUST FAIL AS A MATTER OF LAW.**

The existence of a fiduciary duty, naturally, is an essential element AHMA's breach of fiduciary duty claim, and AHMA must prove that Reed had a fiduciary duty to AHMA to disclose and share the revenues in order to succeed. As relevant to this case, a fiduciary duty

5

arises "as a matter of law." *Crichton v. Golden Rule Ins. Co.*, 358 Ill. App. 3d 1137, 1149 (5th Dist. 2005); *Carroll v. Caldwell*, 12 Ill.2d 487, 496-97 (1958). Where, as here, "the evidence contains writings of the parties that distinctly indicate a relationship other than a partnership, the assertion that a partnership exists must be based on very clear and convincing evidence." *Seidmon v. Harris*, 172 Ill. App. 3d 352, 357 (1st Dist. 1988).

At trial AHMA did not present sufficient evidence for a reasonable jury to find that a fiduciary relationship existed based on any theory.

> **A.     AHMA cannot establish that a fiduciary duty existed as a matter of law due to a joint venture, because there is no evidence that the parties shared profits or intended to enter into such an arrangement.**

To establish a joint venture, the plaintiff must prove *all* of the following elements (1) AHMA and Reed had an express or implied agreement to carry on the hardware show; (2) AHMA and Reed manifested an intent to be associated as joint venturers; (3) AHMA and Reed had a joint interest, shown by the contribution by each of them of property, financial resources, effort, skill, and/or knowledge; (4) AHMA and Reed had some degree of joint proprietorship or mutual right to exercise control over the hardware show; and (5) AHMA and Reed jointly shared profits of the hardware show. Jury Instructions at 18. Here, the evidence is conclusive that the parties did not share profits, and there is no manifestation of intent by the parties to form a joint venture (in fact, the Show Agreement manifests a contrary intent).

> **1.     AHMA and Reed did not share profits from the National Hardware Show, as required for a joint venture or partnership.**

The rights and liabilities of members of a joint venture are tested by the same legal principles that govern partnerships, *Richton v. Farina*, 14 Ill. App. 3d 697, 703 (1973) (citing *Carroll*, 12 Ill.2d at 496-97). Profit sharing, and in particular net profit sharing, is an "essential" element for establishing a partnership or joint venture. *Rizzo v. Rizzo*, 3 Ill. 2d 291, 300 (1954);

*see also Petry v. Chicago Title and Trust Co.*, 51 Ill. App. 3d 1053, 1057 (1977) (joint venture did not exist because the record did not show a sharing of expenses or profits, despite that the parties shared *some costs*); *Stanley Gudyka Sales Co. v. Lacy Forest Prods. Co.*, 686 F. Supp. 1301, 1305 (N.D. Ill. 1988) (no partnership; sharing of "net margins" that excluded certain expenses was not tantamount to a sharing of profits); *Carroll*, 12 Ill.2d at 496-97; 805 ILCS 205/6.5 (the Uniform Partnership Act) ("[t]he sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived"). Moreover, Profits must be "shared" – an independent generation of individualized profits is not sufficient to satisfy the profit-*sharing* element. *Quadro Enters., Inc. v. Avery Dennison Corp.*, 2000 U.S. Dist. LEXIS 11568, at *20 (N.D. Ill. July 26, 2000). *See also Colorado Performance Corp. v. Mariposa Assocs.*, 754 P.2d 401, 405 (Colo. Ct. App. 1987) ( "chief characteristic of a joint adventure is a *joint* and not a *several* profit"). Simply put, the fortunes of joint venturers rise and fall together.

Here, the evidence established that Reed and AHMA overwhelmingly shared revenues, not profits. Reed's expert witness, Barry Epstein, testified in detail that Reed and AHMA had a revenue sharing relationship, not a profit sharing one, based on an accounting analysis of what Reed and AHMA actually shared for all years for which accounting records existed. (Tr. at 3019-30; 3046-57.) Epstein's accounting analysis, which was not materially contested at trial, established that over 98% of the revenue shared constituted revenue, not profits. (Tr. at 3058.) Further, Epstein testified based on his direct analysis of expenses from 1991 to 2003 (all years for which information was available) that 97.72 percent of all of Reed's direct expenses associated with the hardware show were absorbed solely by Reed. (Tr. 3060-61.) Epstein also showed how the one document AHMA relied up to suggest the parties were sharing profits actually proved the opposite. (Pl. Ex. 50; Tr. 3146-50.)

7

Because the evidence is conclusive that Reed and AHMA did not, in fact, share profits, the Court must find against AHMA as a matter of law as to the existence of a fiduciary duty based on a joint venture theory. AHMA's argument that it shared profits because it shared revenues with Reed and both parties incurred expense is a non-sequitur. The fact that each party had substantial separate expenses does not establish that they jointly shared profits. *See Quadro Enterprises, Inc. v. Avery Dennison Corp.*, 2000 WL 1029176, at *6 (N.D. Ill. July 26, 2000) (no joint venture existed where parties agreed to "individually determine[] and enjoy whatever profit and loss resulted from their own respective joint venture effort" because "such 'independent' generation of individual profits is insufficient to satisfy the profit-sharing element of a joint venture").

### 2. The plain language of the Show Agreement does not indicate that the parties had the necessary intent to form a joint venture.

Although the absence of profit sharing is dispositive, other essential joint venture elements are also missing. The nature of a joint venture relationship is a matter of intent and arises only where parties intend to associate themselves as a joint venture, "such intention being determined in accordance with the ordinary rules governing the interpretation and construction of contracts." *Carroll*, 12 Ill. 2d at 497. The status of a joint venturer arises wholly out of a contract. *Public Electric Constr. Co. v. Hi-Way Electric Co.*, 62 Ill. App. 3d 528, 531 (1st Dist. 1978). Because the relationship is a matter of intent, it is necessary that "both parties intend to enter into a joint venture and the intention of only one party to do so is insufficient." *Id.*

Where an express written contract unambiguously establishes the parties' relationship, a court can determine as a matter of law whether two parties intended to form a joint venture. *See Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc.,* No. 05-5488, 2005 U.S. Dist. LEXIS 29836, at *4-6 (N.D. Ill. 2005), *aff'd*, 471 F.3d 745 (7th Cir. 2006); *Hallmark*, 697 F. Supp. at

325. For example, in *Autotech*, the district court found that, because a contractual provision expressly disclaimed a necessary element of joint liability for all debts and obligations, a joint venture or partnership could not exist. The court granted defendants' Rule 52(c) motion, and the Seventh Circuit affirmed. *See also Southex Exhibitions, Inc. v. Rhode Island Builders Ass'n*, 279 F.3d 94, 99 (1st Cir. 2002) (Rhode Island law) (no partnership existed between a trade association and a show owner and producer, even though the written agreement indicated that net show profits were to be shared 55/45, the parties had joint bank accounts, and the written agreement set forth that the association participated in the trade shows as "sponsors and partners.").

Here, the 1977 Show Agreement specifically disclaims an agreement to create a joint venture. Most importantly, the Show Agreement clearly contemplated a sharing of gross revenues and not a sharing of profits. (Reed Ex.. 10 at ¶ 10.) Paragraph 10 unambiguously provides for Reed to collect *all* revenue, requires Reed to pay AHMA a percentage share of *gross revenue* from the sale or rental of space, requires Reed to pay *all* expenses, and entitles Reed to keep all remaining profits and to bear any resulting loss. (Reed Ex. 10, ¶ 10 (a)-(c) and (e).) It provides for limited revenue sharing related only to the sale or rental of space.

The Show Agreement also contains other provisions that establish that no joint venture was intended. For example, paragraph 14 specifically states that the National Hardware Show is the "business enterprise" of Reed. Paragraph 14 expressly provides a right of first refusal to AHMA if *Reed* determines to sell the Show at any time during the term of the Agreement. AHMA had no similar right to sell the show to a third-party. (Reed Ex. 10 at ¶ 10.) In addition, the Show Agreement contained a definitive commencement date and end date which could be extended only by written notice, and which was only extended by written notice. (Reed Ex. 10 at ¶ 2.) Further, paragraph 11(d) provides that following termination of the Agreement, Reed "shall

have the right to conduct the Show with no liability to [AHMA]." (Reed Ex. 10 at ¶ 11(d).) Moreover, these provisions in the 1977 Agreement never changed. The 1981 First Amendment and 1989 Second Amendment affirmed the original 1977 contract, as did the 1991 First Addendum. (Reed Ex. 10 at 1st Amend., 2nd Amend, and 1st Addendum.) The unambiguous terms of the Show Agreement which was in effect until 2003 establishes that the parties never intended to form a joint venture. AHMA offered no evidence that the parties ever changed to a profit-sharing relationship.

### 3. AHMA's contention that it owned or co-owned various show assets is insufficient to establish a joint venture or partnership.

Throughout the trial, AHMA has elicited testimony regarding its purported co-ownership of various Show assets. Co-ownership of assets, however, is insufficient to create a fiduciary duty. Rather, ownership of assets is only one of a number of factors in the joint venture/partnership analysis. Where other factors are absent, joint ownership does not create a joint venture – it is simply joint ownership and the parties' rights are solely contractual. *O'Brien v. Cacciatore*, 227 Ill. App. 3d 836, 845 (1st Dist. 1992) (no joint venture existed even though there was evidence of joint ownership and sharing of profits because parties did not intend to create joint venture); *see also Sajdak v. Sajdak*, 224 Ill. App. 3d 481, 488 (1st Dist. 1992); *Dunbar v. Olson*, 349 Ill. App. 308, 311-12 (4th Dist. 1953); *Pearson v. Hafnia Holdings, Inc.*, No. 90 C 991, 1991 U.S. Dist. LEXIS 1578, at *15 (N.D. Ill. Feb. 7, 1991) (Illinois law) ("Owning shares of a corporation, without more, is insufficient to show a joint venture."); *Davis v. Kurtz*, 165 Ill. App. 3d 417, 419 (3d Dist. 1988); Illinois Uniform Partnership Act, 805 ILCS 205/6(1): "Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not by itself establish a partnership, even if the co-owners share profits made by the use of the property."). Thus, AHMA has failed to establish a fiduciary

relationship. Regardless whether it co-owned any assets, its rights were limited to those in the 1977 Show Agreement, as amended. Under that Agreement, as this Court has held, Reed had no contractual obligation to disclose or share the Freeman commissions. Reed breached no duty to AHMA, and Reed is entitled to judgment on AHMA's fiduciary duty claim and its fraud claim based on fiduciary duty.

### III. AHMA HAS FAILED TO PRESENT SUFFICIENT EVIDENCE THAT IT WAS FRAUDULENTLY INDUCED, AND THUS THE RELEASE SHOULD BAR ALL PRE-RELEASE CLAIMS.

#### A. MacDonald's alleged promise not to violate paragraph 11(a) of the Show Agreement cannot form the basis of a fraudulent inducement claim.

AHMA's counsel has clarified that AHMA seeks rescission based solely on its contention that it was fraudulently induced by Dennis MacDonald's alleged oral promises. (Tr. at 3280.) AHMA argues, however, that based on MacDonald's promise not to violate paragraph 11(a) "if the jury concludes that any one of the three shows at issue do violate paragraph 11(a) of the Show Agreement or paragraph 20(a) of the Separation Agreement that that would constitute fraudulent inducement." (*Id.*) That argument fails for at least two independent reasons.

First, the alleged promise regarding paragraph 11(a) is a statement of opinion that cannot form the basis of a claim for fraudulent inducement. "[I]n 'an action for fraud, the alleged misrepresentation must be one of fact and not an expression of opinion.'" *Cain v. Osman*, 286 Fed. Appx. 934, 936-37 (7th Cir. 2008) (quoting *People ex rel. Peters v. Murphy-Knight*, 248 Ill. App. 3d 382, 387 (1st Dist. 1993)); *see also Weeks v. Samsung Heavy Indus.*, 126 F.3d 926, 939-40 (7th Cir. 1997); *Indemnified Capital Investments, SA. v. R.J. O'Brien & Assocs.*, 12 F.3d 1406, 1413 (7th Cir. 1993); *LaScola v. US Sprint Commc'ns*, 946 F.2d 559, 568 (7th Cir. 1991).

Whether a show is "primarily related to home improvement products" or "primarily related to the home improvement industry" is inherently subjective, as amply demonstrated by the divergent testimony at trial. For example, both Madge Douglas from the Chicago

Homebuilders and Richard Chace from the Security Institute testified that their shows, the Midwest Builders Show and the ISC/HAS were not home improvement shows. (Tr. at 910, 2957.) Mr. MacDonald agreed. (Tr. 1874, On the other hand, the Farrells and Mr. McClelland testified that the shows were primarily related to home improvement. One's opinions on this issue is not a topic that can be the subject of a fraud claim.

Second, there is no evidence that MacDonald knew that the alleged promise was false when it was made, as required by Illinois law. To prevail on its claim for fraudulent inducement, AHMA must establish by clear and convincing evidence that the alleged false statement was "known or believed to be false by the person making it." *Hoseman v. Weinschneider*, 322 F.3d 468, 476 (7th Cir. 2003). Here, AHMA presented no evidence that *Mr. MacDonald* believed that Reed's involvement with any of the shows violated paragraph 11(a) of the Show Agreement. To the contrary, the uncontested evidence is that Mr. MacDonald got his information regarding the Midwest Builders Show from Tom Fagan. (Tr. 1934-35.) Mr. Fagan identified the show as an "event focused on the builders/contractors market that Reed and the AHMA walked away from . . . ." (Reed Ex. 189.) There is no evidence that Mr. MacDonald disbelieved this disbelieved his later statements to William Farrell that Reed would abide by section 11(a) of the Show Agreement. (Tr. at 1938-39.) AHMA has not put forward evidence sufficient to contradict Mr. MacDonald's testimony regarding his knowledge. To the contrary, MacDonald's testimony is consistent with the information provided to him at the time. (Reed Ex. 189; Tr. at 1791-94, 1796-98, 1934-39.)

In addition to all of the foregoing, the Court should grant judgment as a matter of law against AHMA on its pre-release claims on the grounds set forth in Reed's previously filed Rule 50(a) motion. Now that the testimony is complete, it is even more evident that AHMA has failed to present sufficient evidence to carry its clear and convincing burden that:

- Reed intended to induce AHMA to enter into the Settlement Agreement.

- AHMA did or even could justifiably rely on the alleged promise.

- The alleged promise was material to AHMA's decision to enter into the Settlement Agreement.

- Reed's participation in the other shows was a breach of the Agreement.

(*See, e.g.*, Tr. at 2545-80.) In particular, there is no evidence, other than Ferrell's self-serving conclusory statement, that the alleged oral promises made a difference in the terms of the Settlement Agreement in any way that related to the release. To the contrary, the evidence is undisputed that a mutual, global release was part of the draft agreement long before the alleged oral promises were made. (*Compare* Reed Exs. 149, 155, 166, 183 and 188 *with* Reed Exs. 194 and 202.))

### IV. AHMA'S REMAINING POST-RELEASE CLAIMS FAIL AS A MATTER OF LAW BECAUSE AHMA HAS FAILED TO PRESENT ANY EVIDENCE THAT IT SUFFERED AN INJURY AS A RESULT OF REED'S ACTIONS.

AHMA's only remaining post-release claims are AHMA's claim that Reed allegedly breached the non-compete provisions of the Show Agreement and the Separation Agreement (Counts IV and XIII, respectively) and its claims for false advertising and unfair competition under the Lanham Act (Counts VII and VIII, respectively).[1] Each of these claims fails as a matter of law because AHMA has not and cannot present any evidence as to any injury or damages resulting from Reeds' alleged actions.

First, for AHMA's claims for Reed's alleged breaches of the non-compete provisions of the Show Agreement and the Separation Agreement to go to the jury, AHMA must prove that it was damaged as a result of Reed's breaches. It is undisputed that AHMA is not seeking damages

---

[1] AHMA's has withdrawn or voluntarily dismissed its post-release claims for fraud (Count I), breach of fiduciary duty (Count V), unjust enrichment (Count VI), common law unfair competition (Count IX), common law trademark infringement (Count X) and violation of the Illinois Consumer Fraud Act (Count II).

13

as a result of Reed's participation in the MBS, ISC or HAS shows. (Tr. at 2521-22.) Therefore, the Court should enter judgment against AHMA as a matter of law on its claims that Reed allegedly breached the non-compete provisions of the Show Agreement and Separation Agreement.

Second, for AHMA's claim for false advertising under the Lanham Act to go the jury, AHMA bears the burden of proving that "Reed's false advertising caused actual confusion among consumers and that AHMA sustained injury as a result." (J. Kennelly Jury Instruction on AHMA's Claims – damages (b).) AHMA has presented no evidence of actual confusion or injury to AHMA as a result of Reed's alleged false advertising. Tim Farrell testified that Distribution America, a distributor group within the home improvement industry, was "being promoted as being involved with Reed's 2004 show" and that Distribution America contacted Reed to "remove DA from any type of support of [Reed's] show." (Tr. at 2102-04.) Neither Mr. Farrell nor any other witness identified any injury to AHMA as a result of Reed's alleged advertisements concerning Distribution America. Therefore, the Court should enter judgment against AHMA as a matter of law on its claim for false advertising.

Third, for AHMA's claim for unfair competition under the Lanham Act to go to the jury, AHMA must show that it suffered injury as a result of Reed's alleged infringement. (J. Kennelly Jury Instruction on AHMA's Claims – damages (b).) Again, AHMA has not established any evidence that it suffered any injury as a result of Reed's alleged infringement. Therefore, the Court should enter judgment against AHMA as a matter of law on its claim for unfair competition.

## V. REED IS ENTITLED TO JUDGMENT ON PARTIAL FINDINGS ON THE AVAILABLILITY OF RESCISSION UNDER RULE 52(A).

Finally, for all of the reasons stated in Reed's previously filed Rule 52 motion, the Court should enter judgment against AHMA that rescission is not an available remedy as a matter of law.

## CONCLUSION

Based on all of the foregoing, Reed respectfully requests that the Court enter judgment as a matter of law against AHMA and grant all other relief proper in the circumstances.

Dated: February 10, 2011

Respectfully submitted,

**REED ELSEVIER INC.**

s/ Michael I Rothstein
One of Its Attorneys

Michael I Rothstein
Caesar A. Tabet
Christopher D. Liguori
Karina Zabicki DeHayes
Timothy A. Hudson
TABET DIVITO & ROTHSTEIN LLC
209 South LaSalle Street, 7th Floor
Chicago, IL 60604
Telephone: (312) 762-9450